*In the United States District Court*
*for the Northern District of Illinois*
*Eastern Division*

| | |
|---|---|
| Rasul Freelain, | |
| plaintiff, | **13-cv-3682** |
| – v – | Judge Durkin |
| | Magistrate Judge Martin |
| Village of Oak Park, an Illinois municipal corporation, and Sergeant Dina Vardal, in her individual capacity, | |
| | **Jury demanded** |
| defendants. | |

## Response to Motion to Dismiss First Amended Complaint

# Statement of Facts

<u>Mr. Freelain is harassed by Sergeant Vardal, complains, and becomes ill</u>

This case concerns alleged Family and Medical Leave Act violations, alleged Americans with Disabilities Act violations, alleged Illinois Gender Violence Act violations, and alleged assault and battery. [¶1][1]

Defendant Oak Park Police Department hired Mr. Freelain in 2002. [¶5] By 2007, defendant had promoted Mr. Freelain to detective in the Juvenile Investigations Division, where defendant Dina Vardal was a sergeant. [¶6] Sergeant Vardal outranked Mr. Freelain and began making romantic and/or sexual advances towards him. [¶¶6, 8]

Mr. Freelain rebuffed Sergeant Vardal's advances. [¶7] Immediately thereafter Sergeant Vardal began to retaliate against Mr. Freelain. [¶8] Sergeant Vardal's demeanor towards Mr. Freelain changed from being cordial to shunning him, and when Sergeant Vardal did communicate with Mr. Freelain, she was exceedingly rude. [¶8]

---

[1]     All citations in the Statement of Facts are to the First Amended Complaint (doc. #24).

Mr. Freelain tried to avoid Sergeant Vardal, but his shifts as a detective regularly overlapped with Sergeant Vardal's shifts. [¶9] Beginning with Mr. Freelain's rejection of Sergeant Vardal's advances in 2007, Sergeant Vardal regularly harassed and demeaned him by, among other things, treating him rudely, rejecting his arrest reports for inconsequential typographical errors and compelling him to correct and resubmit those reports, ridiculing him in front of fellow officers at the scene of a traffic stop, and criticizing him over open police radio. [¶¶8, 9]

In January 2012, Mr. Freelain's wife became seriously ill. Because Mr. Freelain needed more flexibility in his schedule to care for his wife, he voluntarily stepped down from his detective position and returned to patrol. [¶10] Mr. Freelain's returning to patrol had the side-effects of reducing his ability to avoid Sergeant Vardal and of giving Sergeant Vardal more opportunities to act as his immediate supervisor. [¶10]

In early April 2012 Mr. Freelain telephoned his commander's office, only to have Sergeant Vardal answer. [¶11] Sergeant Vardal intimated that she had just reviewed video of Mr. Freelain conducting a DUI field sobriety test and that he had made one or more mistakes. [¶11] Mr. Freelain responded that his skills were steadily improving since returning to patrol. [¶11] Sergeant Vardal then commented that Mr. Freelain had looked "cute" doing the exam, which made Mr. Freelain very uncomfortable. [¶11]

Later that month, Sergeant Vardal approached Mr. Freelain in defendant's parking facility. [¶12] Sergeant Vardal told Mr. Freelain that he needed to improve his DUI skills and offered to train him. [¶12] Mr. Freelain tried to deflect Sergeant Vardal's comment by replying that the entire department could benefit from supplemental training. [¶12] Undeterred, Sergeant Vardal stated her intention to provide

Mr. Freelain with "one-on-one training" on her "own personal time". [¶12] Mr. Freelain demurred and ended the interaction. [¶12]

On May 5, 2012, Sergeant Vardal called Mr. Freelain on his personal cell phone. [¶14] By that time, Mr. Freelain had lived with Sergeant Vardal's harassment for years and was unwilling to let it escalate further. [¶¶13, 14] A few days later, on May 9, 2012, Mr. Freelain orally complained to HR Director Frank Spataro followed by a written sexual-harassment complaint against Sergeant Vardal the next day. [¶14]

