IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RASUL FREELAIN, <br><br> Plaintiff, <br><br> v. <br><br> VILLAGE OF OAK PARK, a municipal corporation, SERGEANT DINA VARDAL, in her individual capacity, <br><br> Defendants. | No. 13 C 3682 <br><br> Judge Manish S. Shah <br><br> Magistrate Judge Martin |

**THE VILLAGE OF OAK PARK'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON COUNTS I THROUGH IV OF THE SECOND AMENDED COMPLAINT**

Defendant, Village of Oak Park (the "Village"), by their attorneys, Stephen R. Miller, Nikoleta Lamprinakos and Rachel E. Lutner of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd, and for its Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment on Counts I, II, III and IV of the Complaint filed by Freelain state as follows:

**I.      DOCUMENTS**

The following pleadings and documents are referenced in this Rule 56.1 Statement of Undisputed Material Facts and attached as indicated:

1. The Second Amended Complaint ("Complaint") (Doc. 51);

2. The Answer and Affirmative Defenses to the Complaint ("Answer") (Doc. 70);

3. Excerpts from the transcript of the deposition of Rasul Freelain (Exhibit A);

4. Excerpts from the transcript of the deposition of Frank Spataro (Exhibit B);

5. Excerpts from the transcript of the deposition of Deputy Chief Ambrose (Exhibit C);

6. Freelain's narrative describing alleged sexual harassment by Sergeant Dina Vardal which was received by the Village on May 12, 2009 (Exhibit D);

7. Freelain's narrative describing the alleged battery by Sergeant Dina Vardal which was received by the Village of May 29, 2012 (Exhibit E);

8. The police report of the May 19, 2012 incident in which Sergeant Vardal pushed Freelain (Exhibit F);

9. Director Spataro's memorandum to Sergeant Vardal dated May 22, 2012, titled, "Notice of Sexual Harassment Complaint" (Exhibit G);

10. Director Spataro's September 28, 2012, "Report on Sexual Harassment Complaint and Battery" (Exhibit H);

11. Documentation of Freelain's contacts with the Office of the State's Attorney in which he pushed that office to charge Sergeant Vardal with felony battery (Exhibit I);

12. Sergeant Borcher's Memorandum to Deputy Chief Ambrose dated August 24, 2012, regarding Freelain (Exhibit J);

13. Documentation of Freelain's absences from June 1, 2012, to May 26, 2015 (Exhibit K);

14. The Medical Roll Policy governing Freelain's employment (Exhibit L);

15. Director Spataro's Memorandum to Freelain dated September 11, 2012, regarding his work status (Exhibit M);

16. Freelain's Memorandum to Director Spataro dated September 13, 2012 complaining of inaccurate documentation of his absences by the Village (Exhibit N);

17. The Certification of Health Care Provider form submitted by Freelain's doctor on his behalf to the Village of September 21, 2012 (Exhibit O);

18. Director Spataro's September 26, 2012, correspondence to Dr. Obolsky regarding his fitness-for-duty assessment of Freelain (Exhibit P);

19. Director Spataro's Memorandum to Freelain dated September 26, 2012, granting his request for FMLA leave (Exhibit Q);

20. Freelain's release to return to work issued by his doctor on September 28, 2012 (Exhibit R);

21. Chief Tanksley's Memorandum dated September 27, 2012 ordering Freelain to undergo a fitness for duty examination (Exhibit S);

22. Dr. Obolsky's November 13, 2012, correspondence to Director Spataro reporting the outcome of the fitness-for-duty assessment of Freelain (Exhibit T);

23. Documentation that Freelain's leave, between when the Village directed him to appear for a fitness-for-duty assessment and when he returned to work following that assessment, was categorized as paid administrative leave (Exhibit U);

24. Freelain's November 12, 2012 correspondence regarding the classification of his leave between September 28, 2012 and when he returned to work (Exhibit V), and

the Village's determination that all leave between September 28, 2012 and November 13, 2012 was paid administrative leave (Exhibit W);

25. Freelain's December 27, 2012, request for FMLA leave to care for his wife (Exhibit X);

26. Director Spataro's Memorandum dated January 20, 2013, granting Freelain's request for FMLA leave to care for his wife (Exhibit Y);

27. Director Spataro's April 26, 2013 Memorandum granting Freelain's request for intermittent FMLA leave to care for his wife (Exhibit Z);.

