# Exhibit A

               IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION

RASUL FREELAIN,            )
                           )
           Plaintiff,      )
                           )
      vs.                  )   No. 13 C 3682
                           )
VILLAGE OF OAK PARK, a     )
municipal corporation,     )
SERGEANT DINA VARDAL, in   )
her individual capacity,   )
                           )
           Defendants.     )


        The deposition of RASUL FREELAIN,

called by the Defendant for examination,

pursuant to notice and pursuant to the Federal

Rules of Civil Procedure for the United States

District Courts pertaining to the taking of

depositions, taken before Susan M. Reed,

Certified Shorthand Reporter for the State of

Illinois, at 55 West Monroe Street, Suite 800,

Chicago, Illinois, at 11:00 o'clock A.M., on the

2nd day of June, A.D., 2015.

Page 25

1       MR. ROBERTSON:  Look at the whole

2 document.

3 BY THE WITNESS:

4    A.   Sure.  This appears to be a photocopy

5 of my FMLA paperwork from Dr. Thakur that was

6 completed at the time of my illness.

7    Q.   Is that the document from your doctor

8 which was filled out and sent to Frank Spataro

9 describing your medical condition that you took

10 off starting I think it was August 21 of 2012?

11    A.   Yes, this appears to be that document.

12    Q.   And was this, in effect, an application

13 for FMLA leave?

14    A.   Yes.

15    Q.   And if you look at 43, the next

16 exhibit, what is that document?

17    A.   This is a memo from Frank Spataro to

18 me, reference the FMLA paperwork.

19    Q.   Did Frank Spataro, Human Resources

20 Director, approve your FMLA leave that was

21 referenced in Exhibit 42?

22    A.   Yes.

23    Q.   Did you apply for FMLA leave again in

24 2013?

Page 26

1    A.    Yes.

2    Q.    And I think if you look at Exhibit 44,

3 you'll see another request for FMLA leave, and

4 that was -- is that true?

5    A.    Yes.

6    Q.    Is that what 44 is?

7    A.    Yes, it is.

8    Q.    And was that for FMLA leave for the

9 care of your wife?

10   A.    Yes.

11   Q.    And if you look at the first page of

12 Exhibit 44, did Mr. Spataro and the Village of

13 Oak Park approve that FMLA leave?

14   A.    Yes.

15   Q.    And was that an FMLA -- was that an

16 extension of the FMLA leave?

17   A.    No.

18   Q.    That was just another request for FMLA

19 leave?

20   A.    That's correct.

21   Q.    Okay.  And did you also apply for an

22 extension of FMLA leave?

23   A.    Yes.

24   Q.    Was that also granted?

1 time had been incorrectly changed; and he

2 responded that he would look into it; and I

3 believe the next day or shortly -- a day or two

4 after I got a response that says, yes, you're

5 right, the time shouldn't have been changed.

6 It's been reverted to the correct categorization

7 according to human resources or what have you.

8 So at some point it was ultimately rectified

9 according to what Deputy Chief Ambrose said.

10     Q.   Okay.   Maybe I misunderstood the

11 beginning of the whole discussion.   I had asked

12 you if there was any FMLA time that you had

13 asked for that was denied, and is the story you

14 just told me about a situation in which the FMLA

15 request was initially denied but then reversed

16 and accepted?

17     A.   Yes, it was denied.   That was your

18 question, and that's the answer.   It was denied.

19     Q.   Fair enough.   So the situation you just

20 told me about was ultimately approved?

21     A.   Yes, ultimately.

22     Q.   Okay.   So getting back to your illness

23 and your wife's illness and your request for

24 FMLA leave, were any of those requests ever

1 denied and never approved?

2    A.    Not to my knowledge.

3    Q.    Okay.  Now, you indicated in your

4 complaint that you were retaliated against by

5 the Village for making your FMLA claims; is that

6 correct?

7    A.    Yes.

8    Q.    Let's go down the list, and I want to

9 ask you specific people.  Did Frank Spataro ever

10 make any comments about being unhappy with or

11 dissatisfied with or angry about the fact that

12 you had made an FMLA claim?

13    A.    Any comments, not that I recall.

14    Q.    Anything in writing?

15    A.    No, not that I recall.

16    Q.    How about Deputy Chief Ambrose?

17    A.    In writing, no.

18    Q.    How about orally?

19    A.    Through supervisors, yes.

20    Q.    What supervisors?

21    A.    One example would be Sergeant Anthony

22 Thomas.

23    Q.    Let's go back to Ambrose himself.  Did

24 Deputy Chief Ambrose ever make any comments to

Page 33

1 Tanksley expressing displeasure with the fact

2 that you were taking FMLA time?

3    A.    Yes.

4    Q.    Tell me what Mr. Thomas, Officer Thomas

5 says he heard Ambrose say?  First of all, when

6 did this conversation with Thomas take place?

7    A.    There were -- and can I go back to one

8 thing to qualify what we said?

9    Q.    Yes, of course.

10    A.    There also were instances where

11 Sergeant Thomas referenced the chief as

12 well-being unhappy with me, and I believe part

13 of it was because of the FMLA time.

14    Q.    Well, as opposed to what you believe, I

15 want you to be very careful.  I want to know

16 things Anthony Thomas said to you, not what you

17 think he meant.  Fair enough?

18    A.    That's fair.

19    Q.    What did Thomas say that Ambrose

20 supposedly said about your FMLA leave?

21    A.    In January of 2013, Thomas makes the

22 first comment regarding he's been told by Deputy

23 Chief Ambrose to begin a preliminary

24 investigation as to why I'm using small

Page 34

1 increments of time.  I think at that point human

2 resources had already been contacted, had

3 already authorized the time; and my response was

4 I was taking my wife to the doctor.  We're

5 preparing for surgery.

6     Q.    Okay.

7     A.    So that was the first time where he

8 said he wants me to investigate you for why

9 you're using time to -- taking time off like

10 this.

11     Q.    Okay.  Is that the sum total of what

12 Thomas told you that Ambrose said, that he wants

13 you to look into or investigate why you were

14 taking certain increments of time?

15     A.    He said he wants me to investigate you,

16 like not look into the matter, he says --

17     Q.    Sure.

18     A.    -- that I'm going to be the subject of

19 investigation regarding my use of time.

20     Q.    Okay.  Did Thomas say anything else to

21 you about what Ambrose supposedly said to him?

22     A.    That was the first instance.

23     Q.    Okay.  When was the next incident where

24 Thomas said something -- said to you something

1 that Ambrose supposedly said to him?

2    A.    The next one would have been -- most --

3 much of these were or most of these happened in

4 the time period where my wife was having or

5 subsequent after my wife's first surgery.

6    Q.    Give me a time frame.

7    A.    Maybe we're talking -- I was off from

8 January to March.  So maybe after my return in

9 March.  So March, April, somewhere that early --

10 late winter, early spring of 2013.

11   Q.    Were you off for two -- for three

12 months in the early 2013?

13   A.    For FMLA, for my wife's surgery and

14 preliminary treatment.

15   Q.    Sure.

16   A.    Yes, it was a period of time that I was

17 off.

18   Q.    And it was about that chunk of time

19 that Thomas was referring to, correct me if I'm

20 wrong, where he said Ambrose wanted him to

21 investigate that time you were taking off?

22   A.    In the first instance?

23   Q.    Yes.

24   A.    No.

Page 36

1    Q.    Okay.

2    A.    The first instance was prior to taking

3 off using vacation time and other time to care

4 for my wife in preparation for the surgery.

5 There were small amounts of time that I was

6 taking off, 15 minutes, 30 minutes maybe at the

7 beginning of work prior to get her to the

8 doctor's office, pick up prescriptions,

9 preparation for the surgery --

10    Q.    Sure.

11    A.    -- that was coming; and it was that

12 time, that small amount of time; and I did

13 address that in writing.

14    Q.    So those -- the incidents in which

15 Thomas said that Ambrose wanted him to look into

16 it were, what, maybe in December of 2012?

17    A.    January of 2013.  That was the first

18 time Thomas says that, and he's referring to

19 time I used in January of 2013.

20    Q.    Got it.  Okay.  Then when was the next

21 conversation you had with Thomas in which he

22 said that Ambrose expressed some -- something

23 about your FMLA leave?

24    A.    I believe upon returning to work, I

Page 37

1 returned to work at the end of March.  During

2 that time period there -- I was seeking an

3 extension of FMLA time from the human resources

4 department and from the department -- you know,

5 from the Village; and somewhere during that time

6 period Thomas, again, informed me that Ambrose

7 is questioning why I'm using this time and that

8 he should begin investigating me and why I need

9 this time, why I'm using this time, why I'm

10 taking this time off.

11     Q.    Sure.

12     A.    So those are two that I recall.

13     Q.    Did Thomas say anything else to you

14 about what Ambrose said to him other than what

15 you just said, which is I want you to

16 investigate why you're taking this time?

17     A.    Those are two examples that I recall.

18     Q.    Sure.  Did he make any editorial

19 comments, did Ambrose make any editorial

20 comments to Thomas about how Ambrose felt about

21 that that were conveyed to you?

22          MR. ROBERTSON:  Objection.  Form.  Go

23 ahead.

24

Page 38

1  BY THE WITNESS:

2      A.    Thomas, because you said he, so Thomas

3  made comments regarding his thought on what

4  Ambrose said, which was that he didn't

5  understand it because he knew I had turned in

6  all the documentation that would be required to

7  take time off.

8      Q.    Different question.

9      A.    Okay.

10     Q.    I'm not really that interested in what

11 Thomas believed Ambrose was thinking.  I want to

12 know what Thomas told you about statements

13 Ambrose made to him, if there are any.  Are

14 there any?

15     A.    Not that I recall at this time.

16     Q.    Okay.  Thank you.

17          MR. ROBERTSON:  That were conveyed to

18 him?

19 BY MR. MILLER:

20     Q.    That were conveyed to you.

21     A.    Directly about what Deputy Chief

22 Ambrose said or felt or what have you?

23     Q.    Yes.

24     A.    Not that I recall.

Page 39

1    Q.    Were there thoughts that Ambrose

2 supposedly felt about this leave that were

3 conveyed to other officers besides Thomas that

4 you're aware of?

5    A.    I'm not sure.

6    Q.    Do you know of any as you sit here

7 today?

8    A.    Not that I recall right now.

9    Q.    So now is that all the conversations

10 that you had with Thomas in which he expressed

11 the thoughts of Ambrose about your FMLA leave or

12 are there more?

13    A.    Those are two that I recall at this

14 time.  I get the impression that Thomas

15 addressed this with me on several occasions.

16 Those are two that right now that I can

17 remember.

18    Q.    Now, tell me what -- when did you speak

19 to Phyllis Ballard about --

20    A.    Will Ballard, William Ballard.

21    Q.    I'm sorry.

22    A.    It's Phyllis Howard is the retired

23 commander.

24    Q.    Phyllis Howard.  William Ballard.  My

Page 40

1 apologies.  So it's William Ballard, and you're

2 saying that William Ballard told you some things

3 that Tanksley had supposedly said to him about

4 your FMLA leave; is that correct?

5     A.    Yes, that's correct.

6     Q.    When did this conversation or

7 conversations with Mr. Ballard occur?

8     A.    In, I believe it was approximately

9 March 2014, somewhere in that time period.  I

10 don't recall the exact date, but it was

11 following my wife's third surgery.  I called to

12 request the day off.  My wife had had surgery

13 the prior day and didn't feel well after the

14 surgery.  I spoke to Sergeant Ballard who I

15 believe was the acting watch commander on that

16 day.  He answered the phone.  I asked for the

17 time off; and he began to berate me, yell at me

18 about the chief is sick of this, sick of you

19 using this FMLA time like this.  You need to get

20 your stuff straight.  I explained to him, sir,

21 I've already straightened this out with the

22 Village.  I'm authorized to use FMLA vacation

23 time as I need to care for my family.

24                 So he then went on to deny the

1 one-hour comp time that he had approved before

2 because I said since you've approved comp time

3 weeks ago for today as a coincidence, may I

4 still use the one-hour comp time plus seven

5 hours of FMLA vacation.  He said, no, I'm not

6 letting you mix time like that.  You got to

7 pick.  So I said, well, I guess I have to use

8 eight hours of FMLA vacation, and then he hung

9 up.

10     Q.    This was Ballard?

11     A.    This is Ballard.

12     Q.    And you took the eight hours of FMLA

13 vacation?

14     A.    I believe so, yes.

15     Q.    Was it booked as FMLA vacation?

16     A.    To my knowledge.

17     Q.    And --

18     A.    I don't know certainly, but I believe

19 so.

20     Q.    Do you know if Chief Tanksley ordered

21 your time that you just described to be treated

22 as FMLA vacation time?

23     A.    I don't know who ordered that.

24     Q.    Do you know who made the decision?

Page 42

1    A.    No.

2    Q.    Were you paid?

3    A.    Yes, I believe so.

4    Q.    Have there been any instances since

5 August 21, 2012, when you took your first

6 personal illness time off that you have not been

7 paid?

8    A.    Yes.

9    Q.    When was that?

10    A.    During the fall of 2012 during the

11 fitness-for-duty evaluation.  There was a day

12 that I was ordered to attend a meeting with

13 Dr. Obolsky.  On one of those days, because

14 there were several of those days; but on one of

15 those days I was not paid for my work that I

16 did, which was attending those meetings and

17 interviews and what have you; and I brought that

18 to Deputy Chief Ambrose's attention in maybe --

19 in an email that may have been December 2012.

20 He told me he would look into it and address it,

21 and he never followed up with me.

22    Q.    Well, if you would look at page 2 of

23 Exhibit 1.

24    A.    Is that with the designation 281 at the

Page 46

1 I had been cleared for fitness for duty and

2 returned to work in November, and then I sent

3 him a communication.  It might have been in

4 December, end of November.  He told me he would

5 look into it.

6            So is there a question -- is there

7 a case of where retroactively they later went

8 back and added pay on a different date?  I would

9 say I don't know.  Was I paid on -- when this

10 pay was due?  I was not.  There was -- again,

11 I've got an email that, a document that he said

12 he would follow up.  So I don't believe for one

13 of these days, was it the 2nd or the 9th or the

14 7th, I couldn't tell you 100 percent; but I know

15 at the time that that pay was due, the pay was

16 not on the check.  I didn't get it.  So

17 regardless of what it says here in this book

18 unless they went back and retroactively

19 corrected the numbers.

20     Q.    Are you done?

21     A.    Answering your question?

22     Q.    Yes.

23     A.    Yes.

24     Q.    Okay.  I've let you go on, and I

Page 62

1 simply -- what she shared with me was that they

2 began -- the administration began to try to

3 document things that weren't true, make false

4 allegations against her and create an

5 environment where it was no longer good for her

6 to work in the detective bureau.

7    Q.    Who did she say was doing the

8 retaliation?

9    A.    She related that it included Commander

10 LeDonne Reynolds and also that she felt that it

11 was from the chief of police's permission, that

12 he was very aware of it, may have been -- you

13 know, I don't know the particulars because,

14 again, you know, she was vague and I didn't do a

15 lot of prying.