A little over a week later, on May 19, 2012, Mr. Freelain was working in uniform in conjunction with the Chicago police as added support for that weekend's NATO summit in Chicago. [¶15] While Mr. Freelain was helping the Chicago police investigate a suspicious vehicle at a CTA train station, he was startled to find himself being pushed backward. [¶15] Mr. Freelain turned to face the aggressor and discovered that it was Sergeant Vardal, who continued to push Mr. Freelain backwards until she had pinned him against his squad car. [¶16] Sergeant Vardal, inches from Mr. Freelain's face, then repeatedly told Mr. Freelain to "look out" before releasing him and walking away. [¶16] Mr. Freelain then spoke with his immediate supervisor, Sergeant Curtain, and explained that he had filed a sexual harassment complaint against Sergeant Vardal. [¶17] Sergeant Curtain advised Mr. Freelain to supplement his sexual-harassment complaint to include a battery complaint and offered to be a witness to the battery. [¶17]

Over the next several days Mr. Freelain began to feel sick, to feel anxious, and to experience headaches. [¶18] On May 21, 2012, Mr. Freelain reported the battery and his physical symptoms to HR Director Spataro and expressed his desire to file criminal charges against Sergeant Vardal. [¶18] HR Director Spataro assured Mr. Freelain that

the matter would be thoroughly examined by an independent investigator. [¶18] That same day Mr. Freelain met with Deputy Chief Anthony Ambrose, who indicated that he, along with another commander, would personally conduct the investigation. [¶19] Deputy Chief Ambrose also instructed Mr. Freelain not to file a criminal complaint against Sergeant Vardal until the investigation was complete. [¶19]

Mr. Freelain passed on a special DUI assignment the following Memorial Day weekend, because he knew Sergeant Vardal would be in charge. [¶20] Then, on June 1, 2012, to avoid losing any further wages, Mr. Freelain wrote HR Director Spataro, Police Chief Rick Tanksley, and defendant's Village Manager requesting that Sergeant Vardal be placed on administrative leave until the investigation was complete. [¶20]

That very day Chief Tanksley, Deputy Ambrose, and Commander Keenan Williams summoned Mr. Freelain to a meeting at which they told him in no uncertain terms that Sergeant Vardal would not be placed on administrative leave. [¶21] At that meeting, they also chastised Mr. Freelain for having requested union representation at the meeting. [¶21] Mr. Freelain left the meeting feeling dejected, believing that the investigation would go nowhere, and convinced that he would be retaliated against for having complained of Sergeant Vardal's harassment. [¶21]

Defendant Village's ADA and FMLA violations

Over the summer of 2012, the "investigation" of Sergeant Vardal continued, and Mr. Freelain's health deteriorated. [¶22] Mr. Freelain began seeing a psychologist to cope with his anxiety and stress, but his headaches became more severe. [¶22] By August 2012 Mr. Freelain's headaches and attendant fatigue were so bad he began to call in sick. [¶22] On or about August 21, 2012, having used several sick days, a supervisor

asked Mr. Freelain if his illness was work related, and Mr. Freelain replied that it was.
[¶23]  By late August 2012, Mr. Freelain was taking medicine for migraines.  [¶23]

In August or September 2012, Mr. Freelain applied for Family and Medical Leave
Act leave, which was approved on September 24, 2012. [¶24]   The actions of Sergeant
Vardal were the proximate cause of Mr. Freelain's need for leave.  [¶24]

On September 27, 2012, Mr. Freelain received a call from Commander Williams
ordering him to attend a meeting the following day with Chief Tanksley.  [¶25]  Upon
being informed that Mr. Freelain had a doctor's appointment that day, Commander
Williams instructed Mr. Freelain to reschedule the appointment on pain of discipline
and, possibly, termination.  [¶25]  At Mr. Freelain's rescheduled doctor appointment
that evening, Mr. Freelain was told he was being cleared to return to work.  [¶25]

At the September 28, 2012, meeting with Chief Tanksley and Deputy Ambrose,
Chief Tanksley told Mr. Freelain that his absences called into question Mr. Freelain's
fitness for duty.  [¶26]  Chief Tanksley ordered Mr. Freelain to complete a
fitness-for-duty evaluation and further stated that Mr. Freelain could not return to work
until the evaluation was complete.  [¶26]

On October 1, 2012, Mr. Freelain spoke to Sergeant Curtain, who stated that the
fitness evaluation would begin the following day and that Mr. Freelain would be listed as
"self sick" until the evaluation was completed.  [¶27][2]  Defendant never informed
Mr. Freelain that he could apply to be categorized "sick accident."  [¶30]