28. Documentation in May, 2013 regarding Freelain's request to change his short days ("Kelly days") for the balance of the year with two other officers (Exhibit AA);

29. Excerpts from the transcript of the deposition of Chief Richard Tanksley (Exhibit BB);

30. Excerpts from the transcript of the deposition of Sergeant Thomas Dransoff (Exhibit CC);and

31. Memorandum of Understanding between the Village and the Fraternal Order of Police Oak Park Lodge #8 regarding the assignment of "Kelly Days" (Exhibit DD).

## II.  UNDISPUTED MATERIAL FACTS

1. Freelain Rasul Freelain ("Freelain") is employed as a police officer for the Village of Oak Park ("Village"). Freelain has been employed by the Village since 2002. (Complaint ¶¶ 2, 5.)

### Venue and Jurisdiction

2. Venue is appropriate in this judicial district. (Complaint ¶¶ 46, 48; Answer ¶¶ 46, 48.)

3. This Court has jurisdiction over Freelain's claims which are brought pursuant to the *Family and Medical Leave Act of 1993*, 29 U.S.C. § 2617 and the *Americans with Disabilities Act of 1990*, as amended, 42 U.S.C. 12117(a). (Complaint ¶ 47; Answer ¶ 47.)

### Freelain's Sexual Harassment Complaint

4. On May 9 and May 12, 2012, Freelain reported to Frank Spataro, the Village's Human Resources Director, that he was sexually harassed by another Village employee, Sergeant Dina Vardal. (Complaint ¶ 14.) (Exhibit B, Spataro dep. pp. 105-109; Exhibit D.)

3

5. On May 22, 2012, Director Spataro notified Sergeant Vardal that Freelain had accused her of sexual harassment, the Village would investigate his complaint, she must limit her contact with Freelain to essential police matters, and all retaliation was prohibited. (Exhibit B, Spataro dep. pp. 111-112; Exhibit G.)

6. On May 29, 2012, Freelain reported to Director Spataro that on May 19, 2012 Sergeant Vardal placed her hands on his chest and shoved him while he was on duty. (Exhibit E.)

7. Freelain claimed that Sergeant Vardal's conduct constituted felony criminal battery, and Freelain filed a police report about the incident. (Exhibit F.)

8. The Village investigated Freelain's sexual harassment complaint. The investigation did not substantiate the complaint. On September 28, 2012, Director Spataro advised Freelain that his complaint had not been substantiated, and the Cook County State's Attorney's Office had decided not to file criminal charges for battery against Sergeant Vardal. (Exhibit B, Spataro dep. pp. 116-118, 123; Exhibit H.)

9. Freelain strongly disagreed with the decision of the Cook County State's Attorney's Office not to file criminal charges against Sergeant Vardal. On several occasions, Freelain communicated his dissatisfaction with this decision directly to the Assistant State's Attorney assigned to assess the matter. The State's Attorney's Office, Police Chief Rick Tanksley and Deputy Police Chief Anthony Ambrose viewed Freelain's conduct in doing so inappropriate and unusual. (Exhibit B, Spataro dep. pp. 119-121; Exhibit C, Ambrose dep. pp. 81-82, 138-140; Exhibit I.)

**Freelain's FMLA Leave of Absence Due to His Serious Health Condition**

10. In July 2012, Freelain began experiencing migraine headaches. (Complaint ¶¶ 22-25, 27-28.)

4

11. On August 21, 2012, Freelain advised the Village that he was sick and would not be able to work his scheduled shift. Freelain said that he could not work because of stress. (Exhibit J.)

12. On August 24, 2012, Freelain advised the Village that he was sick and would not be able to work his scheduled shift that night, as well as on August 25 and 26, 2012. Freelain said that he could not work because he was suffering from stress and migraine headaches which were caused by the continued presence of Sergeant Vardal at work. Freelain said that he did not feel safe at work because Sergeant Vardal had not been relieved of duty following his sexual harassment complaint against her. (Exhibit A, Pl. dep. pp. 177, 423; Exhibit C, Ambrose dep. p. 269; Exhibits J and K.)