16    Q.    Did she tell you that she believed the

17 chief was aware of it and was letting it happen?

18    A.    Yes.

19    Q.    Any other incidents?

20    A.    Of someone reporting sexual harassment

21 and then experiencing retaliation?

22    Q.    Race.

23    A.    Okay, any kind of harassment?

24    Q.    Any kind of harassment.

Page 63

1          MR. ROBERTSON:  Oh, sorry about that.

2          THE WITNESS:  One second.

3          MR. MILLER:  Let's take two minutes.

4               (Whereupon a recess was taken at

5               12:40 p.m. until 12:55 p.m.)

6 BY MR. MILLER:

7     Q.    You indicated that you believe you have

8 sustained damages in the amount of approximately

9 14 months of CTA pay; is that correct?

10    A.    As one example, yes.

11    Q.    Yeah.  Why are you claiming that as

12 damages?

13    A.    Because -- and it may be more than 14

14 months, but, again, year, 15 months.

15    Q.    Sure.

16    A.    In part because of the fact that

17 Sergeant Vardal's conduct and the subsequent

18 manner in which the department handled it

19 created a situation where it became clear that I

20 wasn't safe working with Sergeant Vardal.

21               Due to our scheduling, the only

22 days I could work CTA typically is an off-day

23 unless I were on vacation; and so what that

24 means is because Sergeant Vardal's and my

Page 64

1 schedules are sort of opposite, on days that I'm

2 off, she would have been my supervisor because

3 my off-day is a working day for her. So if I

4 were to work CTA, I would have to potentially

5 report to her even possibly directly if she were

6 the acting watch commander; and I didn't feel

7 safe doing so.

8    Q.   When you say you didn't feel safe, do

9 you mean you felt like you would experience more

10 sexual harassment from her; is that what you're

11 talking about or that she might shoot you?

12    A.   I felt that her behavior was very --

13 had gotten very unpredictable at that point.

14    Q.   Sure.

15    A.   Where it had ranged from inquiries

16 about spending time with her and wanting to get

17 me one on one alone to train me and I'm cute on

18 the DUI and these sort of things, it went from

19 that to her battering me and threatening me.

20              And because of that culmination of

21 that sort of behavior and after learning that

22 she also battered Officer William Dunn and

23 other -- those circumstances primarily made it

24 clear to me and the department's refusal to

Page 65

1 place her on administrative leave and so on and

2 so forth, I felt that it was unsafe for me to

3 work for her.  I didn't know what she would do.

4 She became unpredictable; and I didn't want to

5 subject myself to that.

6            And, yes, I did document in

7 writing when I requested for her to be placed on

8 administrative leave that we're officers -- at

9 least in maybe the meeting I had with the chief

10 and the deputy chief and Commander Williams and

11 that, yes, we're officers, we have firearms.

12 I'm very concerned about working with someone

13 who is displaying aggressive, violent behavior

14 that is now ratcheting up in a direction that I

15 don't know what's going to happen.  So that's

16 what I mean.

17    Q.   Was is it your decision, for whatever

18 your reasons were, wanting to avoid Dina or

19 whatever, not to work the CTA detail?

20    A.   The circumstances forced that decision,

21 yes, I believe.

22    Q.   Was it your decision?

23        MR. ROBERTSON:  Objection.  He answered

24 that question.

Page 66

1 BY THE WITNESS:

2    A.    I don't feel that that -- I'm trying my

3 best to answer that question.

4    Q.    I'll strike the question.  Was the

5 detail available to you?

6    A.    Yes.

7    Q.    You did say you went back to work at

8 the CTA detail.  When did you go back?

9    A.    That would be approximately end of

10 2013, beginning of 2014.  So maybe close to the

11 beginning of 2014.  Could have been December

12 2013, but somewhere around that time.  2014

13 about.

14    Q.    Was Dina Vardal working CTA detail when

15 you went back and got the CTA detail?

16    A.    Yes.

17    Q.    When you went back and did the CTA

18 detail, did you report to Dina Vardal?

19    A.    In some instances.

20    Q.    When you went back and reported to Dina

21 Vardal, did you experience any harassment or

22 anything of a negative nature from her?

23    A.    Not that I recall.

24    Q.    You also indicated that you didn't do

1 your IDOT detail.  When was the period of time

2 in which you didn't do IDOT detail?

3     A.    IDOT details are offered periodically

4 through the course of the year.  I don't recall

5 all of the dates that are available, but they

6 include things around major holidays typically.

7 So there may be a Memorial Day detail.  There

8 may be a St. Patrick's Day detail, Fourth of

9 July detail.

10     Q.    You passed on all those?

11     A.    I did for -- first when I went back to

12 working, it was not until maybe two weeks ago.

13 After the time that I had the incident, series

14 of incidents with Sergeant Vardal and my

15 decision to not work those, I didn't return to

16 those until recently because -- yeah.

17     Q.    On the IDOT detail, would you also have

18 reported to Dina Vardal?

19     A.    Yes, in some instances I would have

20 directly.

21     Q.    So you're saying you decided that in

22 order to avoid Dina Vardal, you would not go on

23 that IDOT detail; is that correct?

24     A.    To avoid being victimized by her, yes.

Page 68

1    Q.   And when you went back to CTA detail at

2 the end of 2013 and she was still there, what

3 changed?  Why did you decide to go back?

4    A.   Because my wife wasn't working and we

5 needed the money, so I had to make the tough

6 decision to return despite my fear.

7    Q.   Now, if you would just take a quick

8 look at Exhibit 3 and tell me what that is.

9    A.   It appears to be photocopy of the

10 department's sexual harassment policy.

11   Q.   Did you get a copy of the policy?

12   A.   Yes.

13   Q.   Are you aware -- were you aware of the

14 policy when the incidents were occurring with

15 Dina Vardal?

16   A.   Yes.

17   Q.   And if you would look at the

18 description of what the department defines as

19 harassment, I believe it says verbal or physical

20 conduct of a sexual nature.  Do you see that?

21   A.   Are we on page 2?  Page 1 or 2?

22   Q.   Let's see.

23   A.   The bottom of page 1?

24   Q.   Yeah, advances or requests for sexual

Page 73

1 room headed to the locker room; and she makes a

2 comment, she says, whoa, whoa, you need to work

3 out.  You need to get in the gym because I like

4 it when you're bigger.

5    Q.   Okay.

6    A.   And I just turned my head sort of with

7 confusion about why are you making, you know,

8 you like it when I'm bigger, you know, you want

9 me -- so then I just shook my head and walked

10 past her into the roll call room.

11   Q.   Is that the full extent of the comment

12 she made?

13   A.   I don't recall.  That was part of what

14 she said.  I don't recall if there was more.

15   Q.   What else do you remember her saying at

16 that time?

17   A.   That's primarily what I recall from

18 that incident.

19   Q.   Were there any other incidents in which

20 she made comments to you?

21   A.   Not that I recall.

22   Q.   We're going to talk about a lot of

23 instances that you've reported in your various

24 narratives.  Is it fair to say that you never

Page 74

1 reported or complained of any harassment from

2 Dina Vardal until May 9, 2012?

3     A.    I reported it to my wife, and I

4 reported it to my co-worker Schonella Stewart.

5     Q.    Let me rephrase the question.  Did you

6 ever report or complain of sexual harassment by

7 Dina Vardal to any member of the Oak Park Police

8 Department administration?

9     A.    Not in terms of a formal complaint, no.

10     Q.    How about informally?

11     A.    I believe I sent, may have sent an

12 email -- I don't have the email, so they would

13 have to go back and check.  It was one of the

14 times that Sergeant Vardal sent me a

15 happy-birthday comment in an email; and I

16 forwarded that to Commander Reynolds, LeDonne

17 Reynolds, just to make him aware of it because

18 it was something I was becoming uncomfortable

19 with.  But that was the extent of it.

20     Q.    So you're saying that the only

21 reporting to a supervisory personnel at the Oak

22 Park Police Department of what you believe was

23 harassment was when you forwarded a

24 happy-birthday email that Dina had sent you to

1 Commander Reynolds?

2    A.    Yes.

3         MR. ROBERTSON:   You're talking about

4 prior to May 9, right?

5 BY MR. MILLER:

6    Q.    Prior to May 9, 2012.

7    A.    Yeah, I was afraid to report it.

8    Q.    When did the harassment start?  Did it

9 start in 2007?

10    A.    I would have to say approximately, yes.

11    Q.    And it went on for approximately five

12 plus years until you decided to come forward on

13 May 9, 2012?

14    A.    Yes.

15    Q.    And --

16    A.    Intermittently.

17    Q.    Sure.  And were you aware that there

18 was a policy in place that required you to come

19 forward if you had a complaint?

20    A.    Yes.

21    Q.    And, in fact, you knew that the

22 administration investigated sexual harassment

23 because you were working there when Dina was

24 disciplined for sexual harassment; weren't you?

Page 76

1    A.    Yes.

2    Q.    And that had happened in 2005, seven

3 years before your incident, correct?

4    A.    I don't know the exact year.

5    Q.    But you knew for many years prior to

6 May 9, 2012, that the administration

7 investigates sexual harassment complaints; is

8 that a fair statement?

9    A.    That's a fair statement.

10   Q.    Did Dina Vardal ever make an offensive

11 joke to you?

12   A.    Not that I recall.

13   Q.    Did Dina Vardal ever call you a name?

14   A.    No.  She yelled at me, but I don't know

15 if she called me a name.

16   Q.    When did she yell at you?

17   A.    There was an incident when Schonella

18 Stewart and I were partners.  We were working

19 nights.  Time frame would have put it at

20 approximately 2010 or so, where --2009, 2010,

21 where -- I don't remember the total

22 circumstances, but what I recall was we were

23 sort of getting ready to end our tour of duty.

24 It was close to the end of the night, and we

Page 162

1 It was dated September --

2    A.    September 2012, right.

3    Q.    Right.  And after you submitted that

4 form, is it your testimony that the Village of

5 Oak Park retaliated against you?

6    A.    The Village of Oak Park retaliated

7 against me, in my belief, while I was sick, the

8 sickness which ultimately led to needing an FMLA

9 authorization.

10    Q.    How did they retaliate against you?

11    A.    One of the ways is by refusing to allow

12 me to sign complaints against Sergeant Vardal

13 because I asked --

14    Q.    We're speaking -- maybe I'm not being

15 clear.  You filed an FMLA complaint.

16    A.    A request.

17    Q.    You got sick -- did you get sick on

18 August 21, 2012?

19    A.    Prior.  Prior.

20    Q.    You were sick prior to August 21, 2012?

21    A.    Yes.

22    Q.    Relating to Sergeant Vardal?

23    A.    Yes.

24    Q.    Okay.  And did you make an FMLA claim

Page 163

1 for those dates?

2    A.    No, I tried my best to kind of deal

3 with the problem.

4    Q.    Did you make an FMLA claim for illness

5 related -- that you relate to Sergeant Vardal

6 prior to the illness that started August 21,

7 2012?

8    A.    No, the FMLA claim was around that time

9 for the August time.

10    Q.    So the FMLA claim filed in September

11 2012 was for your illness that began on

12 August 21, 2012.

13    A.    Yes.

14    Q.    Is that correct?

15    A.    According to how that was phrased, yes.

16    Q.    If you look at Exhibit 42 please.  That

17 appears to be a fax to Frank Spataro from your

18 doctor; is that correct?

19    A.    Yes.

20    Q.    Is that the first notice of your

21 FMLA -- of your first FMLA claim for the

22 incident involving Ms. Vardal?

23    A.    No, there was prior documentation,

24 email documentation to HR from back, I believe,

Page 164

1 in August.  This would have just been -- this

2 was sort of a slow process of the doctor

3 completing paperwork.

4     Q.   Is that the first FMLA form?

5     A.   For that, yeah, I believe so.  Yes.

6     Q.   Okay.  So if that's the first FMLA

7 form, when was the first retaliation against you

8 by the Village for making an FMLA claim?

9     A.   I would consider it me being ordered

10 for the fitness-for-duty evaluation right after

11 that.

12     Q.   So you consider the decision by the

13 department to send you for a fitness-for-duty

14 evaluation to be an act of retaliation in

15 retaliation for your having filed the FMLA

16 claim?

17     A.   I think that there were multiple things

18 that were being retaliated against.  Among those

19 was the FMLA, also the fact that I brought to

20 light the -- Sergeant Vardal's behavior and the

21 possible relationship between Sergeant Vardal

22 and Deputy Chief Ambrose or at least the fact

23 that she flaunts that in an attempt to

24 intimidate others, and specifically me.  When

1  that was brought to light, I believe that that's

2  one of the things that they did was not just the

3  fitness-for-duty evaluation, but the type of

4  fitness-for-duty evaluation.

5              When I met with Dr. Obolsky, one

6  thing that he said was that your department has

7  requested, and I'm paraphrasing, a very

8  intrusive, sort of extreme fitness-for-duty

9  evaluation.

10             Now, I would have no knowledge of

11  this because I don't have any background on

12  fitness-for-duty evaluations; so I don't know

13  the type -- the difference between a simple one

14  and an advanced one; but one thing he explained

15  was your department requested what I'm

16  paraphrasing as a very intrusive

17  fitness-for-duty evaluation that will also be

18  accompanied by us providing a -- not only am I

19  going to record this, our interviews but also

20  provide a transcript for your, for your chief

21  and your deputy chief and the department to

22  review and then was subject to an assortment of

23  humiliating questions, including how many times

24  a week I have sex with my wife.  So, yes, that

Page 166

1 type of fitness-for-duty evaluation was a form

2 of retaliation, I believe.

3    Q.    Okay.  I didn't mean to -- I'm not

4 cutting you off.  You can go on as long as you

5 want.

6    A.    I felt I needed to say that to answer

7 your question fairly.

8    Q.    That's fine.

9    A.    That's all.

10    Q.    You haven't answered my question, so

11 let me ask it again.

12              Could you read back the question

13 please?

14              (Requested question read from page

15               164 lines 12 through 16.)

16    Q.    Can you answer that yes or no?

17         MR. ROBERTSON:  Objection.  He answered

18 the question.

19         MR. MILLER:  No, he didn't.

20         MR. ROBERTSON:  Yes, he did.

21         MR. MILLER:  I'm entitled to an answer.

22         MR. ROBERTSON:  You got an answer.

23 BY MR. MILLER:

24    Q.    Let me rephrase it.  Do you believe

Page 167

1 that the decision to send you to a

2 fitness-for-duty evaluation was in part

3 motivated by retaliating against you for the

4 fact that you filed an FMLA claim?

5     A.    For this type of --

6     Q.    Yes.

7     A.    Yes, for this type of fitness-for-duty

8 evaluation to that extent as I described, yes.

9     Q.    Sure.  And you believe that the

10 decision to how intrusive to make the

11 examination was an act of retaliation against

12 you for filing the FMLA claim?