---

[2]     Defendant considers "self-sick" to be a non-work-related illness or injury, so an officer's
vacation and/or sick days are used for each "self-sick" absence.  [¶28]  Conversely, an officer
who is "sick accident" is considered to be on a work-related absence, meaning that officer is paid
rather than being docked vacation and/or sick days.  [¶29]

Mr. Freelain spent approximately eight hours at his fitness-for-duty evaluation on October 2, 2012, only to be informed the evaluation was incomplete and he needed to return next week. [¶31] Although the evaluation was completed the next week, Mr. Freelain remained off work "self sick" until November 15, 2012. [¶31] Mr. Freelain wrote many letters to HR Director Spataro and to the police union president. [¶32] Finally, on November 15, Mr. Freelain was told by defendant's doctor what his own doctors had already told him – he was fit for duty and cleared to return to work. [¶32]

Mr. Freelain's sick days were exhausted – in fact, they had run negative causing his pay to be docked. [¶33] Mr. Freelain, believing his illness was work related, sought to have his sick days reinstated and was still doing so in late December 2012, when his wife was diagnosed with cancer. [¶33]

When Mr. Freelain attempted to utilize FMLA time in early January 2013 to care for his wife post-surgery, defendant informed him that he had no FMLA leave available. [¶34] Finally, a portion of Mr. Freelain's sick days were returned, enabling Mr. Freelain to care for his wife from late January to early March 2013. [¶34] But because some of his absences were still deemed "self sick" Mr. Freelain ran out of FMLA leave just as his wife developed complications. [¶34] Mr. Freelain repeatedly contacted defendant seeking an extension of his FMLA leave, but his calls and e-mails were ignored. [¶35] Though his wife needed near-continuous care, Mr. Freelain returned to work on March 8, 2013. [¶35] Because defendant had categorized Mr. Freelain's days off as "self sick" and because defendant had ignored Mr. Freelain's requests for an extension, defendant would not give Mr. Freelain FMLA leave to care for his wife until late April 2013. [¶35]

Defendants continued to retaliate against Mr. Freelain to the present. [¶37]

# Argument

I.     **This Court has jurisdiction over Mr. Freelain's federal claims because the Supremacy Clause prevents state-law workers-comp exclusivity from vitiating federal claims, and both the FMLA and the ADA contemplate simultaneous state-law workers-comp claims.**

Defendant's argument that alleged state-law workers-comp exclusivity vitiates

Mr. Freelain's federal claims runs smack into the Supremacy Clause:

> "This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."

U.S. Const. Art. VI, cl. 2 (emphasis added). This point is so basic that it is literally

black-letter law in treatises. See, e.g., Illinois Jur., Workers' Compensation §3:24

(2004) ("The exclusivity provisions do not bar civil rights claims.") See also, EEOC

Enforcement Guidance: Workers' Compensation and the ADA:

> "Do exclusive remedy provisions in workers' compensation laws bar employees from pursuing ADA claims?
>
> No. The purpose of workers' compensation exclusivity clauses is to protect employers from being sued under common law theories of personal injury for occupational injury. Courts have generally held that the exclusive remedy provisions of state workers' compensation laws cannot bar claims arising under federal civil rights laws, even where a state workers' compensation law provides some relief for disability discrimination. Applying a state workers' compensation law's exclusivity provision to bar an individual's ADA claim would violate the Supremacy Clause of the U.S. Constitution and seriously diminish the civil rights protection Congress granted to persons with disabilities."

www.eeoc.gov/policy/docs/workcomp.html at "Exclusive Remedy Provisions". See also,

cases cited therein at n.32.

Further, both the FMLA and the ADA contemplate claims under those statutes co-existing with simultaneous state-law workers comp claims. That possibility is expressly noted and provided for in the FMLA regulations. See e.g., 29 C.F.R. 825.702(d)(2) ("An employee may be on a workers' compensation absence due to an on-the-job injury or illness which also qualifies as a serious health condition under FMLA. The workers' compensation absence and FMLA leave may run concurrently....") Similarly, the cases in which the ADA covers a state-law workers-comp injury are legion. Indeed, it is so basic that both federal law and state workers comp can cover the same medical condition that one federal judge called a defendant's position to the contrary "without merit". See, Jedlowski v. Charter Twp. of Genesee, 2007 WL 3408544 (E.D. Mich. Nov. 14, 2007), Ex. A to this Response, at *7 ("the Township's apparent position, that FMLA leave and the receipt of workers' compensation benefits are mutually exclusive, is without merit.") (emphasis added).