13. By the end of Freelain's scheduled shift on August 25, 2012, Freelain had missed three consecutive scheduled shifts due to illness. As a result, on August 25, 2012, and pursuant to the Medical Roll policy that governed police officers' absences, the Village sent Freelain paperwork so that he could, if appropriate, request a leave pursuant to the federal Family and Medical Leave Act ("FMLA"). (Exhibit B, Spataro dep. pp. 19-21, 30-31, 33; Exhibits J, K and L.)

14. Freelain was absent because of his migraine headaches on August 29 and 30, 2012, and September 4, 7, 8 and 9, 2012. (Exhibits K and M.)

15. Freelain claims that his headaches were caused by the alleged sexual harassment by Sergeant Vardal. Freelain advised his immediate supervisor, Sergeant Thomas, that he (Freelain) wanted his absences classified as arising from a work-related injury. Aside from communicating this preference to one supervisor, Freelain never told anyone else that he wanted his absences classified as arising from a work related incident. (Exhibit A, Pl. dep. pp. 179-180, 183, 423.)

16. Freelain also never completed the Village's work injury form to report that he had been injured at work. (Exhibit A, Pl. dep. pp. 179-180, 182; Exhibit B, Spataro dep. p. 27; Exhibit C, Ambrose Dep. p. 122.)

17. Freelain never filed a worker's compensation claim asserting that his headaches were caused by an at-work incident. (Exhibit A, Pl. dep. pp. 186-187, 291-292; Exhibit B, Spataro dep. p. 27.)

18. Freelain never provided any information from a health care provider stating that his headaches were related to his concerns about Sergeant Vardal. (Exhibit A, Pl. dep. pp. 177, 183.)

19. The Village never classified Freelain's headache-related absences as arising from an accident or injury at work. (Exhibit A, Pl. dep. pp. 182-183.)

20. On September 11, 2012, Human Resources Director Spataro advised Freelain in a letter that, until he submitted a medical certification form as required to establish his need for FMLA leave, Freelain's absences were deemed "sick self" for purposes of payroll. Director Spataro's September 11, 2012, letter also told Freelain that the Village would require him to submit a note from his physician releasing him to return to work before he could return, and that the Village would require him to submit to a fitness-for-duty exam to ensure that he was fit to return to his job before he returned to work. (Exhibit A, Pl. dep. p. 25; Exhibit B, Spataro dep. pp. 35-36; Exhibit M.)

21. Freelain was absent from work due to his own illness on September 12 and 13, 2012. (Exhibit K.)

22. On September 13, 2012, Freelain sent an email to Director Spataro complaining that the Village failed to accurately count the amount of accrued sick time he used to cover his recent absences. (Exhibit N.)

23. Freelain was absent from work due to illness on September 17, 18 and 21, 2012. (Exhibit K.)

24. On September 21, 2012, Freelain's physician submitted, on Freelain's behalf, a completed FMLA "Certification of Health Care Provider" form stating that Freelain had been suffering from headaches since July 2012, he could not work when he had a headache, and he

6

required intermittent leave approximately twice a week for 2-3 hours at a time because of his headaches. (Exhibit B, Spataro dep. p. 56; Exhibit O.)

25. Freelain was absent from work due to illness on September 22, 2012. (Exhibit K.)

26. On September 26, 2012, Director Spataro granted Freelain's request for intermittent leave as described by his physician in the September 21, 2012 Certification of Health Care Provider form. Director Spataro advised Freelain that his FMLA-covered, headache-related absences would be designated "FMLA self-sick" for purposes of payroll. (Complaint ¶ 31; Exhibit A, Pl. dep. p. 25; Exhibit B, Spataro dep. p. 55; Exhibits O and P.)

27. On September 27, 2012, Police Chief Richard Tanksley ordered Freelain to undergo a fitness for duty examination (Exhibit S; Exhibit BB, Tankley dep. p. 78.)

28. On September 28, 2012, Freelain provided a letter from his personal treating physician releasing him to return to work. (Exhibit B, Spataro dep. p. 72-73, 78-79; Exhibit Q.)

### The Fitness-For-Duty Exam

29. Pursuant to the Village's September 11, 2012 letter, and in light of Freelain's communications that stress was making him physically sick with headaches, and his ongoing concerns about Sergeant Vardal and whether he was safe at work, which seemed out of proportion to the Village's understanding of the minor nature of the shoving incident and the purported sexual harassment, the Village decided to send Freelain for a psychiatric fitness for duty exam prior to returning to work. (Exhibit B, Spataro dep. pp. 35-43, 70-71, 79, 228-229; Exhibits M, R and S.)