13     A.    Among it was -- it was retaliatory --

14     Q.    In part?

15     A.    In part, yes, I do.

16     Q.    And why do you believe that their

17 decision to send you for a fitness-for-duty

18 evaluation was retaliation for your having filed

19 a claim?

20     A.    Because it was wrapped with the

21 explanation of -- the whole context for why

22 allegedly I was being sent for a

23 fitness-for-duty evaluation is because I had

24 been off with an injury, with an illness.

Page 168

1    Q.    Yeah.

2    A.    And the way it was summarized in the

3 letter from Chief Tanksley was when I was

4 ordered to meet with him and gave a written

5 summary but verbally he said the same thing,

6 which was you reported injuries or illnesses

7 that you say are -- relate to Sergeant Vardal,

8 again, I'm paraphrasing, Sergeant Vardal's

9 conduct or what have you has led me to question

10 whether or not you're fit to be a police

11 officer; and based on that -- or first of all,

12 she was found, you know, gave a quick summary,

13 which in the summary it said there was a finding

14 of no sexual harassment.  The battery section

15 didn't address whether or not any action had

16 been taken against Vardal or not.  It just was a

17 very short one or two lines and then said based

18 on your allegations that you were experiencing

19 illness because of your -- because of Sergeant

20 Vardal's conduct, I now question your fitness to

21 be a police officer, and I'm ordering you to

22 this.

23            Even in the meeting itself, there

24 was never a question of how are you, have you

1 met with your doctors, we'd like you to come

2 back, what's your status because if I had even

3 been asked that simple question, I would have

4 been able to provide a document from one of my

5 doctors that had already cleared me to return to

6 work.  The second document was obtained from

7 Dr. Thakur that next Monday.  So there was -- it

8 was clearly already decided ahead of time that

9 no matter what that this was going to take

10 place.  However --

11     Q.   Hold on.  Let me stop you right there.

12 Are you saying that you had already given them a

13 note that says you're fit to return to work when

14 they ordered you for the evaluation?

15     A.   What I'm saying is that on the day I

16 was ordered to complete the fitness-for-duty

17 evaluation, the day prior I had been cleared to

18 return; but the conversation was so completely

19 one-sided from Chief Tanksley, there was never

20 an inquiry to me how am I, where are you, are

21 you ready to return, we'd like to have you back,

22 but we got to know what's going on.

23                   There was nothing.  It was

24 basically a unilateral you sit there and listen

1 August 21, 2012, did you go to a doctor for

2 headaches?

3    A.    I went to EAP Psychologists for stress.

4    Q.    Was that in that six-week time frame --

5 or the time frame between June 15 and August 21?

6    A.    I think it was prior to June 15 and

7 then overlapping lasted until September.

8    Q.    And did something trigger the

9 headaches, anything specific?

10    A.    Initially I had headaches.  I was

11 experiencing stress or related symptoms and had

12 periodic terrible headaches that I had never had

13 before and didn't initially recognize the

14 correlation.  After a while it became clear over

15 time as the summer went on that it was related

16 to stress associated.

17             So was it one thing?  It was a

18 combination of things, the battery by Sergeant

19 Vardal, having to report her for sexual

20 harassment, the department's refusal to place

21 her on administrative leave, the prospect of

22 having to work with her or for her.  Those

23 things sort of became clearer and clearer; and

24 the stress of that and the relationship between

1 that and the headaches became more evident and

2 it kind of, you know, came to a head in August.

3     Q.    Did you ever submit a report to the

4 Village of Oak Park explaining the relationship

5 between the stress and the headaches?

6     A.    At what point?  Do you mean prior?

7     Q.    At any point.  Is it in that WH380 that

8 Dr. Kerr filled out?

9     A.    No, because only one doctor would fill

10 out -- I was told my primary-care physician

11 would fill that out.  I was seeing Dr. Schwartz

12 at the same time.  Both were aware that they

13 were stress related but --

14     Q.    Did anybody tell -- was there any

15 report to the Village about that?

16     A.    I'm not sure.

17     Q.    So you believe it was related to the

18 stress from Dina Vardal, right?

19     A.    I know it was, yes.

20     Q.    When you say I know it was, what do you

21 mean?

22     A.    I mean there was -- I know my body.  I

23 know the circumstances.  I'm the one that lived

24 it; and after receiving, you know, quite a bit

1 the report you'd fill out?

2    A.    I'm aware now.  I wasn't aware then

3 because those incidents have happened, I

4 believe, since this incident.

5    Q.    You knew that the medical roll required

6 you to fill out an AIR report if you had a

7 duty-related incident; didn't you?

8    A.    I can't say that I know that, but I

9 knew, I knew that I needed to inform a

10 supervisor; and when it came to a head in

11 August, I did inform Sergeant Dan Silva that

12 these illnesses were work-related.

13    Q.    Did you ever make a claim to the

14 employer by filling out any kind of paperwork

15 claiming that the headaches were caused by work?

16    A.    Claimed in terms of workmen's comp and

17 that, no.

18    Q.    Did you ever fill out any paperwork and

19 submit it to the Village claiming that any

20 injuries that you sustained, any problems you

21 had medical were related to work?

22    A.    That was, that was expressed.  As far

23 as filling out a form, it was verbally told to

24 the department.  I don't believe -- I don't know

Page 180

1 if I filled out a form or not.

2    Q.    Okay.  Why did you go to fill out the

3 AIR form for the dog bite, Exhibit 15?

4    A.    Because I was instructed to do so.

5    Q.    By who?

6    A.    By -- I don't remember.  It was

7 whoever, one of my sergeants.  I believe it

8 would have been -- it was Sergeant Dan Silva, I

9 believe.

10           MR. MILLER:  Give me one second.

11                (Whereupon a recess was taken at

12                 3:50 p.m. until 3:55 p.m.)

13           MR. MILLER:  Can you read back the last

14 question please?

15                (Requested record read.)

16 BY MR. MILLER:

17    Q.    When you had the dog bite, did you

18 receive sick accident?

19    A.    I was treated that day, and I don't

20 know how it was classified.  I was treated that

21 day at the hospital and was cleared to work the

22 next day.

23    Q.    Have you received any sick accident pay

24 in your time with the department?

Page 182

1 you tell the supervisor you've been injured on

2 the job and then the supervisor makes the

3 decision as to how it's going to be coded?

4     A.    Well, you're probably asking a question

5 that's beyond my knowledge.  My working

6 understanding is that I know of officers who

7 have been injured while on duty who had to miss

8 work and their time was classified on the sheets

9 as sick accident or some version of that

10 classification.

11     Q.    Sure.  Do you know if any officer has

12 ever received sick accident pay in the Village

13 of Oak Park without either filing a worker's

14 compensation claim or filling out the accident

15 investigation report like Exhibit 15?

16     A.    That I don't know.

17     Q.    Do you know of anybody in the Village

18 of Oak Park who's ever received sick accident

19 designation for suffering a stress-related time

20 off of work?

21     A.    I wouldn't know.

22     Q.    Do you believe that you were

23 discriminated against or retaliated against by

24 the Village's decision not to award you sick

Page 183

1  accident?

2      A.    Yes.

3      Q.    And, again, are you saying that the

4  notice that you gave to the Village that your

5  headaches were caused by stress from Dina Vardal

6  is something you told the supervisor?

7      A.    I'm sorry, can you rephrase that or

8  repeat the question?

9          MR. MILLER:  Can you read it back

10 please?

11         (Requested question read.)

12         THE WITNESS:  One more time, if you

13 don't mind.

14         (Requested question read.)

15 BY THE WITNESS:

16     A.    Yes, meaning that is that the extent of

17 the notice, is that what you're asking?

18     Q.    Yes.

19     A.    That's what I told the supervisor, and

20 I was never told by anyone else to complete any

21 other document.  Never told by a supervisor to

22 complete that form you're referring to.  Never

23 given the opportunity to do so.

24     Q.    So you believe that even though you had

Page 184

1 a work-related accident, that it was incumbent

2 on a supervisor to instruct you as to how to

3 proceed and not to file what a medical roll

4 tells you to do?

5     A.    I've never had a work-related accident.

6 So, yes, I do believe they should have told me,

7 or Frank Spataro should have told me.   Someone

8 should have told me.

9     Q.    Sure.   Could you take a look at

10 Exhibit 2 for a minute?   What is Exhibit 2?

11    A.    It says medical roll in the general

12 order.

13    Q.    And if you'll turn to page 0009.

14    A.    Okay.

15    Q.    It says the accident investigation form

16 will be completed regardless if the member

17 chooses to receive medical attention.   Had you

18 read that before you had your stress headaches?

19    A.    I don't recall if I ever read it.

20    Q.    Did you look at the medical roll and

21 what its requirements were after you started

22 getting headaches?

23    A.    After I began to get headaches?

24    Q.    Yes.

Page 185

1    A.    No.  No.

2    Q.    Did you ever look at the medical roll

3 at any time to determine what the proper

4 procedure was?

5    A.    I don't recall.

6    Q.    Did you ever request to be paid sick

7 accident at any time prior to filing your

8 lawsuit in this case?

9    A.    I believe so.

10    Q.    When would that have been?

11    A.    In the -- I know at least in a

12 communication to the president of the union,

13 James Valentine, at the time, patrol officers

14 union.  I know I referenced the fact that while

15 I was being -- while I was off of -- from work

16 during the fitness-for-duty evaluation that my

17 self-sick time was being used and that that time

18 was running out and that I believe in that I may

19 have referenced that the time should have been

20 classified as sick accident as opposed to

21 self-sick.

22              So I feel like I recall mentioning

23 that.  I know that verbally upon my return I

24 spoke with Frank Spataro about the fact that my

Page 186

1 time should be rectified and should have been

2 classified as self-sick; and I don't really

3 remember his response, but I don't know --

4    Q.    You mean sick accident or self-sick?

5    A.    I'm sorry, excuse me.  As sick accident

6 from self-sick, yes.

7    Q.    Okay.

8    A.    But I don't recall his response.

9    Q.    Do you have any information to

10 substantiate your belief that your condition

11 qualifies as a compensable sick accident?

12    A.    What do you mean?

13    Q.    Do you have any information in writing,

14 anything --

15    A.    You mean like -- by information do you

16 mean like an authorization from the Village,

17 from what?  What do you mean?

18    Q.    Sure, an authorization from the

19 Village.

20    A.    No, the Village has never authorized my

21 injury to be classified as sick accident.

22    Q.    Have you ever filed a comp claim?

23    A.    No, I filed a lawsuit.

24    Q.    The question was did you ever file a

Page 187

1 comp claim?

2    A.    No.

3    Q.    Did you believe that your injury was
4 work-related when the headaches began?

5    A.    When they first began, I wasn't sure.

6    Q.    When did you realize or come to the
7 belief that they were work-related?

8    A.    Definitely by August, by the time that
9 I filed that complaint.

10    Q.    After August 21?

11    A.    The FMLA form.

12    Q.    After August 21 or early September of
13 2012 when you came to believe that your medical
14 bills and injuries were work-related, did you
15 ever file a worker's compensation claim?

16    A.    I did not.

17    Q.    What other actions did the Village take
18 to retaliate or interfere with your exercise of
19 your FMLA rights?

20    A.    Do you want me to give you a list of
21 what I believe they are?

22    Q.    You told me the first thing was you
23 believe that their decision to send you for a
24 fitness-for-duty evaluation was a retaliatory

1 just focus on things he said or did that either

2 he said they were related to your FMLA filing or

3 things that he did from which you could infer

4 that they related to your FMLA filing.

5 A. I can't.

6 Q. Specifics.

7 A. I can't say for sure.

8 Q. So wasn't it Frank who approved each of

9 your FMLA leaves?

10 A. I'm not sure how that process goes. A

11 lot of -- the conversation I would have with

12 Frank would be that he had to have a

13 conversation with sometimes -- sometimes the

14 lines between Frank Spataro's office and the

15 chief of police's office were blurry even in his

16 own conversations, so I don't know how that

17 works.

18 Q. Did Frank Spataro send you the emails

19 or the memos approving each and every one of

20 your FMLA requests?

21 A. Yes. Yes.

22 Q. Okay. Were there any other acts which

23 you believe were in retaliation for the exercise

24 of your FMLA rights?

Page 194

1 been speaking for hours.  I just want to be

2 clear that I've answered the question.

3    Q.    Are you aware that an employer is not

4 required to pay you for FMLA sick time?

5    A.    Sure, I'm also aware that I've got

6 protection under my contract as a union

7 employee.

8    Q.    But did the Village pay you FMLA sick

9 time?

10    A.    They allowed me to use my self-sick and

11 a bank of self-sick time that got moved into a

12 category called FMLA vacation to when I needed

13 time, yes.  In some cases they allowed me to do

14 that.

15    Q.    Any other actions that you believe were

16 taken in retaliation for your filing an FMLA

17 claim other than what we've discussed?

18    A.    Sure, the chief of police's refusal to

19 allow me to sign complaints I believe was

20 retaliation against a variety of things.

21    Q.    I'm talking about FMLA.

22    A.    Yes, I believe that was part of it.

23    Q.    Did he ever make any complaints

24 relating his decision on not to file charges

1 against Dina to the filing of your FMLA claim?

2      A.    No, he didn't.

3      Q.    Did he ever write any memos, did you

4 ever see anything in writing about that?

5      A.    No, but you asked for conduct what did

6 he do.

7      Q.    Sure.

8      A.    And --

9      Q.    But --

10     A.    I'm sorry.  Go ahead.

11     Q.    Let's stick on that one.

12     A.    Sure.

13     Q.    So you believe that his decision not to

14 press -- not to file misdemeanor battery charges

15 was related to your having filed an FMLA claim?

16     A.    In part, yes.

17     Q.    What do you base that on?

18     A.    I base that on, in part, his treatment

19 of me, how drastically different it had become

20 at the time that these decisions were being made

21 from how my rapport and relationship with him

22 had been prior to.

23     Q.    So you mean there was a change in his

24 demeanor after you filed your FMLA claim?

Page 196

1    A.    Demeanor and actions.  Prior to this

2 whole thing I had a great relationship and

3 rapport with the chief.

4    Q.    And now you have a poor relationship

5 with him?

6    A.    Now his treatment, his treatment of me

7 and behavior towards me is night and day, way

8 worse.

9    Q.    Has he done anything with your sick

10 pay, vacation time, done anything to harass you

11 with your vacation -- with any of your pay?

12    A.    With my time.

13    Q.    Yes.

14    A.    Yes.  Yes.

15    Q.    And what do you believe was done in

16 retaliation for your filing an FMLA claim with

17 regard to how your pay is classified?

18    A.    The -- in spring of 2013, I believe it

19 would be as my wife was -- had finished her

20 first surgery, was undergoing chemotherapy

21 treatment, I requested to the chief to be

22 allowed to switch what we call our short days,

23 our Kelly days so that I could better care for

24 my family, care for my wife and take care of

1 family responsibilities at that time; and the

2 chief denied me being able to do that, listed an

3 assortment of reasons that, frankly are untrue

4 and I think are untruthful and then later

5 offered a version of it that would have been so

6 impractical and unreasonable that it became not

7 even an option.