None of the cases defendants cited in support of workers-comp exclusivity supposedly barring Mr. Freelain's FMLA and ADA claims concerned federal claims; rather all the cases defendants cited on this point concerned state common-law claims, such as "negligent training and supervision", "negligent entrustment", and intentional infliction. See cases cited by defendants at p. 3 of Memorandum Supporting Motion to Dismiss (doc. #36). Defendants's cases are wildly off the mark.

Finally, defendants attempt to invoke workers comp exclusivity by ignoring much of what Mr. Freelain pled. Defendants assert that Mr. Freelain only pled the "self-sick"/"sick-accident" difference. But actually, Mr. Freelain's pled much more:

> "Defendant Village, by categorizing Mr. Freelain as 'self sick', requiring a fitness for duty evaluation, delaying the completion of the fitness for duty evaluation, delaying the results of the fitness for duty evaluation, refusing to reinstate Mr. Freelain, refusing to timely correct the categorization of Mr. Freelain's absences as 'sick accident', and refusing to communicate with Mr. Freelain regarding an FMLA extension, retaliated against Mr. Freelain for his exercise of his rights under the FMLA and interfered with Mr. Freelain's exercise of those rights."

See First Amended Complaint (doc. #24) at ¶¶ 45, 48. Defendants' argument thus relies on ignoring most of the facts that Mr. Freelain has pled.

In short, defendants' argument that Mr. Freelain's federal claims are barred by workers' comp exclusivity is contrary to the Constitution, contrary to the black-letter law, contrary to the FMLA and the ADA, and depends on ignoring most of what Mr. Freelain is claiming. Therefore, defendants' Motion to Dismiss should be denied.

## II.     Dismissal of Mr. Freelain's FMLA retaliation and interference claims is inappropriate because defendant forced Mr. Freelain to suffer through the retaliation and deprived him of FMLA benefits.

Mr. Freelain pled perfectly valid FMLA retaliation and interference claims. First of all, even if defendant Village eventually gave Mr. Freelain all the FMLA benefits to which he was legally entitled (which Mr. Freelain disputes), defendant Village forced Mr. Freelain to suffer through the retaliation, with all its attendant uncertainty and pain. As the Supreme Court held in Burlington N. & S. F. R. Co. v. White, 548 U.S. 53 (2006), even an employee who eventually receives pay and benefits to which he or she was legally entitled can pursue a retaliation claim because the employee "did not know during that time whether or when [he] could return to work....And [the employee] described to the jury the physical and emotional hardship that 37 days of having 'no income, no money' in fact caused." Id. at 72. In our case, although Mr. Freelain

-9-

continued working and earning money, he did not know whether or when he would be able to care for his wife, who had recently been diagnosed with cancer, had undergone cancer surgery, and was suffering through complications.

Even more important, however, and contrary to defendants' assertion, Mr. Freelain pled that he did not get his full FMLA benefits: he lost sick days, had his pay docked, and was unable to care for his wife as she was suffering through complications from cancer surgery and needed near-continual care. <u>Compare</u>, First Amended Complaint (doc. #24) at ¶¶ 34, 35 <u>to</u> defendants' Memorandum Supporting Motion to Dismiss (doc. #36) at p. 7, inaccurately asserting that Mr. Freelain "never pleads ... that he was denied FMLA benefits....".

In short, because defendant forced Mr. Freelain to suffer through the retaliation and deprived him of the full value of his FMLA benefits, Mr. Freelain has pled perfectly valid FMLA retaliation and interference claims, and defendants' Motion to Dismiss those claims should be denied.

**III.      Dismissal of Mr. Freelain's ADA discrimination claim is inappropriate because the ADA does not require a plaintiff to prove, much less to plead, a diagnosis, and Mr. Freelain pled more than sufficient facts supporting that he was disabled under the ADA.**

In our case, Mr. Freelain pled that he suffered from anxiety, suffered from stress, suffered severe headaches, suffered from attendant fatigue, was put on medicine for migraines, and had his doctor approve his request for FMLA leave. This is more than enough to plead a "disability" under the ADA. Many, many cases hold that, for purposes of the ADA, an impairment or a group of impairments does not require a formal diagnosis to be a "disability". <u>See</u> <u>e</u>.g., <u>Navarro v. Pfizer Corp.</u>, 261 F.3d 90, 97 (1st Cir.