30. Human Resources Director Spataro contacted Dr. Alexander Obolsky and engaged him to perform the fitness-for-duty exam. Director Spataro requested that Dr. Obolsky conduct a complete exam to ensure that Freelain, when he returned to his job, was fit to do so. (Exhibit B, Spataro dep. pp. 62-68, 79, 80-81, 82, 223; Exhibit C, Ambrose dep. pp. 124-125; Exhibits M, R and S.)

31. On September 27, 2012, the Village advised Freelain that he was being sent for a fitness-for-duty exam with Dr. Obolsky and the exam would occur on October 2, 2012, and if necessary to complete it, on October 9, 2012, as well. (Complaint ¶ 33; Exhibit S.)

32. Freelain appeared for the fitness-for-duty exam on October 2 and 9, 2012. On November 13, 2012, Dr. Obolsky advised Director Spataro that the exam had determined that Freelain was fit to return to his job as a police officer. (Complaint ¶¶ 38-39; Exhibit T.)

33. Between September 28, 2012, when Freelain's physician released him to return to work, and November 15, 2012, Freelain remained on paid administrative leave. (Exhibit U.)

34. During this time, the Village experienced some confusion with regard to how to properly classify Freelain's leave, which was initially categorized as a continuation of his sick leave. On November 12, 2012, Freelain told Director Spataro that he was concerned about his leave balances and believed his leave should be classified as paid administrative leave. (Exhibit B, Spataro dep. p. 90; Exhibit V.)

35. After looking into the matter, the Village agreed with Freelain. (Exhibit A, Pl. dep. p. 46; Exhibit B, Spataro dep. pp. 89-95; Exhibit W.)

36. On November 13, 2012, the Village received the fitness for duty report. (Exhibit T.)

37. On November 16, 2012, Freelain returned to work. (Exhibit B, Spataro dep. pp. 82-83; Exhibit V.)

38. On January 9, 2013, the Village changed the classification of Freelain's absences between September 28, 2012, and November 15, 2012, to paid administrative leave. This change made Freelain whole by restoring his vacation and sick leave balances to what they were before his administrative leave. (Exhibit A, Pl. dep. p. 46; Exhibit B, Spataro dep. pp. 93-94; Exhibit W.)

**Freelain's Subsequent FMLA Leaves of Absence**

39. On December 27, 2012, Freelain requested an FMLA leave of absence to care for his wife who had been diagnosed with breast cancer. (Exhibit X.)

8

40. Freelain provided a completed Certification of Health Care Provider form to the Village on January 17, 2013, to support his request for FMLA leave. (Exhibit Y.)

41. On January 20, 2013, the Village granted Freelain's request for FMLA leave. (Exhibit A, Pl. dep. p. 26; Exhibit Y.)

42. On April 26, 2013, the Village granted Freelain's updated request for FMLA leave to continue to care for his wife. The Village granted Freelain's request for FMLA leave on the same day he made it. (Exhibit A, Pl. dep. p. 384; Exhibit Z.)

43. The Village approved every one of Freelain's requests for FMLA leave. (Exhibit A, Pl. dep. pp. 30-31, 192.)

### Freelain's allegations of FMLA interference and retaliation, and disability discrimination and retaliation

44. Freelain identifies a myriad of actions as part of a pattern of alleged FMLA interference and retaliation, and disability-based discrimination and retaliation.

45. Freelain contends that the Village failed to timely respond to his FMLA-related communications. (Exhibit A, Pl. dep. p. 227-229.)

46. Freelain asserts that, at various times in 2012 and 2013, the Village inaccurately calculated his leave balances. (Exhibit A, Pl. dep. pp. 244, 337.)

47. Freelain claims that the Village did not classify his absences in the manner he believed was most appropriate, including refusing to classify his headache-related absences as arising from an injury at work. (Exhibit A, Pl. dep. pp. 192, 230, 260-261, 395.)

48. Freelain contends that the Village demanded that he provide certain information about each absence, including the reason he was absent, and investigated his absences taken pursuant to intermittent FMLA leave. (Exhibit A, Pl. dep. pp. 33-41, 254-258, 519.)