8              In addition, he harassed and

9 bullied one of the officers who had agreed to

10 switch Kelly days with me; and that was

11 witnessed by another officer at the same time;

12 and that happened approximately on the day my

13 lawsuit was filed in federal court.

14              So, yes, I believe the chief of

15 police was very angry with me reporting the fact

16 that I had needed time, that I had used time,

17 that I had brought it to light; and so, yes, one

18 of the things he did was when I needed time off

19 and explained that I needed because my wife was

20 undergoing cancer treatment, he denied it, said

21 that it was for problems X, Y and Z problems and

22 then later said I'll give you a version on a

23 30-day, month-to-month basis, you can do it this

24 way; and it would have been so intrusive and

1 unreasonable for any officer that it became not

2 a legitimate option.  So that's one way that he

3 did it with my time.

4      Q.   Is this the incident in which you asked

5 for Kelly days and changes in a number of

6 aspects of your schedule and then you were given

7 a list, a laundry list of reasons why that

8 couldn't be accommodated?

9           MR. ROBERTSON:  Objection.

10 Argumentative, form, mischaracterizes the

11 statement --

12 BY MR. MILLER:

13      Q.   Who is the person --

14           MR. ROBERTSON:  If I could just finish.

15           MR. MILLER:  Go ahead.

16           MR. ROBERTSON:  Mischaracterizes the

17 deponent's testimony, but go ahead.

18 BY MR. MILLER:

19      Q.   Go ahead.

20      A.   One of the memos that was submitted was

21 a request for changing Kelly days, yes; and that

22 list that was provided, which I didn't

23 receive -- I never received until -- well, I

24 received an email from the chief of police

Page 200

1    A.    Yes.

2    Q.    And Officer Keenan Williams denied your

3 request?

4    A.    Commander.

5    Q.    Commander Keenan Williams, and gave you

6 a laundry list of reasons, right?

7    A.    He just denied it.  He didn't give me

8 any reasons.  That was something he gave to the

9 chief.

10    Q.    All right.  And you have read it

11 though; haven't you?

12    A.    Yes.  What page -- what's the page for

13 that?

14    Q.    It's not actually listed.  It's not an

15 exhibit number.

16    A.    Okay.

17    Q.    But --

18    A.    So I don't know it verbatim.

19    Q.    Sure.

20    A.    But I know some of the gist of it.

21    Q.    It was your short day request and

22 there's a memo dated May 23, 2013, or

23 thereabouts?

24    A.    Yes.

Page 201

1    Q.    From Commander Williams to the chief?

2    A.    Yes.

3    Q.    And Commander Williams recommended to

4 the chief that it be denied and gave a list of

5 reasons why?

6    A.    Yes.

7    Q.    So your testimony is that the decision

8 to deny your short-day request was made in

9 retaliation for your having filed an FMLA claim?

10   A.    Absolutely, yes.

11   Q.    And you base it on the fact that all of

12 these reasons that you believe are basically

13 bogus?

14   A.    There are -- didn't say that they're

15 bogus.

16   Q.    They're not legitimate?

17   A.    I'm not saying -- not legitimate

18 implies like maybe they don't exist.  That's not

19 what I'm saying.  What I'm saying is, as I

20 recall, there were five primary reasons that

21 were listed.

22   Q.    Sure.

23   A.    Three of those were -- because on dates

24 A, B and C it would have caused officers --

Page 226

1 administrative leave.  Knowing what that meant,

2 that I'm going to be under investigation if I

3 don't show back up to work and miraculously get

4 healed, that was definitely what I considered to

5 be one of the forms of retaliation, especially

6 when Frank Spataro later said, oh, despite that

7 thing that was conveyed to you through Borchers,

8 it was not true and you're not on administrative

9 leave.  So the threat of that.

10     Q.    So let's go look at Exhibit 36 for a

11 minute.

12     A.    Okay.

13     Q.    Is that the reference that you're

14 speaking of?

15     A.    Yes, it is.  This is the letter that

16 tied to the phone call from Borchers.

17     Q.    So this is a memo from Frank Spataro to

18 you dated September 11, 2012, correct?

19     A.    Yes.

20     Q.    And this is referencing a statement

21 that Sergeant Borchers made to you?

22     A.    Yes.

23     Q.    And the statement he made was you have

24 to return to work or, if you don't, you'll be

1 placed on administrative leave; is that the

2 essence of it?

3    A.    Yes.

4    Q.    And do you believe -- who do you

5 believe retaliated against you?  Was that

6 Sergeant Borchers?

7    A.    No, Deputy Chief Ambrose.

8    Q.    Deputy Chief Ambrose.  And what do you

9 believe Deputy Chief Ambrose did to retaliate

10 against you because you had a disability?

11    A.    He used the sergeant to threaten me.

12    Q.    And was the threat to get back at you

13 because you'd made the complaint?  Is that what

14 you believe?

15    A.    I believe it was -- the retaliation I

16 experienced from Deputy Chief Ambrose as well as

17 from some of the other things that I've

18 mentioned I believe was multi-layered and

19 multi-faceted; so I can't just say it's just for

20 that, but, yes, partially.

21    Q.    Okay.  Would you agree with me that as

22 of September 11, 2012, you'd already been off

23 for a couple weeks, right?

24    A.    Yes.

1 2012, we agree you had already been off several

2 weeks, right?

3    A.   Yes.

4    Q.   Do we now agree, having looked at

5 Exhibit 42, that you did not send the Form 380

6 until September 21?

7    A.   No, not that I did not send it, that it

8 wasn't sent.  It's not me.  I'm not the one that

9 would have sent it.

10    Q.   Is it fair to say that the Village of

11 Oak Park didn't get the Form 380 from the doctor

12 until September 21?

13    A.   I believe that's what the fact shows.

14    Q.   So when Sergeant Borchers stated when

15 you don't return to work, you will be placed on

16 administrative leave, do you believe that that

17 statement, since they didn't have an FMLA 380

18 form from you was retaliatory against you?

19    A.   Yes.

20    Q.   Okay.  And why do you think that it was

21 retaliation for them to threaten you to place

22 you on administrative leave when you hadn't

23 turned in any documentation from a doctor

24 indicating that you had a right to be off?

Page 230

1    A.   Again, it wasn't that I hadn't turned

2 in.  That they hadn't received it, right.

3 There's a distinction.

4    Q.   Do we agree that they hadn't received

5 it?

6    A.   As of this date?

7    Q.   Yes.

8    A.   I believe that's correct.

9    Q.   We do agree that you had sent plenty of

10 emails saying I'm sick, right?  Is that what

11 you're talking about?

12    A.   I don't know plenty, but I had

13 communicated via phone primarily.

14    Q.   Sure.  And email, I'm sick, I have

15 headaches?

16    A.   Yes, on -- yes.

17    Q.   You had said you have headaches and

18 you're off?

19    A.   Yes.  More than headaches, but yes.

20    Q.   Okay.  So why do you think it was

21 retaliation against you under the ADA if at the

22 time they -- Sergeant Borchers threatened you to

23 place you on administrative leave you hadn't

24 submitted anything in writing from a doctor yet?

1 of Oak Park by September 11, 2012, to your

2 knowledge?

3    A.    At that point I didn't have knowledge.

4 Now that later I learned from the fax date on

5 there, apparently it was faxed the 21st of

6 September.

7         MR. MILLER:   Please read the question

8 back.

9             (Requested question read.)

10    A.    Apparently not, based on the facts that

11 you showed me.

12    Q.    Thank you.   Any other way in which you

13 believe you were retaliated against as a result

14 of your disability?

15    A.    Yes?

16    Q.    What other ways?

17    A.    In March 2013, I was instructed by

18 Commander Keenan Williams to complete a to-from

19 memo to the chief of police, reference the

20 situation involving Sheila Mack and Heather

21 Mack.   Sheila Mack -- Sheila Mack's belief that

22 her daughter was going to murder her and Sheila

23 Mack's request that the department pay for the

24 ambulance that was used to hospitalize her

Page 238

1 disability, as well as some of the other claims

2 that were taking place.  This department chief

3 of police --

4     Q.    Just keep -- don't lecture me.  Just

5 tell me what the retaliation was.

6     A.    The retaliation was he orders me to do

7 the memo after chastising me for the

8 circumstances surrounding needing to do the

9 memo.

10    Q.    Yes.

11    A.    I complete the memo, and I show to it

12 him; and he says no, don't send it to the chief

13 of police, go back and change it now and send it

14 to the deputy chief of police because the chief

15 of police is tired of you.  He thinks you're

16 harassing him, and I don't want you to

17 communicate with him.  He doesn't want to hear

18 from you.  So go back and now send this to

19 Deputy Chief Ambrose.

20    Q.    Okay.

21    A.    So the file that's saved at the

22 department is saved under to-from RCT.

23    Q.    Yes.

24    A.    Which are the initials for Rick C.

Page 240

1    Q.    Is there more to this story related to

2 the to-from memo?

3    A.    I reconfigured -- I completed the memo.

4    Q.    Yes.

5    A.    Subsequently I spoke with Sergeant

6 Curtin, my sergeant, about another memo that I

7 was told to direct to the chief of police.   I

8 don't recall what the exact subject of that was.

9 In that memo -- I mean in that conversation I

10 say to Curtin, I've been told by Commander

11 Williams to not direct anything to the chief of

12 police.   I can't write him a memo because

13 Williams told me not to.

14    Q.    Yeah.

15    A.    Curtin said, no, that would have

16 been -- that's not a legitimate order.   He

17 should have never told you that.   Of course, you

18 have to be able to communicate with the chief of

19 police.   I don't know why anybody would say that

20 now you can't communicate with the chief of

21 police.

22    Q.    So Curtin is telling you that he felt

23 that Tanksley's order was not legitimate; is

24 that the point?

Page 226

1 administrative leave.  Knowing what that meant,

2 that I'm going to be under investigation if I

3 don't show back up to work and miraculously get

4 healed, that was definitely what I considered to

5 be one of the forms of retaliation, especially

6 when Frank Spataro later said, oh, despite that

7 thing that was conveyed to you through Borchers,

8 it was not true and you're not on administrative

9 leave.  So the threat of that.

10     Q.    So let's go look at Exhibit 36 for a

11 minute.

12     A.    Okay.

13     Q.    Is that the reference that you're

14 speaking of?

15     A.    Yes, it is.  This is the letter that

16 tied to the phone call from Borchers.

17     Q.    So this is a memo from Frank Spataro to

18 you dated September 11, 2012, correct?

19     A.    Yes.

20     Q.    And this is referencing a statement

21 that Sergeant Borchers made to you?

22     A.    Yes.

23     Q.    And the statement he made was you have

24 to return to work or, if you don't, you'll be

1 placed on administrative leave; is that the

2 essence of it?

3    A.   Yes.

4    Q.   And do you believe -- who do you

5 believe retaliated against you?  Was that

6 Sergeant Borchers?

7    A.   No, Deputy Chief Ambrose.

8    Q.   Deputy Chief Ambrose.  And what do you

9 believe Deputy Chief Ambrose did to retaliate

10 against you because you had a disability?

11    A.   He used the sergeant to threaten me.

12    Q.   And was the threat to get back at you

13 because you'd made the complaint?  Is that what

14 you believe?

15    A.   I believe it was -- the retaliation I

16 experienced from Deputy Chief Ambrose as well as

17 from some of the other things that I've

18 mentioned I believe was multi-layered and

19 multi-faceted; so I can't just say it's just for

20 that, but, yes, partially.

21    Q.   Okay.  Would you agree with me that as

22 of September 11, 2012, you'd already been off

23 for a couple weeks, right?

24    A.   Yes.

Page 228

1    Q.    Had you submitted an FMLA Form 380 as

2 of that date?

3    A.    Yes.

4    Q.    Okay.

5    A.    I believe so.  That's the form that

6 Dr. Thakur completed.

7    Q.    Yes.

8    A.    It was given to the doctor.  It just

9 hadn't been turned in to human resources yet.

10 So I had received one, and I had submitted one

11 through my physician, and it was in the hands of

12 the doctor and HR for them to work that out.

13    Q.    Take a look at Exhibit 42.  That's the

14 Form 380 that was submitted by your doctor,

15 right?

16    A.    Yes.

17    Q.    What's the date that that was faxed to

18 Frank Spataro, that Form 380 FMLA leave?

19    A.    It says the 21st of September.

20    Q.    So getting back to my question as of

21 Exhibit 36, the memo from --

22    A.    I'm sorry, I clearing my throat.  I

23 couldn't hear you.

24    Q.    So my question is as of September 11,

Page 229

1 2012, we agree you had already been off several

2 weeks, right?

3    A.    Yes.

4    Q.    Do we now agree, having looked at

5 Exhibit 42, that you did not send the Form 380

6 until September 21?

7    A.    No, not that I did not send it, that it

8 wasn't sent.  It's not me.  I'm not the one that

9 would have sent it.

10    Q.    Is it fair to say that the Village of

11 Oak Park didn't get the Form 380 from the doctor

12 until September 21?

13    A.    I believe that's what the fact shows.

14    Q.    So when Sergeant Borchers stated when

15 you don't return to work, you will be placed on

16 administrative leave, do you believe that that

17 statement, since they didn't have an FMLA 380

18 form from you was retaliatory against you?

19    A.    Yes.

20    Q.    Okay.  And why do you think that it was

21 retaliation for them to threaten you to place

22 you on administrative leave when you hadn't

23 turned in any documentation from a doctor

24 indicating that you had a right to be off?

Page 230

1    A.    Again, it wasn't that I hadn't turned

2 in.  That they hadn't received it, right.

3 There's a distinction.

4    Q.    Do we agree that they hadn't received

5 it?

6    A.    As of this date?

7    Q.    Yes.

8    A.    I believe that's correct.

9    Q.    We do agree that you had sent plenty of

10 emails saying I'm sick, right?  Is that what

11 you're talking about?

12    A.    I don't know plenty, but I had

13 communicated via phone primarily.

14    Q.    Sure.  And email, I'm sick, I have

15 headaches?

16    A.    Yes, on -- yes.

17    Q.    You had said you have headaches and

18 you're off?

19    A.    Yes.  More than headaches, but yes.

20    Q.    Okay.  So why do you think it was

21 retaliation against you under the ADA if at the

22 time they -- Sergeant Borchers threatened you to

23 place you on administrative leave you hadn't

24 submitted anything in writing from a doctor yet?

Page 231

1    A.    Because the Village, in my experience,

2 has other options.  In cases like this, I've

3 seen where a sergeant will contact the person

4 and say would it be okay for me to stop by, you

5 haven't been in in three days.  This is a

6 long-standing practice that happens

7 periodically, and it's allowed in the rules, for

8 a sergeant to say, hey, can I come out to the

9 house and talk to you.  You haven't been in in a

10 couple days, just want to check on you, what

11 have you.

12    Q.    Stop right there.  Had they checked on

13 you after you first called in?