2001) (source of impairment irrelevant); <u>Pacourek v. Inland Steel Co., Inc.</u>, 916 F. Supp. 797, 801 (N.D. Ill. 1996) (Alesia, J.) ("Moreover, it does not matter whether the infertility is explained or not. The ADA and regulations under it are simply devoid of any requirement that a physiological disorder or condition have a scientific name or known etiology."). <u>See also</u>, <u>E.E.O.C. v. Resources for Human Development, Inc.</u>, 827 F. Supp. 2d 688, 694 (E.D. La. 2011) ("Further, neither the EEOC nor the Fifth Circuit have ever required a disabled party to prove the underlying basis of their impairment. The EEOC Compliance Manual specifically provides that '[t]he cause of a condition has no effect on whether that condition is an impairment.'"); <u>Scarborough v. Natsios</u>, 190 F. Supp. 2d 5 at 37 (D.D.C. 2002) ("It is the impairment itself – and not the medical diagnosis of the condition – that determines whether a particular ailment is an impairment under the Act."); <u>U.S. v. City and County of Denver</u>, 49 F. Supp. 2d 1233, 1241 (D. Colo. 1999) ("Accordingly, whether a defendant knows that a physical impairment is considered a disability is of no consequence. It suffices if the defendant knows the physical impairment exists."); <u>Robertson v. Neuromedical Center</u>, 983 F. Supp. 669, 671 n.2 (M.D. La. 1997) ("The ADA does not require the employer to be aware of a 'diagnosis.' The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."); <u>Schmidt v. Safeway Inc.</u>, 864 F. Supp. 991, 997 (D. Or. 1994) ("The employer need only know the underlying facts [of a disabling condition], not the legal significance of those facts."); <u>Lawrence v. Metro-Dade Police Dept.</u>, 872 F. Supp. 950, 956 n.5 (S.D. Fla. 1993) ("[t]he cause of a disability is always irrelevant to the determination of disability").

Just as Mr. Freelain does not need to prove a diagnosis, so he does not need to plead one. Fowler v. UpMC Shadyside, 578 F. 3d 203, 209-212 (3d Cir. 2009). In Fowler, the Third Circuit held that a plaintiff who pled that she was injured at work, medically released to perform sedentary work, never contacted about jobs she applied for and other jobs, and "terminated because she was disabled" adequately pled a claim under the Rehabilitation Act.[3] In our case, as noted, Mr. Freelain pled that he suffered from anxiety, suffered from stress, suffered severe headaches, was put on medicine for migraines, and had his doctor approve his request for FMLA leave. Further, as the Third Circuit held in Fowler, the plaintiff "is not required, at this early pleading stage, to go into particulars about the life activity affected by her alleged disability or detail the nature of her substantial limitations." Id. at 213. In short, Mr. Freelain's First Amended Complaint compares favorably with the one the Third Circuit upheld in Fowler, and defendants' Motion to Dismiss Mr. Freelain's ADA claims should therefore be denied.

## IV. Dismissal is also inappropriate on Mr. Freelain's ADA retaliation claim, because that claim only requires Mr. Freelain to have had a good-faith belief that he was disabled.

Mr. Freelain's ADA retaliation claim only requires him to have had a good-faith belief that he was disabled. See Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 786 (3d Cir. 1998), Selenke v. Medical Imaging, 248 F. 3d 1249, 1264 (10th Cir. 2001). In our case, a reasonable jury could clearly find that Mr. Freelain had such a good-faith belief given his anxiety, stress, fatigue severe headaches, being on medicine for migraines, and having his doctor approve his request for FMLA leave. Because a

---

[3]     The standards for disability under the Rehabilitation Act are the same as under the ADA. See Fowler v. UpMC Shadyside, supra, 578 F. 3d at 208.

reasonable jury could thus find that Mr. Freelain had a good-faith belief that he was disabled, defendant's Motion to Dismiss this claim should be denied.

**V.     This Court has supplemental jurisdiction over the state-law claims because that "are so related that they form part of the same case or controversy".**

The requirement for supplemental jurisdiction over the state-law claims is only that they be "so related that they form part of the same case or controversy".  28 U.S.C. §1367(a).