49. Freelain asserts that his supervisors employed tones of voice and unfriendly demeanors to retaliate against Freelain for taking FMLA leave. (Exhibit A, Pl. dep. pp. 169-170, 195-198, 250-251, 447.)

50. Freelain claims that some comments in his evaluations constituted unlawful retaliation. (Exhibit A, Pl. dep. pp. 268-269, 273, 341, 388-391.)

51. Freelain contends that the Village did not prosecute Sergeant Vardal for battery. (Exhibit A, Pl. dep. pp. 262-264.)

52. Freelain contends that the Village required him to comply with all attendance-related procedures in the Medical Roll. (Exhibit A, Pl. dep. pp. 33-37, 345, 519.)

53. Freelain contends that he was threatened with discipline. (Exhibit A, Pl. dep. p. 227.)

54. Freelain contends that he was sent for the fitness-for-duty exam as FMLA-based retaliation. Freelain acknowledges, however, that the Village had a right to send him for a fitness-for-duty exam. (Exhibit A, Pl. dep. pp. 164-65, 167, 249-251, 267, 343-344.)

55. Freelain contends that his request on May 16, 2013, to switch to a short-day shift was denied. (Exhibit A, Pl. dep. p. 197; Exhibit AA).

**The Village's Response to Freelain's Allegations of Discrimination and Retaliation**

56. Other than the fact that the above events followed Freelain's request for, and grant of, FMLA leave for his headaches, Freelain has no evidence linking his use of FMLA leave to any of the myriad of incidents he construes as FMLA retaliation. (Exhibit A, Pl. dep. pp. 162-67, 226, 230, 235, 238, 240, 254-56, 262-64, 284-285.)

57. Freelain was not demoted or disciplined, and suffered no lost wages. (Exhibit A, Pl. dep. pp. 329, 340.)

58. Freelain received several "plum," prestigious assignments from Chief Tanksley, including serving as a school resource officer and juvenile detective. (Exhibit CC, Dransoff dep. pp. 120-122.)

59. The Village had legitimate business reasons for each and every act which Freelain contends constituted unlawful discrimination and/or retaliation, including the denial of Freelain's request to trade his short-day shift with other officers, which Freelain cannot rebut. (Exhibit A, Pl.

10

dep. pp. 200-201; Exhibit B, Spataro dep. pp. 19-21, 27, 34-36, 56, 62-68, 70-71; Exhibit C, Ambrose dep. p. 54-57, 74-82, 122, 229-231, 235, 240, 264-265, 271-275, 333-339.)

60. Freelain submitted a complex request to Commander Williams to switch his "short days" or "Kelly days" with two other officers for the last seven months of 2013 to care for his ailing wife. (Exhibit AA, p.5.)

61. Sergeant Dransoff had never seen a proposal as complex, and he had worked in the Police Department for sixteen years. (Exhibit CC, Dransoff dep. pp. 5, 112, 113.)

62. "Kelly days" are chosen by seniority pursuant to a Memorandum of Understanding between the Village and the patrol union. (Exhibit CC, Dransoff dep. pp. 102-108, Exhibit DD.)

63. Commander Williams denied Freelain's request because it would have involved, among other things, making several dozen adjustments to Police Department schedules, as well requiring payroll adjustments for each of the three officers affected by the proposal. (Exhibit CC, Dransoff dep. pp. 102, 108-111, 116-117; Exhibit AA, pp. 1-2.)

64. These adjustments would have been necessary because the proposed shift scheduling and payroll did not coincide. (Exhibit CC, Dransoff dep. pp. 109-111.)

65. After his request was denied, Freelain appealed to Chief Tanksley, who asked Commander Williams to explain the reasons he had denied the request, so that Chief Tanksley could explain it to Freelain. (Exhibit AA, pp. 3 and 2a.)

66. Commander Williams also asked Sergeant Dransoff, who was the steward for the sergeants' union and an accountant, to review of the mechanics of Freelain's request. (Exhibit BB, Tanksley dep. p. 244; Exhibit CC, Dransoff dep pp. 6-7,101-102.)