14    A.    Checked on by visited my home?

15    Q.    Called you up, just like you said.

16    A.    No, I said come to your home.  They

17 never came to my home.

18    Q.    Did they call you up to check on you?

19    A.    I'm sure I had a phone call with

20 someone.

21    Q.    Didn't they call you and try to find

22 out how you're doing on August 24?

23    A.    Is that Sergeant Borchers or Curtin?

24    Q.    Didn't Sergeant Borchers, when you

Page 232

1 called in sick, send you the FMLA paperwork and

2 tell you that you needed a doctor's note before

3 you returned to work?

4    A.   Yes, that's right.

5    Q.   So let's get back to your belief.  Why

6 do you believe that when Sergeant Borchers

7 threatened to put you on administrative leave

8 and you hadn't submitted anything from a doctor

9 that that constituted retaliation for your

10 claiming a disability?

11    A.   Because the tone which was used from

12 Sergeant Borchers to convey the fact of, yeah, I

13 got a message for you, deputy chief told me to

14 tell you, let you know that if you don't come in

15 by Monday, you're going to be placed on

16 administrative leave.

17    Q.   So the problem was, A, with the tone,

18 it sounded threatening?

19    A.   Sure, absolutely.

20    Q.   Okay.  And did the Oak Park Police

21 Department have a right to demand you to come

22 into work or produce a doctor's note or you'll

23 be placed on administrative leave?

24    A.   In a vacuum, yes.

1    Q.    Okay.

2    A.    The way they handled the situation --

3    Q.    Did they have a right to do it is all I

4 want to know, in a vacuum, if you know?

5    A.    Repeat the question.  I want to answer

6 it properly.

7    Q.    Did the Village have a right, in a

8 vacuum, to place you on administrative leave on

9 September 11, if you didn't show up for work or

10 provide a doctor's note for your absence after

11 you had been off two weeks?

12         MR. ROBERTSON:  Objection.  Calls for a

13 legal conclusion by this witness who is not

14 competent to answer.  Go ahead and answer if

15 you'd like.

16 BY THE WITNESS:

17    A.    I don't think that this was --

18    Q.    If you don't know, just tell me you

19 don't know.

20    A.    I don't think it was a legitimate

21 claim.  I think it was a threat, and the reason

22 why I say that it was --

23    Q.    Mr. Freelain, I'm not asking you --

24 again, if you don't know the answer, just tell

Page 234

1  me you don't know.  Do you believe they had a

2  right to threaten you with administrative leave

3  if you'd been off work almost three weeks and

4  hadn't provided a note from a doctor?

5      A.    No, because I had never asked for a

6  note prior to that and they were aware that I

7  was in the process of getting FMLA paperwork

8  completed.

9      Q.    I'm sorry, they didn't ask for a note.

10  Didn't they send you FMLA paperwork on

11  August 24?

12      A.    Right.  I understand you're saying a

13  note.

14      Q.    You're saying -- did they give you FMLA

15  paperwork on August 24?

16      A.    Yes.

17      Q.    Did you turn that paperwork in by

18  September 11?

19      A.    Yes.  To my doctor, yes.

20      Q.    Did you turn that paperwork in to the

21  Village of Oak Park by September 11?

22      A.    I never turned it in to the Village of

23  Oak Park.

24      Q.    Did anybody turn it in to the Village

Page 235

1 of Oak Park by September 11, 2012, to your

2 knowledge?

3    A.   At that point I didn't have knowledge.

4 Now that later I learned from the fax date on

5 there, apparently it was faxed the 21st of

6 September.

7         MR. MILLER:  Please read the question

8 back.

9             (Requested question read.)

10    A.   Apparently not, based on the facts that

11 you showed me.

12    Q.   Thank you.  Any other way in which you

13 believe you were retaliated against as a result

14 of your disability?

15    A.   Yes?

16    Q.   What other ways?

17    A.   In March 2013, I was instructed by

18 Commander Keenan Williams to complete a to-from

19 memo to the chief of police, reference the

20 situation involving Sheila Mack and Heather

21 Mack.  Sheila Mack -- Sheila Mack's belief that

22 her daughter was going to murder her and Sheila

23 Mack's request that the department pay for the

24 ambulance that was used to hospitalize her

1 daughter.

2    Q.    So you were asked to do a memo, a

3 to-from?

4    A.    Yes, involving Sheila Mack and Heather

5 Mack.

6    Q.    All right.  Are you telling me that his

7 order for you to prepare a memo was in

8 retaliation for your filing -- for your

9 disability which lasted from August 21 of '12

10 until September 28 of '12?

11    A.    What I'm saying is that because the

12 retaliation was multi-pronged and not for just

13 one thing, but, yes, including that claim, when

14 I was instructed to do the memo, the context of

15 that was first a chastisement regarding the

16 letter we received from Sheila Mack.  Williams

17 chastised me saying why does this woman expect

18 us, think that we're going to pay for the

19 ambulance that took her daughter to the

20 hospital, why would you give her that

21 impression.

22    Q.    Yes.

23    A.    And I related I didn't give her that

24 impression at all.  I don't know why she would

Page 237

1 make that decision; that we would never -- you

2 know, her safety, her daughter's safety was --

3 and Miss Mack's safety was paramount, not an

4 issue of an ambulance.  I had no control over

5 her believing that we should pay for it.  He

6 says okay.

7     Q.    Stop right there.

8     A.    Okay.

9     Q.    Let me just see if I got the essence of

10 it because I don't want to cut you off.

11     A.    Yes.

12     Q.    Is the point of this anecdote you're

13 telling me that Keenan Williams made you do a

14 to-from memo?

15     A.    No.

16     Q.    Did he make you do more than a to-from

17 memo?

18     A.    He did, but I will try to briefly

19 summarize the next part of that because I

20 haven't fully explained why this was

21 retaliatory.

22     Q.    Why was this retaliatory for your

23 disability?

24     A.    In -- multi-pronged, for the

Page 238

1 disability, as well as some of the other claims

2 that were taking place.  This department chief

3 of police --

4    Q.   Just keep -- don't lecture me.  Just

5 tell me what the retaliation was.

6    A.   The retaliation was he orders me to do

7 the memo after chastising me for the

8 circumstances surrounding needing to do the

9 memo.

10    Q.   Yes.

11    A.   I complete the memo, and I show to it

12 him; and he says no, don't send it to the chief

13 of police, go back and change it now and send it

14 to the deputy chief of police because the chief

15 of police is tired of you.  He thinks you're

16 harassing him, and I don't want you to

17 communicate with him.  He doesn't want to hear

18 from you.  So go back and now send this to

19 Deputy Chief Ambrose.

20    Q.   Okay.

21    A.   So the file that's saved at the

22 department is saved under to-from RCT.

23    Q.   Yes.

24    A.   Which are the initials for Rick C.

Page 239

1  Tanksley.

2      Q.    Okay.

3      A.    However, when you open the memo, it

4  says to Deputy Chief Ambrose, reference the

5  Sheila Mack situation.

6      Q.    Okay.

7      A.    And subsequently I spoke with Sergeant

8  Curtin.  There was another time where --

9      Q.    Hold on.

10     A.    Okay.

11     Q.    Let's stick on this incident.

12     A.    Okay.

13     Q.    So you said that Keenan Williams told

14 you to retitle the memo to send it to Ambrose

15 because Chief Tanksley said he felt you were

16 harassing him?

17     A.    Yes.

18     Q.    Did he say what he felt you were

19 harassing him about?

20     A.    No.

21     Q.    Specifically?

22     A.    No, that he felt I was harassing him.

23     Q.    Okay.  And did you redo the memo?

24     A.    Yes, I did.

Page 240

1    Q.    Is there more to this story related to

2 the to-from memo?

3    A.    I reconfigured -- I completed the memo.

4    Q.    Yes.

5    A.    Subsequently I spoke with Sergeant

6 Curtin, my sergeant, about another memo that I

7 was told to direct to the chief of police.  I

8 don't recall what the exact subject of that was.

9 In that memo -- I mean in that conversation I

10 say to Curtin, I've been told by Commander

11 Williams to not direct anything to the chief of

12 police.  I can't write him a memo because

13 Williams told me not to.

14    Q.    Yeah.

15    A.    Curtin said, no, that would have

16 been -- that's not a legitimate order.  He

17 should have never told you that.  Of course, you

18 have to be able to communicate with the chief of

19 police.  I don't know why anybody would say that

20 now you can't communicate with the chief of

21 police.

22    Q.    So Curtin is telling you that he felt

23 that Tanksley's order was not legitimate; is

24 that the point?

Page 244

1 September 28 is somehow connected to Keenan

2 Williams' decision to have you retitle the

3 to-from memo other than what you've told me?

4     A.   I don't -- I'm not sure, not at this

5 time.

6     Q.   Were there any other acts of

7 retaliation that you believe were related to the

8 fact that you made a claim for disability or

9 were disabled?  Let me -- here.  Strike that

10 question.

11              Did you lose any pay from the

12 retaliation that you say you suffered for your

13 disability?

14     A.   The five days of pay.

15     Q.   Do you believe that the five days of

16 pay, that's the five days in November?

17     A.   Yes.

18     Q.   And that's the days after the

19 evaluation but before the report came out?

20     A.   Yes, I believe.

21     Q.   And you believe that those were

22 classified as unpaid leave also in retaliation

23 for your disability?

24     A.   Yes.

Page 249

1 requested a more intrusive or exhaustive

2 evaluation was to retaliate against you for ADA,

3 FMLA or Dina Vardal?

4    A.    Yes.

5    Q.    What did they say and who said it?

6    A.    In the meeting --

7    Q.    Just tell me who said it first.

8    A.    Chief Tanksley.

9    Q.    Chief Tanksley.  Did anybody else make

10 those statements?

11    A.    That's who I recall.

12    Q.    Okay, Chief Tanksley, and that was the

13 meeting of September 27?

14    A.    Yes.

15    Q.    And at the meeting of September 27, who

16 was present?

17    A.    Chief Tanksley, Deputy Chief Ambrose,

18 myself, Aaron Janik who was then a labor counsel

19 attorney.  That's who I recall was at the

20 meeting.

21    Q.    Okay.  What did Chief Tanksley say

22 specifically on this point that led you to

23 believe that the reason they were ordering the

24 evaluation was because they were angry or upset

Page 250

1 that you'd filed an FMLA claim or an ADA claim?

2    A.   Or a sexual harassment claim?

3    Q.   Or a sexual harassment claim, that they

4 were trying to get you?

5    A.   In that meeting when I'm brought in the

6 meeting, Chief Tanksley reads the first memo

7 from Frank Spataro.

8    Q.   Yep.

9    A.   He then reads that letter basically or

10 kind of gives a summary of that letter as far

11 as -- he verbalizes what's in the letter as far

12 as you're taking time off for claim of having

13 headaches and so forth because of the stress has

14 brought me to question you about that.  Based on

15 that I'm hereby -- you know, basically you're

16 placed on leave.  You're going to -- you're

17 being ordered to undergo fitness-for-duty

18 evaluation, this and that.  He kind of

19 summarized it's going to begin this day, that,

20 whatever.  He goes, and good luck to you.

21    Q.   Okay, he said, and good luck to you?

22    A.   In a very dismissive,

23 there's-the-end-of-your-career tone.

24    Q.   Hold on.  He didn't say that's the end

Page 251

1 of your career; did he?

2     A.    No, he didn't.

3     Q.    He said, good luck to you?  Those were

4 his literal words?

5     A.    Those were his literal words in a

6 tone --

7     Q.    All right.  And you were

8 interpreting --

9     A.    Absolutely.

10     Q.    -- that in some way because of the tone

11 of the words or the attitude?

12     A.    And the smirk on his face when he said

13 it.

14     Q.    As if you're done?

15     A.    Yes.

16     Q.    Were you done?  Do you continue to work

17 at the department?

18     A.    By God's permission.

19     Q.    Do you continue to work at the Oak Park

20 Police Department?

21     A.    By God's permission, yes, I do.

22     Q.    Did he deliver on his threat that you

23 perceived by using the words good luck that you

24 were done at the Oak Park Police Department?

Page 254

1    Q.    When was your wife's surgery?

2    A.    It was January twenty -- approximately

3 January 21, 2013, somewhere around there.

4 January 23.

5    Q.    And Officer Thomas made a comment to

6 you?

7    A.    Sergeant Thomas, in one of the

8 instances that I referenced earlier where he

9 told me Deputy Chief Ambrose has instructed

10 me -- has, again, instructed me to begin

11 investigating you and your use of time, he says

12 to me, I don't know why he's doing this to you.

13 You've done everything you could do as far as

14 documenting your time, your wife's time, your

15 need for FMLA, this is just wrong what he's

16 doing.

17    Q.    I'm really -- and I appreciate what

18 you're saying.  You're telling me Sergeant

19 Thomas told you his opinion that what was

20 happening to you was wrong, in effect?

21    A.    After giving me the -- informing me

22 that, again, I'm under investigation for using

23 time.

24    Q.    Here's what I want to focus on:  What

Page 255

1 information do you have that you were retaliated

2 against?  That's specifically what.  Are you

3 saying that --

4    A.    I'm saying that was a form of

5 retaliation, being -- having a supervisor

6 constantly tell you your use of time is

7 resulting in you being under investigation is in

8 and of itself harassment, especially if there's

9 no legitimate --

10    Q.    Okay.

11    A.    -- reason to do so.

12    Q.    So you were off work for two plus

13 months?

14    A.    Yes.

15    Q.    And after the two plus months, maybe

16 before or slightly after you returned Sergeant

17 Thomas said to you, DC Ambrose wants me to

18 investigate your leave?

19    A.    This was the second time that it was

20 said.

21    Q.    Right.

22    A.    Or your use of time, your use of time.

23    Q.    And you believe that it was retaliatory

24 that DC Ambrose asked that you be investigated

Page 256

1 after you had taken two plus months of leave?

2    A.    No, because he was already --

3    Q.    Do you believe that?  Do you believe it

4 was retaliatory for him to investigate you?

5    A.    Yes, I believe it was retaliatory.

6    Q.    And did he ever write you a memo, and

7 do you have any information other than what

8 Sergeant Thomas told you about what sergeant --

9 Officer Ambrose was thinking?

10    A.    No, I have correspondence I sent to him

11 but nothing from him.

12    Q.    So you're telling me that the comment

13 from Sergeant Thomas that DC Ambrose wanted to

14 investigate you, that the basis for your belief

15 that it was retaliatory comes from Sergeant

16 Thomas alone; is that correct?

17        MR. ROBERTSON:  Objection.

18 Mischaracterizes his testimony, argumentative.

19 You can answer.

20 BY THE WITNESS:

21    A.    Not just from that.  As I mentioned,

22 because Deputy Chief Ambrose had been so vocal

23 in meetings during the course of the year,

24 in-service, annual in-service for years and

Page 260

1 point --

2    Q.   Okay.  What else?

3    A.   -- of whatever that took place.

4    Q.   Okay.  What else?

5    A.   He never followed through on that.

6    Q.   So your belief is that he never

7 contacted the Citizens Police Review Board?