In our case, the facts concerning the state-law claims are what led to Mr. Freelain's taking FMLA leave and suffering his ADA disability of anxiety, stress, fatigue, severe headaches, and migraines.  Those facts also provide at least part of Sergeant Vardal's and defendant Village's retaliatory animus against Mr. Freelain.  (See Pl.'s First Am. Cmplt. [doc. #24] at ¶ 38.)  The facts concerning the state-law claims are thus part of the same case or controversy, and this Court therefore has supplemental jurisdiction over the state-law claims.  Therefore, the Motion to Dismiss the state-law claims should be denied.

**VI.     The Motion to Dismiss Mr. Freelain's Gender Violence Act and assault-and-battery claims on grounds of alleged workers-comp exclusivity and statutory tort immunity should be denied because those claims are both civil-rights violations and intentional torts, neither of which are preempted.**

The Illinois Gender Violence Act defines "gender-related violence" as both a civil-rights violation and as an intentional tort, as follows:

§5.  Definition.

In this Act, "gender-related violence", which is a form of sex discrimination, means the following:

     (1)     One or more acts of violence or physical aggression <u>satisfying the</u> <u>elements of battery</u> under the laws of Illinois that are committed, at least in part, on the basis of a person's sex, whether or not those acts have resulted in criminal charges, prosecution, or conviction.

     (2)     A physical intrusion or physical invasion of a sexual nature under coercive conditions <u>satisfying the elements of battery</u> under the laws of Illinois, whether or not the act or acts resulted in criminal charges, prosecution, or conviction.

     (3)     A threat of an act described in item (1) or (2) causing a realistic apprehension that the originator of the threat will commit the act.

Illinois Gender Violence Act, §5, <u>codified at</u> 740 ILCS 82/5 (emphasis added).

Thus, by defining gender violence as "a form of sex discrimination" the Gender Violence Act makes gender violence a civil-rights violation, and, as noted above, civil-rights violations are not preempted by workers-comp exclusivity.

In addition, by defining gender violence as "satisfying the elements of battery", the Gender Violence Act makes gender violence an intentional tort, and intentional torts are not preempted by workers-comp exclusivity if the tort was authorized by the employer. <u>See</u> <u>Senesac v. Employer's Vocational Resources, Inc.</u>, 324 Ill. App. 3d 380, 392, 754 N.E.2d 363, 373 (1st Dist. 2001) ("plaintiffs' claims here, based on intentional tort, fall outside the scope of the [Workers' Compensation] Act...."), <u>Fredericks v.</u> <u>Liberty Mut. Ins. Co.</u>, 255 Ill. App. 3d 1029, 1031, 627 N.E.2d 782, 785, (5th Dist. 1994).

Judge Lefkow denied a similar argument to that being made by defendants here, ruling that because the plaintiff's "allegations do not foreclose the possibility that [her] injury was not accidental, her IGVA claim will not be dismissed." 3/22/2011 Order in <u>Cruz v. Primary Staffing</u>, #10 C 5653 (doc. #28), Ex. B to this Response, at p. 2.

Similarly, the Illinois Local Government Tort Immunity Act should not bar a

claim under the Gender Violence Act.  In a similar situation, the Illinois Supreme Court unanimously ruled that that Act did not immunize a unit of local government from a workers-comp retaliation claim, because it was the employer using its power, not the supervisor who actually fired the plaintiff, that caused the injury.  Smith v. Waukegan Park Dist., 231 Ill. 2d 111, 896 N.E.2d 232 (2008).  In our case, by analogy, the employer caused Mr. Freelain's injury by permitting Sergeant Vardal to commit gender violence and assault and battery by using her supervisory authority as Mr. Freelain's supervisor. Therefore, defendants' Motion to Dismiss Counts V and VI should be denied.

## Conclusion

For these reasons, the Motion to Dismiss should be denied.

Rasul Freelain, plaintiff,

By:  s/David L. Lee
One of his attorneys

**Proof of service**: David L. Lee, an attorney, certifies that this Response was served on defendants' attorneys by ECF on December 3, 2013.

/s/David L. Lee

David L. Lee, ARDC #1604422
LAW OFFICES OF DAVID L. LEE
53 W. Jackson Blvd., Suite 801
Chicago, IL  60604
312-347-4400
d-lee@davidleelaw.com

Matthew Robison, ARDC #6291925
ROBISON LAW, LLC
140 S. Dearborn St., Suite 404
Chicago, IL 60603
773-672-7400
matthew@brchicago.com

-15-