67. Sergeant Dransoff's analysis determined that Freelain's request did not address five significant repercussions arising from the proposed addition and subtraction of days and hours to the time records of three police officers over a seven month period. (Exhibit CC, Dransoff dep. p. 102; Exhibit AA, p. 1a.)

68. Chief Tanksley also determined that granting Freelain's request would create a precedent and practice that deviated from the Memorandum of Understanding between the Police Department and the police officers' union for assigning Kelly days, and any decision to accept Freelain's proposal could be used by another group of officers as a basis for a future demand that the Police Department deviate from the Memorandum of Understanding. (Exhibit BB, Tanksley dep. pp. 243-245; Exhibit CC, Dransoff dep. p. 120; Exhibit DD).

69. Sergent Dransoff concurred in the conclusion that any decision by the Police Department to grant Freelain's proposal to change his Kelly days would create a past practice that could be used by other officers to demand similar schedule changes, the denial of which could result in a union grievance if a future similar request was denied. (Exhibit CC, Dransoff dep. p. 119).

70. Freelain was paid for all of the time that he spent on FMLA leave. (Exhibit A, Pl. dep. pp. 194, 323-24, 326; Exhibit B, Spataro dep. pp. 102-103.)

71. The Village required that Freelain provide sufficient information about each absence to enable the Village to assess whether the reason for the absence, its frequency and duration were consistent with the Certification of Health Care Provider form completed by Freelain's physician. The Village also required Freelain to comply with the procedures in the Medical Roll, including providing advance notice of leave when possible. (Exhibit C, Ambrose dep. pp. 54-55, 57, 283, 333-337.)

72. Freelain's physician stated on his Certification of Healthcare Provider form that Freelain's headaches were anticipated to occur twice a week and last 2-3 hours. Freelain, however, took FMLA leave for his headaches more often than twice a week. Rather than take 2-3 hours of leave for his headaches, Freelain took entire days off on August 21, 24, 25, 26, 29 and 30, 2012, and September 3, 4, 7, 8, 9, 12, 13, 17, 18, 21, 22, 23, 26 and 27, 2012. (Exhibits K and O.)

73. Between the first day of his FMLA leave on August 21, 2012, and September 28, 2012, when his administrative leave began, Freelain never asked the Village to return him to work with an accommodation for his headache-related illness. Freelain also never asked the Village to return him to a "light duty" position. (Exhibit A, Pl. dep. pp. 327-328, 533; Exhibit B, Spataro dep. p. 72)

74. The Village makes reasonable accomodations for persons with disabilities who request an accommodation. (Exhibit B, Spataro dep. p. 73.)

75. The ADA accommodation process begins with an employee requesting an accommodation in the workplace. (Exhibit B, Spataro dep. pp. 74-75.)

76. Freelain never asked to engage in the interactive process. (Exhibit B, Spataro dep. p. 76.)

77. Freelain never submitted a written request for an accommodation. (Exhibit B, Spataro dep. p. 76.)

78. Freelain never filed a grievance for any of his complaints. (Exhibit A, Pl. dep. pp. 346-347.)

79. Freelain's evaluations always rated him very highly and his evaluation scores went up following his use of FMLA leave. (Exhibit A, Pl. dep. pp. 345, 354-359.)

WHEREFORE, Village of Oak Park respectfully requests that this honorable Court grant its Motion for Summary Judgment on the Complaint and such other and further relief as is just and appropriate.

          Respectfully submitted,

          Village of Oak Park

    By:  /s/ Rachel E. Lutner
          One of its Attorneys

Stephen R. Miller (6182908)
Rachel E. Lutner (6225505)
ROBBINS, SCHWARTZ, NICHOLAS,
  LIFTON & TAYLOR, LTD.
55 West Monroe, Suite 800
Chicago, Illinois 60603-5144
Telephone (312) 332-7760
fgarrett@robbins-schwartz.com
rlutner@robbins-schwartz.com

510492v1

**CERTIFICATE OF SERVICE BY ELECTRONIC MAILING**

      I hereby certify that I electronically filed the foregoing Defendant's Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment on the Complaint with the Clerk of the Court using the CM/ECF system on this 2nd day of October, 2015, which constitutes service on all counsel of record, registered filing users, pursuant to Fed. R. Civ. P. 5(b)(2)(D) and L.R. 5.9:

                                              /s/ Rachel E. Lutner
                                              Rachel E. Lutner