8    A.   Or that that process wasn't completed

9 properly, whatever that would entail.

10    Q.   And you believe that it wasn't

11 completed properly in retaliation for your

12 filing a claim?

13    A.   In part, yes.

14    Q.   Okay.  What else?

15    A.   His failure to -- nearly 30-day failure

16 to extend my requested FMLA extension, would not

17 respond to my request ignored them.

18    Q.   You mean the extension in 2013?

19    A.   For my wife, that's right.

20    Q.   So you're saying that you made a

21 request, and he didn't respond for some 30 plus

22 days?

23    A.   Right, but meanwhile was sending me

24 correspondence regarding other things.

Page 261

1    Q.    Did he eventually approve that leave?

2    A.    It was eventually approved.

3    Q.    Is that a yes?  Just go yes or no.

4    A.    I'm not sure because he was -- after a

5 period of time, he disappeared and then came

6 back.

7    Q.    Your leave was approved?

8    A.    Right, but I don't know if it was him

9 or someone acting --

10   Q.    Was your leave approved?

11   A.    Yes, but you asked was it approved by

12 him.

13   Q.    Was your FMLA leave approved?

14   A.    Eventually, yes.

15   Q.    So your claim is that there was a delay

16 of 30 days which you ascribe to Frank Spataro?

17   A.    Yes.  And the Village, and Frank

18 Spataro, yes.

19   Q.    And you believe that Frank delayed for

20 30 days in approving your FMLA leave in

21 retaliation for your having filed a claim at

22 all?

23   A.    Yes.

24   Q.    What else?

Page 262

1        MR. ROBERTSON:  Objection.  Vague.

2 BY THE WITNESS:

3    A.   Can you just rephrase for me?

4    Q.   Yeah, we're talking about ADA

5 retaliation.

6    A.   What else in terms of Frank Spataro?

7    Q.   Yes.

8        MR. ROBERTSON:  Objection.  Form.  Go

9 ahead.

10 BY THE WITNESS:

11    A.   He also was instrumental in me being

12 denied the right to sign criminal complaints

13 against Sergeant Vardal.

14    Q.   Frank Spataro was?

15    A.   Yes, he was.

16    Q.   And you believe that -- how was he

17 involved?

18    A.   He -- I contacted Commander Williams in

19 approximately March of 2013 requesting to sign

20 criminal complaints citing the fact that --

21    Q.   Just tell me how he was involved

22 please.  Cut to the chase.

23    A.   I informed Commander Williams.

24 Commander Williams then -- and I think he might

1 have been copied in on the first communication

2 to just make him aware of it since he knew about

3 this from the beginning.  At some point Frank

4 Spataro began communicating with me saying I

5 want there to be a meeting with you and the

6 chief of police and me, meaning Frank Spataro,

7 regarding your desire to sign complaints.

8      Q.   Okay.

9      A.   When I insisted that I wanted either

10 union representation in that meeting or labor

11 counsel attorney Aaron Janik to attend that

12 meeting where we were supposedly going to

13 discuss the signing of complaints against

14 Sergeant Vardal, I then received the email in

15 April of 2013 where Frank Spataro said -- I'm

16 summarizing -- the chief and I have discussed

17 this, and we feel that there's nothing further

18 to talk about, and so we're done talking with

19 you about this subject.

20      Q.   Hold on a second.

21      A.   And basically tried to kill it.

22      Q.   You wanted to talk to Frank Spataro

23 about filing a criminal complaint?

24      A.   No, I didn't want to talk to him about

Page 264

1  it.  He inserted himself into the conversation.

2      Q.    Okay.

3      A.    Copying in the chief of police on these

4  communications.

5      Q.    Are you suggesting that Frank Spataro

6  was part of the decision of the department not

7  to file charges?

8      A.    Apparently because that's the position

9  he took in his last correspondence with me.

10     Q.    Did he say in that email that he was

11  part of the decision not to file charges or just

12  that you shouldn't talk to administration

13  anymore about your desire to have charges

14  pressed?

15     A.    What he said, as I recall -- I'm going

16  to give you my recollection.

17     Q.    Yeah.

18     A.    Is that the chief and I have discussed

19  this matter and we've decided there's nothing

20  further to talk to you about; and so, therefore,

21  there's no meeting and that's it.

22     Q.    Okay.  And so you believe that Frank

23  Spataro actually participated in a decision not

24  to file charges and that that decision and his

Page 268

1    Q.    When did this start?

2    A.    This would have been during, I want to

3 say between 2013 and continued -- like summer of

4 2013 but -- I believe somewhere fall of 2013 and

5 continued through 2014, summer of 2014 where --

6    Q.    Who made the write-ups?

7    A.    Sergeant Will, William Ballard.

8    Q.    Sergeant Ballard.  Anybody else make

9 the write-ups, these excessive write-ups that

10 you believe were in retaliation for your filing

11 claims?

12    A.    There was a write-up also from Anthony

13 Thomas, Sergeant Anthony Thomas.

14    Q.    And how many times --

15    A.    There were about four.

16    Q.    You mean officers or writes-ups?

17    A.    No, there were about four write-ups in

18 my file.

19    Q.    And who did them?

20    A.    I had chance to review the file, and I

21 didn't recognize the handwriting.  I know it was

22 both Sergeant Ballard; and I believe Sergeant

23 Thomas did one; but I don't know how many, who

24 did what.

Page 269

1    Q.    And these were four write-ups in the

2 summer of 2013, fall?

3    A.    You know, between 2013 and 2014 there

4 were approximately four.  I couldn't tell you

5 exactly.

6    Q.    Sure.

7    A.    Because I've had a subsequent

8 conversation -- I documented this.

9    Q.    I want to know how many write-ups

10 though.

11    A.    Approximately four.  But I couldn't

12 tell you which were in 2014 and which were in

13 2013.

14    Q.    And you believe these write-ups were

15 take undertaken by Ballard and Thomas in

16 retaliation for what?

17    A.    Well, I believe that the one --

18    Q.    Just tell me what you believe.

19    A.    For the collective set of

20 circumstances --

21    Q.    Yes.

22    A.    -- reporting Sergeant Vardal,

23 requesting signed complaints, everything that

24 I've summarized for you, the FMLA time usage.

Page 273

1    A.    That's right.  That's right.  I

2 couldn't tell you if it was summer of 2013, but

3 it was 2013.  There were other conversations

4 with Thomas like that where he was warning me

5 that way as well.

6    Q.    How many times would you say he warned

7 you, and when did they occur?

8    A.    Several.  One was in January 2013 as I

9 mentioned.  One was another one sometime in

10 spring.  I don't remember if it was before I

11 went on leave for my wife or when I came back.

12 There was another one in the summer or fall, and

13 then this one I'm describing --

14    Q.    Yeah.

15    A.    -- was in February of 2014.  So there

16 probably was three to four at least of those.

17    Q.    And so your belief is that Sergeant

18 Thomas wrote you up because you had filed an

19 FMLA claim and to retaliate against you?

20    A.    No, because he was instructed to write

21 me up in retaliation against me, not that it was

22 his desire, but that it was the desire of

23 command staff to use him to retaliate against

24 me.

Page 291

1 understanding is it should have had been done by

2 the department.

3    Q.    Who told you that it should have been

4 done?

5    A.    My own experience says that it should

6 have been done.

7    Q.    Who told you -- did any member of the

8 Oak Park Police Department tell you that your

9 leave should have been classified as sick

10 accident in this case?

11    A.    Sergeant Anthony Thomas during a

12 conversation I had with him.

13    Q.    You mean when he -- here, tell me about

14 that.  When did he make that statement?

15    A.    He was a supervisor of mine for years,

16 and I've got a great rapport with him.  So we

17 spoke many times, so I couldn't tell you

18 exactly.

19    Q.    Was Sergeant Thomas one of the people

20 that was involved in processing your sick leave?

21    A.    I don't know if he was involved in

22 processing sick leave.

23    Q.    Did you submit paperwork to Sergeant

24 Anthony Thomas for your disability in August of

Page 292

1 2012?

2    A.    No.

3    Q.    Was Sergeant Anthony Thomas involved in

4 the decision-making process of how your time was

5 classified as a result of your leave in August

6 2012?

7    A.    I don't know if he was or not.

8    Q.    Do you know who was?

9    A.    No, I don't know.  I know -- what I do

10 know is the chief of police and deputy chief

11 would typically be -- have some involvement with

12 that and maybe human resources.  I don't know

13 beyond that.

14    Q.    Okay.  Who were the witnesses to the

15 battery incident involving Officer Vardal?

16    A.    Sergeant John Curtin, myself,

17 obviously, Chicago officer -- it might be Jose

18 Sanchez.  Would have to check.

19    Q.    Okay.

20    A.    Sergeant Vardal herself.  Sergeant

21 Vardal had a friend that was walking with her at

22 the time.  I don't know her name.

23    Q.    Okay.

24    A.    And then there were two other Chicago

1    **from early October until maybe mid November.**

2        Q.    Of 2012?

3        **A.    Yes.**

4        Q.    All right.  So last time we were

5    talking about whether or not you had been paid

6    for a couple of days when you were examined by

7    Dr. Obolsky and then again beginning of November

8    of 2012 while you were off awaiting the results

9    of the fitness for duty exam.  Do you remember

10   that discussion we had?

11       **A.    Yes.**

12       Q.    Okay.  So now I want to ask you to go

13   to the page number, actually it's the top page,

14   836.  Now, what is the pay period that this

15   appears to be showing?

16       **A.    This appears to be the pay period that**

17   **would have ended October 6.**

18       Q.    Of 2012?

19       **A.    '12, that's right.**

20       Q.    So that would have included the date of

21   your first evaluation with Dr. Obolsky, which

22   was, I believe, on October 2; is that right?

23       **A.    I believe that's correct.**

24       Q.    And were you paid for that entire pay

1  period?

2      A.    I believe so.

3      Q.    Okay.  Then I want you to look at page

4  838, which would be the third page of this

5  exhibit.  What pay period does that appear to

6  encompass?

7      **A.    It appears to be the next period after**

8  **the first one that we looked at.  That would be**

9  **from the 6th through the 20th or the 7th through**

10  **the 20th -- yeah, maybe 7th through the 20th of**

11  **October of 2012.**

12      Q.    Got it.  So would you agree with me

13  that that would encompass the date of the second

14  Dr. Obolsky evaluation of October 9, 2012?

15      **A.    Yes.**

16      Q.    And were you paid for that entire pay

17  period?

18      **A.    The normal pay, yes, but not the**

19  **overtime that I would have been due.**

20      Q.    But you received your normal salary?

21      **A.    I believe so, yes.**

22      Q.    And were you still off work during that

23  entire pay period?

24      **A.    Yes, I believe so.**

1   Approximately, yes, give or take depending on

2   what deductions may have occurred during a

3   certain period, paycheck.

4       Q.   Okay.  So now you can qualify it any

5   way you want.

6       A.   The question that I have that I have

7   not yet been able to -- through reviewing my own

8   check stubs, I still have check stubs I need to

9   review, is I believe there's a matter -- and it

10  came up last time at the initial deposition --

11  about, approximately 60 hours' worth of unpaid

12  time that we discussed, it appears to have been

13  acknowledged from your part in the first

14  deposition.  I've also received other

15  communication via email from Jackie Jamison and

16  the command staff that indicate -- I think Rita

17  Dominguez, chief of police's secretary that

18  indicated that there was 60 hours of unpaid FMLA

19  time during that period.  So where that fell and

20  what check that impacted or what have you, I'd

21  still have to fully reconcile.

22      Q.   Okay.  Thank you.  Now, I want you to

23  look at -- do you have -- hold on a second.  I

24  think I'm missing something.  I've got to get a

1    printout for you.  Give me one second.

2                    (Pause.)

3    BY MR. MILLER:

4        Q.    I want to ask you about just a

5    chronological question with regard to your ADA

6    claim.  You first took off for your own personal

7    leave on October -- on August 21, 2012, for the

8    headaches, correct?  Or that's when you first

9    took off leave for which you requested FMLA

10   leave?

11       **A.    Yes.**

12       Q.    And Dr. Schwartz released you for a

13   full return to work as of September 28, 2012; is

14   that correct?

15       **A.    I believe so.**

16       Q.    Okay.  Between August 21, 2012, when

17   you began to take leave protected by FMLA for

18   your headaches and --

19       **A.    And other conditions, not just**

20   **headaches.**

21       Q.    Okay.  But it was FMLA protected leave?

22       **A.    Yes.**

23       Q.    Between that, date August 21 and

24   September 28, 2012, when Dr. Schwartz released

1      you for a full return to work, did you ever

2      request to come back to work with your

3      disability?

4      **A.    During that period?**

5      Q.    Yes.

6      **A.    No.   No, not from the dates that you**

7      **gave, August to September, I don't believe so.**

8      Q.    Okay.   Did you ever ask your

9      supervisors to engage in a dialogue with them on

10      how you could return to work in your disabled

11      condition?

12      **A.    No, I don't believe so.**

13      Q.    In your first deposition, we talked

14      about various losses that you had claimed as a

15      result of the retaliation, et cetera.   I want to

16      ask you a few more specific questions about

17      that.

18             After you made either your

19      complaint for sexual harassment or your claims

20      for FMLA protected leave, were you ever

21      threatened with a demotion?

22      **A.    Define what you mean by threatened with**

23      **a demotion.   Could you explain what you mean by**

24      **that.**

1    Q.   Did anybody ever say to you you're

2   going to get demoted?

3    **A.   No, no one ever said I was going to be**

4   **demoted.**

5    Q.   Did anybody even -- were your

6   responsibilities ever changed from May 19,

7   2012 -- May 12, 2012, when you first made your

8   complaint for sexual harassment?

9    **A.   Until?**

10    Q.   Today.

11    **A.   Until today.   Were they changed?   I**

12   **can't say so.   I don't necessarily think so.**

13    Q.   This may be self-evident, but were you

14   terminated?

15    **A.   No.**

16    Q.   You're still employed with the Village

17   of Oak Park as a patrol officer?

18    **A.   That's right.**

19    Q.   Were you ever reprimanded, either

20   orally or in writing, for taking FMLA-protected

21   leave?

22    **A.   Yes.**

23    Q.   By whom?

24    **A.   Chief Tanksley through Sergeant William**

336

1  Q. Okay. Any other incidents of what you

2 would call a written reprimand where somebody

3 specifically said something to reprimand you for

4 taking the time off?

5  **A. Written, but there are --**

6  Q. I'm talking about written.

7  **A. No, no, but I just want to say**

8 **something and I'll answer your question. I**

9 **believe there may be some other examples of oral**

10 **maybe we talked about the first time or we**

11 **didn't. I don't want to -- I want to say that**

12 **what I said orally that those were examples of**

13 **that. There may be other examples that I have**

14 **not mentioned yet.**

15    **So I don't want to paint myself in**

16 **the corner and say is that it, that's all the**

17 **ones that you ever had. What I gave you were**

18 **examples of oral reprimands that I received.**

19    MR. MILLER: Can you read the question

20 back please?

21    (Requested question read.)

22 BY THE WITNESS:

23  **A. Yes.**

24  Q. When and by whom?

1      **A.**   **We talked about it to a degree in the**

2  **first deposition.**

3      Q.   First if you can identify who and the

4  date.

5      **A.**   **Sergeant Ballard.  Couldn't give you**

6  **the exact date.  There were several instances of**

7  **him writing what I believe to be inaccurate**

8  **accounts of my usage of time on a particular**

9  **call.**

10      Q.   Was the words FMLA or taking leave in

11  the memos from Sergeant Ballard?

12      **A.**   **No, but I believe strongly that that**

13  **was the motivation for his written**

14  **documentation, his false written documentation**

15  **of alleged things that I wasn't doing right.**

16      Q.   Okay.

17      **A.**   **So he's documenting a paper trail that**

18  **was motivated in part by my usage of FMLA time**

19  **that was inaccurate.**

20      Q.   Okay.  I guess it's either my question

21  or you're not understanding it, and I'll take

22  complete responsibility for it.

23      When I ask you a question, I'm not

24  asking you to look into someone's motivations.

1  I'm really interested in words on a piece of
2  paper.  That's what I'm asking about, not why
3  somebody wrapped you for taking eight hours
4  instead of four hours.  I want to know if
5  anybody ever reprimanded you in writing saying
6  you are taking too much leave.  That's what I
7  want to know.
8      **A.    Specifically FMLA leave --**
9      Q.    Not FMLA leave, anybody reprimanding
10 you in writing for taking excessive leave
11 between May 19, 2012, and today.
12         MR. ROBERTSON:  Other than what he's
13 already said, correct?
14         MR. MILLER:  Well, whatever he said he
15 said.  Please answer my specific question.
16         MR. ROBERTSON:  No, no.  What I'm saying
17 is do you want him to repeat what he said
18 previously?
19         MR. MILLER:  No, I don't want to him to
20 repeat anything.
21         MR. ROBERTSON:  Okay, so you want
22 anything else.
23 BY MR. MILLER:
24     Q.    Just answer the question I asked.  You

1    can preface -- you can start out by saying other

2    than what I've already told you.  Just let me

3    have her read it back please.

4                    (Requested record read from page

5                    19 line 23 to page 20 line 11.)

6    BY THE WITNESS:

7        **A.    Not that I recall at this time.    I**

8    **believe it was mainly, mostly oral, most**

9    **situations were verbal.**

10       Q.    Thank you.  Between May 12, 2012 -- and

11   I believe I may have said May 19 in the previous

12   question, and I'm sorry about that, between

13   May 12, 2012, and the present, were you ever

14   reprimanded in writing for taking excessive --

15   for being tardy?

16       **A.    There were written notes inside of what**

17   **we've described in the first deposition as the**

18   **patrol folder, patrol officer folder.  I don't**

19   **know the term they would use, but it's the**

20   **patrol officer's folder kept in the sergeant's**

21   **office; and so periodically there would be, you**

22   **know, maybe a note Officer Freelain called in**

23   **late today or is stuck in traffic or what have**

24   **you; and then some of those would make it into**

1  an annual review where it says during the course

2  of the year you were late three times or two

3  times or whatever.  So I guess those would be

4  examples.

5      Q.    Well, actually let me clarify the time

6  frame because we're going to go through your

7  reviews.  Between May 12, 2012, and today, were

8  you ever admonished for taking excess -- for

9  excessive tardiness?

10      A.    Not to my knowledge, no.

11      Q.    After you returned from each of your

12  FMLA leaves -- and I understand some of your

13  FMLA leaves were intermittent, they were not

14  blocks of time -- did your working conditions

15  change in any way?

16      A.    I need you to repeat that question

17  please.

18              MR. MILLER:  Please read it back.

19                  (Requested question read.)

20  BY THE WITNESS:

21      A.    I don't believe so.

22      Q.    After each of your FMLA leaves --

23      A.    I'm sorry, my working conditions, you

24  mean -- I need to -- I don't know that

terminology. I'm answering it to the best of my understanding. You mean as far as duties and responsibilities on a day-to-day basis?

Q. Sure.

A. No, same patrol duties and responsibilities primarily.

Q. Okay. And after returning from each of your leaves -- strike the question.

After returning from each of your leaves, were you ever disciplined for performance reasons?

A. I do believe that the written comments by Sergeant Ballard and I believe there was one from Sergeant Thomas as well, in the -- would have been the 2013 annual review, I believe, were especially -- I think most of the handwriting was from Sergeant Ballard -- were retaliatory in nature; and I documented that so I do believe so.

Q. Are you talking about a comment that would have appeared in your annual review?

A. It would have been a comment that was in my folder that then led to a low score in a certain category in my review.

1          (Requested question read.)

2   BY THE WITNESS:

3      A.   And by performance we're saying in the

4   form of a review, annual review, is that what we

5   mean?  Discipline for performance?

6      Q.   Period.  Not in your annual review,

7   anywhere.

8      A.   I pause to answer that question because

9   it's very open-ended.  I interpret that as a

10  very open-ended question.

11          For example, when I was cleared to

12  return from medical leave by Dr. Schwartz and

13  Dr. Thakur, I should have been afforded the

14  opportunity to participate in something called

15  the alternative work program that they have in

16  the Village.  It's outlined in the personnel

17  manual.  I was denied that opportunity even

18  though I requested it through the union to be --

19  to communicate to human resources my desire to

20  participate in it.  I was denied that.

21          I do consider that to be a

22  negative outcome that was based on what my

23  performance was perceived to be.  What is that

24  based on?  Because of Chief Tanksley's comment

1    about considering me unfit, I need to go through

2    this fitness-for-duty evaluation, good luck to

3    me, all these things that seemed very dismissive

4    in nature.

5             The department clearly was

6    punishing me for experiencing a disability, a

7    medical condition, using time for that

8    condition; and as a result that's one of the

9    things I was punished -- one of the ways I was

10   punished, by being denied something that other

11   officers have had access to.

12       Q.    Okay.  Well, I'm not sure I understand

13   everything you said to me, but is the testimony

14   that you just gave me the only incident in which

15   you believe you were disciplined for performance

16   reasons after making your sexual harassment

17   claim and taking your FMLA leaves?

18       A.    By discipline are we talking verbal

19   reprimand, are we talking something that makes

20   its way into an annual review?  I think we need

21   to quantify -- you know, qualify what we're

22   saying.

23       Q.    Any of those.

24       A.    There were numerous comments from, for

1   example, Sergeant Thomas about Chief Tanksley

2   always watching my time, being unhappy with my

3   use of time, wanting to know why I used so much

4   time for a particular thing.  The word time, my

5   time and use of time became a recurrent theme to

6   me, whether it was FMLA time, whether it were

7   time on a call, whatever it is; and that became

8   something that created a very, a very negative

9   and difficult work environment.  When you're

10   constantly being unfairly grilled about why are

11   you using this time to take your wife to the

12   doctor's office, why are you using this time to

13   be in the station when I'd only be in the

14   station for 12 minutes, why are you using this

15   much time, the chief doesn't -- is tired of you

16   using FMLA time, all of those.

17         So there were numerous, numerous

18   examples of verbal negative comments being

19   relayed to me from Sergeant Ballard, Sergeant

20   Thomas as well as inquiries that were being made

21   from, you know, Deputy Chief Ambrose and, you

22   know, Commander Williams and what have you.

23         So there have been numerous.  So

24   when you say is that all, I've tried to outline

1    thousand -- turn to 0745.  Who was your reviewer

2    for the '06 evaluation?

3        **A.    0745?**

4        Q.    Yeah.

5        **A.    That was Sergeant Bill Rygh, R-y-g-h.**

6        Q.    And was that also signed off by a

7    supervisor?

8        **A.    Commander Harbour.**

9        Q.    How do you spell that?

10       **A.    H-a-r-b-o-u-r, I believe.**

11       Q.    And if you look at 0724, what was your

12   score for 2010, your 2010 review?

13       **A.    Using the detective scale, 82.28.**

14       Q.    And if you look at page 0723, was there

15   a comment made about your excessive use of sick

16   time during that year?

17       **A.    Yes, which Frank Spataro told me should**

18   **not have been included in the evaluation, that**

19   **was actually illegal to be in there.  It should**

20   **be taken out.  It shouldn't even be in here,**

21   **according to what he told me.**

22       Q.    I appreciate everything you're trying

23   to tell me, and you have a lawyer who can ask

24   you as many questions as he wants.

1    **A.    Sure.**

2    Q.    But I just want to ask you a simple

3    question and ask you for a simple answer without

4    the editorial.  Please read back the question.

5                   (Requested question read from page

6                   354 lines 14 through 16.)

7    **A.    Yes, I had a major illness that year.**

8    Q.    And what was your score -- excuse me.

9    Can you turn to page 0709?  We're still on the

10   2011 evaluation -- no, now -- pardon me.  2011,

11   page 0710, what was your score for your 2011

12   evaluation?

13   **A.    Using the detective scale, 81.3.**

14   Q.    If you turn to page 0709, for 2011, was

15   there a comment made about your excessive use of

16   sick time in 2011?

17   **A.    It says -- yes, it exceeds department**

18   **average.**

19   Q.    And was there a comment made about your

20   being late for duty on eleven documented

21   instances?

22   **A.    Yes.**

23   Q.    And were you, as this note indicates,

24   actually admonished for your tardiness?

356

1    **A.    Yes.**

2    Q.    And if you could just -- we'll get to

3    it later.

4              Now, in 2012, if you turn to page

5    0717, what was your score in 2012?

6    **A.    Using the patrol scale, 95.**

7    Q.    Okay.  What category of rating

8    characteristics does a 95 fall into?

9    **A.    Outstanding.**

10   Q.    And was this the same year that you

11   made your claim for sexual harassment against

12   Dina Vardal?

13   **A.    I believe so, yes.  Let me confirm.**

14   Q.    Was this the same year that you made

15   your claim of -- for FMLA-protected leave for

16   the headaches beginning on August 21?

17   **A.    One more time.  I'm sorry.  Ask that**

18   **question again.**

19   Q.    Was this the same year that you took

20   your FMLA-protected leave for the headaches and

21   other things causing headaches?

22   **A.    And other medical conditions, yes.**

23   Q.    And other medical conditions, thank

24   you.

1          In this year 2012 in which you

2     took your FMLA-protected leave, were you

3     criticized for taking excessive sick time in

4     this review?

5          **A.    I need to review it for a minute to**

6     **answer that question.**

7          Q.    Go ahead.

8          **A.    No, I don't see a criticism there.**

9          Q.    In 2013, if you turn to 0703, what was

10    your score for your review for 2013?

11         **A.    What was the page again?**

12         Q.    0703.

13         **A.    The score is a 94.**

14         Q.    I didn't ask you this, but returning to

15    2012, who was your reviewer on page 0717 -- or

16    0718?  Who was your reviewer for 2012?

17         **A.    Sergeant Anthony Thomas.**

18         Q.    Who signed off as the supervisor?

19         **A.    Commander Keenan Williams.**

20         Q.    And in 2013, page 0703, who was your

21    reviewer in 2013?

22         **A.    Sergeant John Curtin.**

23         Q.    Was there a supervisor sign-off that

24    year?

1     **A.    Yes.**

2     Q.    Who was that?

3     **A.    Looks like Commander Mike Richardson.**

4     Q.    In 2013 you took two different

5     FMLA-protected leaves, one for, I believe you

6     were off the first two months of 2013; is that

7     correct?

8     **A.    Approximately, yes.**

9     Q.    To care for your wife's cancer surgery?

10    **A.    Yes.**

11    Q.    And then after you returned to work in

12    early March, you then requested another

13    FMLA-protected leave on or about April 26 of

14    2013; is that correct?

15    **A.    That's right, I believe so.**

16    Q.    And then you took intermittent leave

17    thereafter pursuant to that request; is that

18    correct?

19    **A.    Yes.**

20    Q.    And in 2013 were there any criticisms

21    of your taking too much sick time or any other

22    kind of leave time in your 2013 review?

23    **A.    I have to review it for a moment to**

24    **answer that question.**

1             **Doesn't look like it.**

2     Q.    In 2013, if you look on page 0702, when

3 you got a score of 94, what rating

4 characteristic bracket did that score fall into?

5     **A.    Outstanding.**

6     Q.    Now, this 2013 is the year, I believe,

7 when you made a response protesting one of the

8 categories; is that right?

9     **A.    Yes, I believe so.**

10     Q.    And am I correct in saying that even

11 though you objected to a certain criticism of

12 your performance, that even with that penalty on

13 your review, you still got a score that put you

14 in the outstanding category; is that a correct

15 statement?

16     **A.    That's correct, yes.**

17     Q.    And the criticism that you were

18 responding to appears on page 0704; is that

19 correct?   That's your written response to the

20 criticism of your 2013 performance?

21     **A.    No, it's not correct.**

22     Q.    That's not -- what is this document,

23 0704?

24     **A.    That is a memo from Commander Mike**

1        MR. MILLER:   Fair enough.

2   BY MR. MILLER:

3        Q.   Let me ask it a different way.  Did you

4   get a memo from Frank Spataro on April 26, 2013,

5   granting your FMLA request of that same day?

6        **A.   That was one of the memos I got, yes.**

7        Q.   And was your FMLA-protected leave of

8   that date approved?

9        **A.   Yes.**

10       Q.   And did you get that FMLA-protected

11  leave that you had requested?

12       **A.   Yes.**

13       Q.   Let's go back now to the email thread

14  which you are trying to explain to me, and we

15  stopped on page -- on the May 15, 2013, email,

16  part of Exhibit 72, from Keenan Williams; and

17  where do we go next from May 15, 2013?

18       **A.   So we, after the May 15 email, my next**

19  **day at work -- or one of my next days at work**

20  **was May 17, 2013.**

21       Q.   Okay.  Just hold on one second.  Is the

22  next email in this thread Saturday May 18?

23       **A.   No, it is -- let me see.   I'm sorry.**

24  **Yes, yes, it is.**

1    Q.   Okay.  As opposed to telling me events

2  that occurred, I really just want to talk about

3  what's in these emails.

4    **A.   Okay, that's what I was attempting to**

5  **do.**

6    Q.   Well, tell me is the email from you on

7  Saturday May 18, 2013, what is that email?

8    **A.   That email is a follow-up on the**

9  **conversation that I had had with Commander**

10  **Williams that day prior on the 17th in which he**

11  **and I discussed my expressing to him that my**

12  **time was inaccurate, that my time bank was -- I**

13  **didn't believe to be correct as far as what the**

14  **available time was and what have you.**

15    Q.   Stop right there.

16    **A.   Sure.**

17    Q.   I don't mean to interrupt you, but I

18  want to make sure I understand what you're

19  telling me.  Is what you're saying that you and

20  Officer Keenan Williams were having a discussion

21  about the fact that you believed that the amount

22  of time in your sick time bank was being

23  recorded incorrectly; am I right about that?

24    **A.   In part, yes.**

1    **A.    Yes, but I'm not -- I wasn't completely**

2    **done answering the question because there's**

3    **other sentences in this same email.**

4    Q.    I want to take it sentence by sentence.

5    Do you believe that those two sentences were

6    retaliatory for the sexual harassment claim and

7    the FMLA-protected leave?

8         MR. ROBERTSON:    Objection.    Form,

9    relevance.    I think -- unfair to ask the witness

10   to separate out sentences from an email,

11   argumentative.    Go ahead.

12        MR. MILLER:    All right.    Let me just

13   have her read it back.    If there's a problem

14   with it, maybe I'll rephrase it.    Let's please

15   read it back.

16             (Requested question read.)

17   BY MR. MILLER:

18   Q.    And if you will just answer this, I

19   will then let you explain, but can you answer

20   that question yes or no?

21        MR. ROBERTSON:    Same objection.

22   BY THE WITNESS:

23   **A.    I feel there were two of the sentences**

24   **that were retaliatory, yes.**

1      Q.    Okay.   Why do you believe that they

2  were retaliatory for your claims of sexual

3  harassment and FMLA-protected leave?

4          MR. ROBERTSON:   Objection.   Form.   Go

5  ahead and answer.

6  BY THE WITNESS:

7      **A.    Because of the next two sentences that**

8  **follow in part.**

9      Q.    Let's read those together.   If you're

10 going to connect those two, let's read them into

11 the record.

12     **A.    Sure.**

13     Q.    So read the next two sentences which

14 you believe together with the last two sentences

15 were motivated by your FMLA leave requests and

16 your sexual harassment claim.   Please read them.

17     **A.    In reference to the alleged prolonged**

18 **confusion, scrutiny and errors that you referred**

19 **to, again, the only support you offer for that**

20 **accusation are the numerous emails which you**

21 **have authored yourself.   When you get notice**

22 **from human resources regarding your request to**

23 **have FMLA time approved, communicate that to the**

24 **department.**

390

1      Q.   Okay.  So in conjunction with those

2  last two sentences, you-made-the-assertion

3  sentence and the I-do-not-see-that-documentation

4  sentence, why do you believe that those four

5  sentences were motivated by the desire of Keenan

6  Williams to retaliate against you for your

7  sexual harassment claim and your FMLA leaves?

8           MR. ROBERTSON:  Objection, form.  Again,

9  I think it's unfair to separate out the document

10  into minor parts or the document from everything

11  else; but if you can answer that question, you

12  can answer it.

13  BY THE WITNESS:

14     **A.   The reason why I believe it to be**

15  **retaliatory for, you know, for the sexual**

16  **harassment claim against Sergeant Vardal, for**

17  **the FMLA time usage, for me having, you know,**

18  **experienced a disability, for a variety of**

19  **things is that, first of all, it's not even true**

20  **what he's describing in here.**

21           **It's a completely inaccurate**

22  **account of a factual piece of information which**

23  **is he's claiming when you get notice from human**

24  **resources regarding your request to have FMLA**

time approved, communicate that to the department. Well, first of all, you've presented today an email from May 3 in which I forwarded to him on May 3 of that same year as part of this same email thread where I said commander, here is the update from human resources. It's been approved, so on and so forth, whatever.

So how is it that on May 21 he's chastising me for not keeping the department informed when on May 3 he received the email that showed him that the FMLA time had been approved. That's the first thing.

What that leads to is the second part, which is this is a disingenuous communication. He knows he's received -- he's been a commander for -- at that time I had been an officer maybe 11 years. The whole time I had been there he had been a commander; and my understanding was he had been a commander many years prior to that.

So this is someone with years and years and years of command experience and is a highly intelligent person. He knows that he

1   out of time; and that shouldn't have happened

2   because my original time from August 21 until

3   May 26 -- excuse me, August 21 until

4   September 26, 2012, approximately should have

5   been considered sick accident time.  It should

6   have been classified that way, not self-sick.

7   Therefore, I would have had another 165 hours or

8   so available to me in my sick-time bank.  Thus,

9   this wouldn't even have happened.

10      Q.   Just a point of clarification.  What

11  category applies to sick accident?

12      A.   Sick accident is the category when

13  someone has been injured or develops a condition

14  that's work related.

15      Q.   Pursuant to the medical roll section

16  that we just looked at a bit ago?

17      A.   That's right, correct.

18      Q.   I see.  Thank you.  Can you identify

19  any employees who you believe were treated more

20  favorably than you?

21      A.   Yes.

22      Q.   Okay.  Please advise or tell me any,

23  any and all employees who you believe were

24  treated more favorable than you?

1  benefits?

2    **A.    I believe that the condition that I**

3  **experienced, the progressive worsening of**

4  **headaches, the variety of medical conditions,**

5  **sleeplessness, anxiety, stress, those**

6  **conditions, those, you know, that medical**

7  **condition which was very debilitating was a**

8  **direct result of Sergeant Vardal's conduct as**

9  **well as how the department handled the**

10 **investigation and handled me during that**

11 **process.**

12   Q.   Did anybody from the Village of Oak

13 Park ever acknowledge to you that your condition

14 was caused by a work-related accident that would

15 have qualified you for worker's comp benefits?

16   **A.    Sergeant Anthony Thomas told me, when**

17 **he saw that my time was being classified as**

18 **self-sick, said to me, this is wrong.   This**

19 **should be sick accident.**

20   Q.   Anybody besides Sergeant Thomas?

21   **A.    Not that I recall.**

22   Q.   Do you know of any Village of Oak Park

23 employee who ever got worker's compensation

24 benefits for a condition like the headaches that

1    you, his response would be, good morning,

2    Officer Freelain or Detective Freelain or it was

3    always cordial and respectful.

4                 After this there's been numerous

5    instance where he won't even speak to me, where,

6    in fact, some of those instances he's even

7    looked at me pointblank in the face with a look

8    of disgust as if he spelled something really

9    foul and then just -- I continued to walk off.

10                I've had -- Commander Williams and

11   I had a great rapport prior to this.  Once I

12   reported, you know, her conduct, Sergeant

13   Vardal's conduct and the subsequent things that

14   occurred, he became very curt with me as far as

15   the interactions and to the point where there

16   was even one where I approached him to ask him

17   to review a report or whatever it was, he wasn't

18   on the phone.  He wasn't -- didn't appear to be

19   doing anything other than sitting, and he just

20   waved his hands -- his hand at me in the

21   commander's office dismissively, like get out of

22   here.  So I knew what that meant, and I just

23   left his office.

24                Sergeant Ballard, he and I had,

516

1    A.    Yes.

2    Q.    Did you -- do you know of -- strike

3    that.

4              When you talked about being -- it

5    seemed that you were being investigated for use

6    of the Family Medical Leave Act?

7    A.    Yes.

8    Q.    And particularly for using it in

9    certain types of increments?

10   A.    Yes.

11   Q.    And who were you talking about that

12   conducted that investigation?

13   **A.    Well, I was told that Deputy Chief**

14   **Ambrose wanted me to be investigated -- by**

15   **Sergeant Thomas told me that Deputy Chief**

16   **Ambrose wanted me to be investigated for using**

17   **this time because he -- I don't know.  He had a**

18   **problem with the use of my time or he felt it**

19   **warranted investigation despite the fact that he**

20   **and other command-level supervisors had been**

21   **given full knowledge of my wife's condition, my**

22   **application for FMLA time, my wife's pending**

23   **surgery and the clear and obvious need for FMLA**

24   **time.**

1      Q.   Okay.  Have you seen any documents that

2   indicate that such a paper trail was being

3   created or that would tend to support that?

4      MR. MILLER:  Objection to the form and

5   foundation.

6   BY THE WITNESS:

7   **A.   There -- I've seen documents that**

8   **support the general level of dissatisfaction**

9   **that the chief of police, for example, and the**

10  **deputy chief of police had with me at that**

11  **point.**

12      **I mean as I've testified to**

13  **before, I believe what they -- their**

14  **dissatisfaction and their anger with me was**

15  **multi-pronged for bringing to light the**

16  **possible -- the fact that Sergeant Vardal was**

17  **telling people that Deputy Chief Ambrose**

18  **protects her, the fact that I reported Sergeant**

19  **Vardal for sexual harassment, the fact that I**

20  **reported Sergeant Vardal for battery, the fact**

21  **that I had insisted that I wanted to sign**

22  **criminal complaints again Sergeant Vardal, the**

23  **fact that I had asked Frank Spataro, copied the**

24  **chief of police and the village manager to**

1   request that Sergeant Vardal be put on

2   administrative leave during the investigation,

3   the fact that I continued to request that

4   despite their attempt to tell me not to, the

5   fact that I got sick, that I developed a medical

6   condition and needed, needed time, needed leave,

7   that the job, the circumstances had caused that

8   illness.

9              They were angry about all of those

10  things, needing to use FMLA time and then

11  needing to use FMLA time for my wife because I'm

12  told that specifically by a supervisor, that

13  that time when Ballard told me the chief was

14  sick of me using FMLA time, that was my wife

15  dealing with, you know, surgical procedures and

16  treatments that were related to her diagnosis of

17  cancer.

18             So one of the documents that

19  Mr. Miller presented in his disclosure documents

20  from June 29 was a communication from the

21  chief -- from the Deputy Chief Ambrose

22  regarding -- to I think it was the director of

23  human resources -- I don't have the number in

24  front of me, but there was a document that's in

1    that long stack of paperwork that shows that he

2    was making the inquiry about my use of

3    FMLA-protected time and him saying basically,

4    him scrutinizing, him questioning it, are you

5    sure he's supposed to be using it, are you sure

6    about this, are you sure about -- you know,

7    that's -- that's in there; and that's a

8    communication from DC Ambrose.  I think it maybe

9    is to the human resources director and, you

10    know, if we need to, we can pull it out; but

11    that was one of the documents I reviewed.

12               The other --

13    Q.   Have you seen --

14         MR. MILLER:  Hold on.  I want to make an

15    objection if he's done with the answer.

16    BY THE WITNESS:

17    A.   No.  There's one other -- because you

18    asked me had I seen any paperwork that indicated

19    their --

20    Q.   Right.

21    A.   -- their dissatisfaction with me or

22    their problem with me or what have you.  The

23    second one is there's a document that's in that

24    disclosure stack of paperwork from the 29th of

1   June where the chief of police -- where a -- the

2   chief of police addresses to the head -- the

3   interim head of human resources, the fact that a

4   citizen had given me a compliment about handling

5   a situation.

6           What happened was a month prior

7   maybe a citizen had stopped me and said, hey, I

8   want to thank you for helping me with my son.

9   My son was troubled, he got in a lot of trouble,

10  you had to arrest him, but you were very fair in

11  how you treated him.  That interaction I feel

12  like really helped to turn his life around.  He

13  is now a mechanic.  He fixes imported cars.  He

14  fixed our family BMW.

15          This is what the father is saying

16  about his son, fixing their family BMW; and the

17  man says, hey, if I can let any supervisor or

18  let somebody know the good job that you're doing

19  out here and that you did with that, I'd love

20  to.  I said, hey, that would be great.  If you

21  can put it in an email, you send me an email and

22  I'll forward it to the supervisor and they can

23  put it in my file.  Thank you.  Not a problem.

24  He did that.  He sent it to me, and I forwarded

1   it to, you know, supervisor and/or like human

2   resources, asked if they could put it in my

3   file, what have you.

4               So in the disclosure documents

5   that Mr. Miller provided to us on the 29th of

6   June, there's a memo from the chief to the head

7   of HR at that time that basically addressed this

8   thing about this thank-you letter from the --

9   the compliment from the citizen; and in it it

10  basically says in part, I find it curious --

11  while although I will allow this thank-you note

12  to be put in Freelain's file, I find it curious

13  that a citizen would provide feedback to Officer

14  Freelain for something he's supposedly did four

15  years ago.

16              And when I read that, it just

17  really brought to light, it was now a sheet of

18  paper that really brought to light the kind of

19  interactions and just the tone of just total no

20  acknowledgment, no value, nothing that I get

21  from the chief of police.

22              Here's a citizen, unsolicited,

23  decides that they want to give your officer

24  feedback and you want to -- in the process of

522

1   putting that in the file what I saw it as was

2   basically giving it a black eye or raising some

3   kind of suspicions around me as if it were

4   contrived, as if I went out and found somebody

5   from four years ago to write me a letter and if

6   it was not a legitimate thing that could occur.

7               Of course, if you treat citizens

8   right and fairly, they may actually thank you

9   years down the road; and I was fortunate that

10  somebody just happened to appreciate something I

11  did.   There's a lot of good officers that do the

12  same kind of work in Oak Park.

13              So it was that kind of scrutiny

14  when I saw that document.   That was something

15  that clearly indicated to me they weren't happy

16  with me and were putting it on paper, and now

17  it's going from the chief of police to human

18  resources, you know, now designed to do what,

19  discredit me with human resources?   It was very

20  unfortunate to see that.

21              MR. MILLER:   Nonresponsive.   Move to

22  strike.

23              MR. ROBERTSON:   I believe that's the

24  questioner's objection, but I'm not making it.

1    that long stack of paperwork that shows that he

2    was making the inquiry about my use of

3    FMLA-protected time and him saying basically,

4    him scrutinizing, him questioning it, are you

5    sure he's supposed to be using it, are you sure

6    about this, are you sure about -- you know,

7    that's -- that's in there; and that's a

8    communication from DC Ambrose.  I think it maybe

9    is to the human resources director and, you

10   know, if we need to, we can pull it out; but

11   that was one of the documents I reviewed.

12                  The other --

13       Q.   Have you seen --

14            MR. MILLER:  Hold on.  I want to make an

15   objection if he's done with the answer.

16   BY THE WITNESS:

17       A.   No.  There's one other -- because you

18   asked me had I seen any paperwork that indicated

19   their --

20       Q.   Right.

21       A.   -- their dissatisfaction with me or

22   their problem with me or what have you.  The

23   second one is there's a document that's in that

24   disclosure stack of paperwork from the 29th of

533

1     **A.    That was summer -- the exact year I**

2   **can't tell you.  Approximately 2009, summer of**

3   **2009-ish.**

4     Q.   Did you ever report that to human

5   resources or make a complaint about it?

6     **A.   No.**

7     Q.   Was that in your narrative of May 9,

8   2012, or May 12, 2012?

9     **A.   It was not.**

10    Q.   You talked about multiple instances of

11  taunting by four or five officers.  Remember

12  that discussion?

13    **A.   I'm going to listen so I can make sure**

14  **I can understand.**

15    Q.   Sure.  Counsel asked you about numerous

16  interactions over a period of years, bad tone,

17  et cetera, with four or five different officers.

18    **A.   Supervisors, yes.**

19    Q.   Supervisors.

20    **A.   Yes.**

21    Q.   Did you ever report any of those to

22  human resources?

23    **A.   No.  Out of fear, no.**

24    Q.   Your testimony, if I'm not mistaken, is