# Exhibit A

# OAK PARK POLICE DEPARTMENT

### OFFENSE REPORT

| 1 OCCURRED ON OR BETWEEN | Mo. | Date | Yr. | Day | Time | 2 POST | 3 REPORT NUMBER | | |
|---|---|---|---|---|---|---|---|---|---|
| | 05 | 19 | 12 | Sat | 1624 | 13 | | | |
| | 05 | 19 | 12 | Sat | 1624 | 13 | | 12-12483 | |
| 4 REPORTED | 05 | 19 | 12 | Sat | 1712 | 5 INCIDENT CLASSIFICATION BATTERY | | | |

**6 LOCATION OF INCIDENT** 720 S. Austin

**7 FIRM NAME IF BUSINESS**

| 8 VICTIM'S NAME (last, first, middle) | | | | ☐ JUV. | 9 RESIDENCE OR BUSINESS ADDRESS |
|---|---|---|---|---|---|
| Freelain, Rasul | | | | | 123 Madison Oak Park, IL 60302 |

| 10 RESIDENCE PHONE | 11 BUSINESS PHONE | 12 SEX | RACE | AGE | 13 DOB Mo. Date Yr. | 14 SOCIAL SECURITY OR PERSONAL IDENTIFICATION NUMBER |
|---|---|---|---|---|---|---|
| | 708 386-3800 | M | B | 40 | 06 29 71 | |

| 15 REPORTED BY (last, first middle) | WITNESS ☐ YES ☒ NO | 16 RESIDENCE OR BUSINESS ADDRESS |
|---|---|---|
| Same as above | | |

| 17 RESIDENCE PHONE | 18 BUSINESS PHONE | 19 SEX | RACE | AGE | 20 DOB Mo. Date Yr. | 21 SOCIAL SECURITY OR PERSONAL IDENTIFICATION NUMBER |
|---|---|---|---|---|---|---|
| | | | | | | |

| INJURY | 22 NATURE AND EXTENT OF INJURY none | 23 HOSPITALIZED / WHERE TREATED ☐ YES ☒ NO |
|---|---|---|
| 24 ATTENDING / PRONOUNCING PHYSICIAN | 25 TRANSPORTED BY | 26 PRONOUNCED DOA Mo. Date Yr. Time | 27 M.E. NAME | 28 DATE AND TIME NOTIFIED |

| WEAPON | 29 ☐ USED ☐ DISPLAYED ☐ IMPLIED | ☐ HANDGUN ☐ SHOTGUN ☐ RIFLE | ☐ KNIFE OR CUTTING INSTRU. | 30 DESCRIBE WEAPON | ☐ BLUE STEEL ☐ CHROME PLATED ☐ NICKEL PLATED ☐ OTHER |

| 31 WAS THERE A WITNESS TO THE OFFENSE? | | | | | IF YES PLACE IN BOX A | X | A |

| | 32 ADDRESS CHECKED | PERSON INTERVIEWED (LAST, FIRST, MI) | DOB Mo. Date Yr. | TELEPHONE NO. |
|---|---|---|---|---|
| Ⓦ NC | 123 Madison Oak Park, IL 60302 | Curtin, John | 11 12 70 | RES. BUS. 708 386-3800 |
| Ⓦ NC | 123 Madison Oak Park, IL 60302 | Fellows, Paul | 11 11 72 | RES. BUS. 708 386-3800 |
| Ⓦ NC | 5701 W. Madison Chicago, IL 60644 | Dragan, Nikin | | RES. BUS. 312-743-1440 |
| Ⓦ NC | 5701 W. Madison Chicago, IL 60644 | Alfaro, Sanchez | 07 04 79 | RES. BUS. 312-743-1440 |

| 34 CAN SUSPECT BE DESCRIBED? | | | | | | IF YES PLACE X IN BOX B | X | B |

| SUSPECT NAME (ARRESTED YES ☐ NO ☐) | RACE | SEX | AGE | HEIGHT | WEIGHT | HAIR | SCARS/MARKS |
|---|---|---|---|---|---|---|---|
| Vardal, Dina E | F | W | 43 | 5'5" | 160 | Bro | |
| CLOTHING WORN BY SUSPECT Chicago Cubs 3/6 jersey, white blouse, blue jeans | | | | OTHER DISTINGUISHING FEATURES | | | |
| SUSPECT NAME (ARRESTED YES ☐ NO ☐) | RACE | SEX | AGE | HEIGHT | WEIGHT | HAIR | SCARS/MARKS |
| | | | | | | | |
| CLOTHING WORN BY SUSPECT | | | | OTHER DISTINGUISHING FEATURES | | | |

| 35 CAN SUSPECT BE NAMED? | IF YES PLACE X IN BOX C | X | C |
| 36 CAN SUSPECT BE LOCATED? | IF YES PLACE X IN BOX D | X | D |

| SUSPECT | NAME/NICKNAME/AKA | ADDRESS/FREQUENTS |
|---|---|---|
| Vardal, Dina E | | 123 Madison Oak Park, IL 60302 |

| 37 CAN SUSPECT BE IDENTIFIED? | IF YES PLACE X IN BOX E | X | E |

NAME WITNESS/VICTIM THAT CAN IDENTIFY SUSPECT (LAST, FIRST, MID)

Freelain, Rasul

| 38 HAS SUSPECT BEEN PREVIOUSLY SEEN? | IF YES PLACE X IN BOX F | X | F |

| 39 REPORTING OFFICER | STAR | SUPERVISOR APPROVING | STAR | REPORT REVIEW | C.A. |
|---|---|---|---|---|---|
| Cindy K. Williams | | N/A | | | |

Village.Rule26Discl.00025

**40 CAN SUSPECT VEHICLE BE IDENTIFIED?**      **IF YES PLACE X IN BOX G**   G

| 41 VEHICLE STATUS | VEHICLE DESCRIPTION | YEAR | MAKE | MODEL | BODY | COLOR |
|---|---|---|---|---|---|---|
| ☐ SUSPECT   ☐ STOLEN   ☐ VICTIM VEHICLE | | | | | | |

| LICENSE NUMBER | STATE | EXPIRES | VIN | DESCRIBE DAMAGE TO VEHICLE |
|---|---|---|---|---|
| | | | | |

LIEN HOLDER NAME AND ADDRESS

| IDENTIFYING FEATURES | KEYS IN IGNITION | TOWED | LEADS MESSAGE | INVENTORY |
|---|---|---|---|---|
| | ☐ YES   ☐ NO | ☐ YES   ☐ NO | # _____   MO. · Date Yr. _____ | # _____ |

**42 IS STOLEN PROPERTY TRACEABLE?**      **IF YES PLACE X IN BOX H**   H

| 43 NO. | ARTICLE | BRAND/MODEL | SERIAL NUMBER | LEADS NUMBER | DESCRIPTION | VALUE |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**44 HAS EVIDENCE TECH WORK BEEN REQUESTED?**      IF YES PLACE X IN BOX I   I

**45 WILL VICTIM/COMPLAINANT PROSECUTE IF ARREST IS MADE?**      IF YES PLACE X IN BOX J   X   J

**46 IS THERE SIGNIFICANT M.O. PRESENT?**      IF YES PLACE X IN BOX K   K

| 47 PLACE OF ATTACK | TYPE OF STRUCTURE | POINT OF ENTRY | METHOD AND SUSPECT ACTIONS | |
|---|---|---|---|---|
| ☐ Structure | ☐ Apartment | ☐ Front Door | ☐ Jimmy | ☒ Unknown |
| ☐ Vehicle | ☐ Apartment/Com. Area | ☐ Rear Door | ☐ Brute force | ☒ Struck/Injured Victim |
| ☐ School | ☐ Office | ☐ Window | ☐ Smash/Grab | ☐ Domestic Violence |
| ☐ Street | ☐ Business | ☐ Roof/Skylight | ☐ Vice Grip | ☐ Sexual Battery |
| ☐ Alley | ☐ Garage | ☐ Overhead Door | ☐ Cut Lock | ☐ Slim Jim |
| ☐ Park | ☐ House | ☐ Garage Side Door | ☐ Lock Pulled | ☐ Peeled Column |
| ☐ Yard | ☐ School | ☐ Wall | ☐ Key | ☐ Ignition Pulled |
| ☐ Parking Lot | ☐ Storage Locker | ☐ Transom | ☐ Slip Lock | ☐ Punched Trunk |
| ☒ Other | ☐ Basement | ☐ Unknown | ☐ Broke/Damaged Glass | ☐ Asked Directions |
| ☐ Unknown | ☒ Other | ☒ Other | ☐ Unlocked/Open | ☐ Offered USC/Candy |
| | | | ☐ Hid in Building | ☐ Approached From Rear |

| OCCUPANCY | If residence, where were occupants? | ALARM SYSTEM | ☐ Purse Snatch | ☐ Took Into Concealment |
|---|---|---|---|---|
| ☒ Occupied | | ☐ YES   ☒ NO | ☐ Chain Snatch | ☐ Made Threats |
| ☐ Unoccupied | | ALARM CIRCUMVENTED | ☐ Home Invasion | ☐ Used Victim's Name |
| ☐ Abandoned/Vacant | One the sidewalk by CTA platform | ☐ YES   ☒ NO | ☐ Smash/Grab Auto | ☐ Took Only Concealables |
| | | | ☐ Theft From Person | ☐ Vehicle Needed |
| | | | ☒ Ransacked/Vandalized | |
| | | | ☐ Other | |

**48 CASE SUMMARY: PROVIDE BRIEF SUMMARY OF THE EVENTS AS THEY OCCURRED**

The victim, Oak Park Police Officer R. Freelain #359 / 0806, reports that while he was on duty and investigating a suspicious vehicle parked in front of the CTA mass transit station at 720 S. Austin, on 19 May 2012 at approximately 1624 hours, he was pushed by the offender. Victim reports that the offender placed their left palm on his chest and started to push him. He turned to face the offender and observed her to be a person he knew as a Sergeant with the Oak Park Police Department. The offender then placed her right palm on his chest so that both of her hands were now on his chest and she did then pushed him against the passenger side door of his parked squad car. The offender stated to him "look out -- look out"!. The offender then left the scene and walked into the train station.

Interviews conducted for this investigation are summarized on the following pages:

**49 CAN OFFENSE BE SOLVED WITH REASONABLE AMOUNT OF INVESTIGATIVE EFFORT?**   IF YES PLACE X IN BOX L   X   L

**50 THERE A REASON TO BELIEVE THAT INVESTIGATION CANNOT BE COMPLETED AT THIS TIME?**   IF YES PLACE X IN BOX M   X   M

| BLOCK # | 51 ENTER DETAILED INFORMATION RELATED TO THE BLOCK ABOVE WITH CORRESPONDING BLOCK NUMBER AT LEFT |
|---|---|
| | |
| | |
| | |

Village.Rule26Discl.00026

# OAK PARK POLICE DEPARTMENT

## CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE 2 | REPORT NUMBER |
|---|---|---|---|---|
| | offense/incident/arrest | | OF 26 | 12-12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS, IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

| BLOCK NUMBER | |
|---|---|
| | Sergeant John Curtin #119 0238 |
| | M/W, DOB: 11/12/1970 |
| | Oak Park Police Department |
| | 123 Madison Street Oak Park, Il, 60302 |
| | 708 386-3800 |

Sgt. John Curtin was interviewed regarding this investigation on 01 June 2012, at 1340 hours in the Watch Commander's Office of the Oak Park Police Department. Curtin related the following information in summary:

Sgt. Curtin stated that on 19 May 2012, he was working as a Field Supervisor assigned to the south sector on the Day Watch, call number 5205. At approximately 1638 hours, he monitored a radio dispatch and responded to the call of a Suspicious Auto at 720 S. Austin Blvd, which is at the CTA EL station (Blue Line). Curtin recalled that he was called to the scene by one of the officers of the scene (He did not recall which officer called him). They were all standing around a mail truck. The truck was broken down and the officers called him over to see what they should do with it. Curtin stated that the officers did not know that it was a break down until later. There was no one around the truck to attend to it. He arrived on the scene and observed Officers Fellows, Officer Freelain and three Chicago Police Department officers who were on bicycles. They stood around for awhile and finally got a hold of the Post Office. They were going to assign someone to go and tow the vehicle. Curtin observed someone coming from Harrison Street. They were standing on the sidewalk and he observed that one of the persons was Sgt. Vardal. She and the other person were wearing Cub clothing. Freelain was on the curb side. He was not blocking the sidewalk and was not blocking their way. The officers were looking in the direction of Sgt. Vardal. Vardal was with another female white and this female was also wearing Chicago Cub's clothing. There was one car parked by the curb. There was a squad car with the lights on (Freelain), the mail truck which was parked right in front of the CTA exit., Fellows car was parked in front of the truck. Curtin parked close to Garfield. The women walking towards them were walking shoulder to shoulder. (continued)

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K. Williams | #10 | | | 16 Nov 12 |

OAK PARK POLICE DEPARTMENT

CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE | 3 | REPORT NUMBER |
| | offense/incident/arrest | | OF | 26 | 12-12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

| BLOCK NUMBER | Curtin (continued) |
| --- | --- |
| | They were standing just north of the CTA exit / entry point. The women were heading to the EL. Curtin observed |
| | by their dress and he believes that one of the officers even asked them if they were going to the Cubs / White Sox |
| | game which was occurring that day. They said that they were going to the game and kept walking. The officers |
| | moved out of the way to let the women by. As they were walking through the officers, Sgt. Vardal took her two |
| | hands and pushed Freelain. It looked like a 'joking around - type' of move. He was not in her way. She pushed him |
| | as she walked by. The push was with two hands to the chest of Freelain. They were facing each other at the time. |
| | After the push Freelain did not fall down or stumble back. He was pushed aside a little bit, but it was enough of a |
| | push to jostle him back. She may have said something like "look out, I'm coming through" or "get out of the way". |
| | No one responded to Vardal's comments. The Chicago Officers looked at the Oak Park Officers and Officer Fellows |
| | explained that she was one of our Sergeants. Freelain was standing by the front of his own squad car at the time. |
| | Vardal and her female companion kept walking by entered the EL stop without further conversation. They did not |
| | stop and talk. |
| | |
| | Curtin stated that he remained on the scene until the tow truck arrived and then he got in his car and left. Freelain |
| | made no statement to Vardal or any other person present at the time of the incident, that he considered Vardal's |
| | actions a Battery. No one mentioned that they thought it was a battery at the time. Curtin stated that it looked like |
| | Vardal was just kidding around. |
| | |
| | Curtin related that Freelain called him on his cell phone about 5 minutes prior to him leaving for the day |
| | (approximately 1725 hours). He told Curtin that he had an on-going sexual harassment complaint with Human |
| | Resources and he could not believe that she would touch him or push him. He was upset that she had touched him. |
| | Curtin advised Freelain that if he had a complaint going on, that he should report this incident to them. Freelain did |
| | not say that he wanted to file Battery charges at the time. Freelain told Curtin that he was going to call Human |
| | Resources and see what they had to say. Curtin completed a memo on the incident on Monday 21 May to document |
| | the incident after being told to do so by Deputy Chief Ambrose. |

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
| Cmdr. K. Williams | #10 | | | 16 Nov 12 |

Village Rule26Discl 00028

# OAK PARK POLICE DEPARTMENT

## CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE | 4 | REPORT NUMBER |
|---|---|---|---|---|---|
| | offense/incident/arrest | | OF | 26 | 12-12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS, IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

| BLOCK NUMBER | |
|---|---|
| | Sgt. Sean O'Shea M/W DOB 02/02/62 |
| | Oak Park Police Department |
| | 123 Madison Oak Park, IL 60302 |
| | 708 386-3800 |
| | Sgt. Sean O'Shea was interviewed on 04 Jun 12 at 1435 hours in the Watch Commander's office. O'Shea related the following information in summary: |
| | On Monday, 21 May he was the Acting Watch Commander Platoon II working the day shift. He was sitting in the office at around 1400 hours when Officer Freelain came in and asked him if he could speak with him and did he mind if he shut the doors. O'Shea told him that he could shut the door. Freelain had been at court so he this meeting occurred after court had concluded. O'Shea related that he was alone in the office with Freelain and that Freelain was highly agitated. He stated that although O'Shea was not aware of this, he had a sexual harassment complaint with the Village against Sgt. Vardal and that he had just come from Frank Spataro's office. Freelain related that he wanted to make a report against Vardal for a battery against him, which occurred on Saturday, 19 May. O'Shea asked him what happened. Freelain told him that they were on a call for service investigating a US Postal service truck which was broken down or illegally parked. He was there with three Chicago Officers and they were standing there to make sure that no one crashed into it. He said that Vardal, who was off duty and wearing street clothes, approached him on foot and pushed him by placing both of her hands on his chest, causing him to fall back into his squad car. He demonstrated the push as two hands to the chest which caused him to lose his balance and fall back as he raised his hands. Freelain related that he was stunned that it all happened. The Chicago Officers asked him whether he knew that woman to let her do something like that. Freelain responded "Yeah, that's one of our sergeants." O'Shea asked if Vardal said or did anything else. He said no she just said "look out, look out" and then pushed him into the side of his squad car. O'Shea then asked Freelain if he did or said anything to cause this. He said no and that he was just so shocked. Freelain told him that Sgt. Curtin was also there when this happened and so he looked at Curtin and Curtin just rolled his eyes. Vardal walked off and entered the CTA station with some woman that she was with. |

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K. Williams | #10 | | | 16 NOV 12 |

Village_Rule26Discl_00029

# OAK PARK POLICE DEPARTMENT

# CONTINUATION SHEET

| CONTINUATION OF A | BATTERY offense/incident/arrest | REPORT | PAGE 5 OF 26 | REPORT NUMBER 12-12483 |
|---|---|---|---|---|

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS, IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

| BLOCK NUMBER | |
|---|---|
| | O'Shea (continued) |
| | O'Shea stated that he asked for Freelain to have a seat. He then walked over to Deputy Chief Ambrose's office and told him |
| | what Freelain was reporting. Ambrose came into the Sergeant's office and closed the door. Ambrose asked Freelain to give him |
| | the same report he had just given to O'Shea. Following Freelain's description of the incident involving Vardal, Ambrose directed |
| | O'Shea to write him a memo describing the incident that Freelain had just described. Freelain then left the office and O'Shea |
| | typed a memo and gave it to Chief Ambrose. He has not discussed the matter with anyone else until this interview. |
| | |
| | O'Shea looked at the memo he wrote and stated that it was the same which he had submitted and that he had nothing further to |
| | add. He did mention that he pulled a number from Records for an incident report. He obtained a dispatch ticket and wrote the |
| | report number at the top of the ticket. O'Shea reported that Freelain was pacing back and forth as he described the incident to him |
| | prior to Deputy Chief Ambrose entering the Sergeant's O'Shea stated that Freelain's pacing was the basis for his earlier statement |
| | that "Freelain was highly agitated", office. This is how O'Shea ascertained that he was agitated. The tone of his voice was also |
| | a little louder than it normally is. When Ambrose came into the office Freelain sat down and lowered the tone of his voice. |
| | When the meeting concluded O'Shea believed that Freelain was under the impression that the incident was going to be |
| | documented. |
| | |
| | Officer Dragan Nikin star #9557 M/W |
| | Chicago Police Department District 15 |
| | 5701 W. Madison Street |
| | Chicago, IL 60644 Phone: 312-743-1440 |
| | |
| | Chicago Police Officer Nikin was interviewed on 01 Jun at 1435 hours. He related the following information in summary: |
| | |
| | Nikin related that he was assigned to bicycle patrol on 19 May, working the evening shift. He and his |
| | |
| | (continued) |

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K. Williams | #10 | | | 16 Nov 12 |

Village-Rule26Discl-00030

OAK PARK POLICE DEPARTMENT

CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE 6 | REPORT NUMBER |
|---|---|---|---|---|
| | offense/incident/arrest | | OF 26 | 12-12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

| BLOCK NUMBER | |
|---|---|
| | Nikin (continued) |

partners were assigned to "hit" the CTA stations and platforms as one of their missions. When they went to the station at Austin and the I-290, they observed that a mall truck was parked outside. They rode a train down to Cicero and when they came back they observed that the truck was still there. They were stopped by a Security Agent (Securitas) and asked about the truck. They called their 911 center to inquire about the matter. At this time an Oak Park Sergeant came to the scene in a Tahoe. Another officer (whom he believed was Hispanic) also pulled up in his squad car. The Oak Park officers called their dispatch and also got in contact with the Post Office. The Sergeant on the scene told them that there was a tow truck coming and then the Chicago Officers left the scene.

Nikin reported that he did not see a battery occur. He did not witness any contact between the officers and any civilians. He observed a female walk by with another female who exchanged pleasantries with the Oak Park officers as they walked by. Nikin asked the Oak Park Officer who the female was and the officer told him that it was an Oak Park Sergeant. Nikin asked this question because he saw them say hello to each other. Nikin observed that the second female who was walking with the Oak Park Sergeant, did not say anything. Nikin stated that when the females walked by, the Oak Park and Chicago officers were standing by the curb. Nikin stated that the Chicago officers remained on the scene as a courtesy until they were told that a tow truck was coming. They then left the scene. Nikin recalled that there was an Oak Park sergeant and an officer on the scene when the Chicago officers left.

Nikin stated that the officers were not blocking the sidewalk and in his opinion pedestrians had enough room to walk by. They did not have to move to allow the females room to walk by as there was enough room on the sidewalk. He related that the Oak Park female sergeant did not push him personally, nor did he witness her push or have contact with anyone else. The whole incident was over in about 15 seconds.

(continued)

| REPORTING OFFICER Cmdr. K. Williams | STAR NO. #10 | SUPERVISOR | STAR NO. | DATE 16 Nov 12 |
|---|---|---|---|---|

Village-Rule26Disc1-00031

OAK PARK POLICE DEPARTMENT

**CONTINUATION SHEET**

| CONTINUATION OF A | BATTERY | REPORT, | PAGE 7 | REPORT NUMBER |
|---|---|---|---|---|
| | offense/incident/arrest | | OF 26 | 12-12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

REPORT NUMBER: 12-12483

BLOCK NUMBER

Nikin (continued)

Nikin believes that he would recognize the female sergeant if he saw her again. Nikin reported that he was talking on the radio when the females were walking by. He did not hear any comments about anyone saying that there was a battery. Everything was pleasant and jovial.

Officer Joseph J. Alfaro #8030 M/H DOB: 04 Jul 1979

Chicago Police Department District #15

5701 W. Madison Street

Chicago, IL 60644 Phone: 312-743-1440

Officer Alfaro was interviewed on 04 Jun 2012 at 1600 hours and related the following information in summary:

Alfaro related that he was working on 19 May from 1000 to 2200 hours on a NATO detail assignment. He and a team of six other officers were assigned to bicycle patrol and were to perform train checks on the mass transit lines. At approximately 1545 hours he, Officer Nikin and Officer Sanchez did a train line check at the Blue line at Austin and the I-290. When they came up the ramp from checking the platform, they noticed a squad car parked behind a Postal truck. They asked an Oak Park officer what was going on and were told that the truck was parked there unattended for several hours. The Oak Park squad car was behind the truck. The officers were standing on the sidewalk. There were a few more marked squad cars that pulled up about three feet in front of (to the south) the postal truck.

Alfaro related that the officers were pretty much blocking the sidewalk and that they were standing by the crosswalk next to the ramp leading up from the expressway. The Chicago officers were talking to an Oak Park officer. Alfaro described the officer as a male white light skinned African American who was

(continued)

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K. Williams | KW #10 | | | 16 Nov 2 |

Village-Rule26Discl-00032

OAK PARK POLICE DEPARTMENT

CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE 8 | REPORT NUMBER |
| | offense/incident/arrest | | OF 26 | 12-12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

BLOCK NUMBER

REPORT NUMBER 12-12483

UCR

METHOD CODE 4110

PLACE CODE

CASE STATUS 0808

Alfaro (continued)

possibly mixed with Caucasian, approximately 5'10"" tall and about 170 pounds. The officers were trying to resolve the situation by tracking down where the vehicle should be. They were informed that the vehicle should not be in Oak Park. The truck did not have license plates in either the front or the back. All they had was a car number displayed on the truck. The Chicago officers also tried their dispatch but were also unsuccessful. They were told that the Oak Park officers were going to have the truck towed.

While the officers were standing there, Alfaro was facing eastbound with his back to the pedestrian railing; the Oak Park officer was facing westbound with his back towards the curb, two ladies walked past them. Alfaro related that he did not see any contact between these ladies and any of the officers. The Oak Park officer said "Yeah, she's a sergeant in Oak Park". Alfaro was not sure if the ladies went around or through the officers as they walked pass. He did not see any contact or anyone get pushed. Alfaro stated that he was not sure if a comment was made regarding the sergeant or who made a comment. He did not recall if there was any conversation between the officers and the sergeant or anyone else.

The female sergeant then entered the EL stop after passing them by. He believes that she had a Cubs or White Sox jersey. After they entered the train stop, the Chicago officers left the scene. Alfaro described the second female as being a Female White, brunette, 5'5"", 150 to 160 lbs. She may have also had on a sports jersey. Alfaro related that no one reported to him that they had been battered. He stated that he did not see anyone fall back onto a squad car and that if such a thing had of happened, he would have remembered that.

(continued)

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
| Cmdr. K. Williams | #10 | | | 16 Nov 12 |

Village_Rule26Discl_00033

OAK PARK POLICE DEPARTMENT

CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE | 9 | REPORT NUMBER |
|---|---|---|---|---|---|
| | offense/incident/arrest | | OF | 26 | 12-12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

**BLOCK NUMBER**

Officer Jose Sanchez   M/W DOB: 06/11/69

Chicago Police Department District 15

5701 W. Madison Street

Chicago, IL 60644  Phone: 312-743-1440

Officer Sanchez was interviewed on 06 June at 1435 hours at the Chicago Police Department. he related

the following information in summary;

Sanchez stated that he was working on 19 May on bike patrol with two other Chicago Officers. They

were checking the CTA station at Austin and the I-290 and noticed a stranded postal truck. The vehicle

had been there for awhile and Oak Park Police officers were on the scene investigating. Sanchez related

that while they were standing there, he observed a female walk by and push the male officer. Sanchez

saw this occur. He stated that she pushed the officer with her left hand and then the male officer

stumbled back a little. Sanchez asked the male officer who was that female. The male officer stated that

the female was a sergeant with the Oak Park Police Department. Sanchez related that the male officer's

body moved back from the push. Officer Sanchez stated the person identified as an Oak Park Sergeant

was with another female. The officers were looking at the vehicle and were not blocking the sidewalk.

Sanchez was facing east bound and our male officer was facing south west. Sanchez related that the male

Oak Park officer did not observe the female sergeant crossing the street and approaching them so he

appeared surprised when she pushed him. Sanchez was standing closest to our officer at the time and he

said " Oh, you must know her?" The male officer stated "Yeah, she's a sergeant".

The females kept walking after the incident. Sanchez related that he probably could identify the female if

he saw her again. She was bigger and heavy set. He believes that she had a Cub's t-shirt on and that she

had long hair and jeans on. They thought that the females must be going to a Cubs game because of how

they were dressed.                    (continued)

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K. Williams | #10 | | | |

Village.Rule26Discl.00034

OAK PARK POLICE DEPARTMENT

CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE | 10 | REPORT NUMBER |
| | offense/incident/arrest | | OF | 26 | 12- 12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

| BLOCK NUMBER | |
| --- | --- |
| | Officer Jose Sanchez (continued) |
| | Sanchez related that the male officer stated that the females must be going to a Cubs game after he |
| | identified the female as a sergeant. Sanchez related that he did not believe that it was that dramatic. He |
| | saw the male officer stumble back but he does not know if he got hurt. He did not see him fall over a |
| | squad car but stated that he may have bumped into his squad which was parked at the curb. |
| | |
| | After this happened another Oak Park Sergeant who was on duty and present on the scene came up to |
| | them and stated that they were going to tow the truck. The Chicago officers also called their Lieutenant |
| | to check on the matter and make them aware that the postal vehicle was there. After the push, the male |
| | officer did not say anything to Sanchez about what had happened. It was like a "nice little push". It |
| | looked to Sanchez like "Oh, you must know her". Sanchez thinks that it was with one hand that the |
| | female pushed the male. The ladies were walking together. They did not stop nor did they say anything. |
| | Sanchez states that he did not say that the ladies must have been girlfriends, nor did he hear this comment |
| | made by any officers. The push appeared to be unexpected and the male officer appeared to be caught |
| | off guard and surprised. Sanchez related that he would not let any citizen just come up and push an |
| | officer like that. This is why he asked the male officer if he knew the lady. Sanchez stated that he was |
| | like "Man, this lady needs to go to jail!" |
| | |
| | The Chicago officers were there a little while longer and then they left the scene. |
| | |
| | (continued) |

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
| --- | --- | --- | --- | --- |
| Cmdr. K. Williams | #10 | | | 16 Nov 12 |

Village_Rule26Discl_00035

# OAK PARK POLICE DEPARTMENT

## CONTINUATION SHEET

| CONTINUATION OF A | BATTERY offense/incident/arrest | REPORT | PAGE 11 OF 26 | REPORT NUMBER 12-12483 |
|---|---|---|---|---|

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

| BLOCK NUMBER | |
|---|---|
| | Officer Paul Fellows #334 |
| | M/W DOB 11/11/72 |
| | 123 Madison |
| | Oak Park, IL 60302 |

Officer Paul Fellows was interviewed in the Watch Commander's office of the Oak Park Police Department on 06 June at 1620 hours. He related the following information in summary:

Fellows stated he was working on 19 May in uniformed patrol. He pulled up in front of the CTA entrance in response to a suspicious auto. It was a mail truck that was parked just north of the entrance. According to CTA security the truck had been parked there for a couple of hours. Fellows was the first car on the scene. Freelain pulled up in front of Fellows. Fellows was parked just north of Garfield facing north bound against the traffic. Freelain was southbound on the west side of the street between the ET truck and the Postal truck. The postal truck was parked right by the off ramp to the I 290. The officers tried the doors of the truck and talked to security to try to find out why the truck was there. About five to ten minutes later, three Chicago Bike officers came up from out of the train station. They said that they were riding the trains for NATO. After WSCDC told them that the postal van that was there is not from the Oak Park station, the Chicago officers called their station to see what they could find out. Sometime after this, Sgt Curtin pulled up. He was southbound on the west side of the street and parked south of Officer Fellows. Sgt. Curtin then said that there was a towing service that may be responding. WSCDC also said that someone was coming to tow the truck. The Oak Park Officers then stood around talking to the Chicago officers about NATO. As they were talking to them, the Chicago officers were north of the entrance to the CTA platform. They were standing by the northwest curb just off of the I-290 east bound exit. Freelain pulled his car behind the mail truck to direct traffic so that everyone would see the truck. (continued)

| REPORTING OFFICER Cmdr. K Williams | STAR NO. 10 | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|

Village-Rule26Discl-00036

OAK PARK POLICE DEPARTMENT      CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE 12 OF 26 | REPORT NUMBER 12- 12483 |
|---|---|---|---|---|

offense/incident/arrest

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

REPORT NUMBER 12-12483

**BLOCK NUMBER**

Officer P. Fellows (continued)

Then Fellows said to Sgt. Curtin that he was going to let the CTA female employee know that someone from Franklin Park was going to come over and make sure that the postal truck was going to be moved, because they did not know this at the time. Fellows then was walking to go back to Freelain. This is when he saw Sgt. Vardal and some other female coming towards them. Vardal was wearing Cubs gear. She said "Hi Paul". He said "Enjoy the Cubs game", and then she left.

When Fellows saw Vardal, she was already past the other officers and was about to enter the CTA doorway. Fellows went over and talked to Freelain. They talked some more with the Chicago officers. The Chicago officers then left the scene first and then Curtin left; followed by Fellows; with Freelain remaining on scene. Freelain was waiting for the tow truck driver to come and waited to ensure that the vehicle did not get hit.

Fellows related that he did not observe anyone get pushed. He did not know anything about this (an impending Battery investigation) until Curtin advised him that he was to be interviewed about the incident. Fellows had asked Curtin about it to find out if the car had gotten towed and whether it was stolen. Fellows stated that he had a conversation with Curtin on Saturday 02 June asking if the postal truck had been towed, and if it was stolen.

Fellows stated that Freelain asked him about this incident after 19 May but before 02 June; Fellows stated that he could not recall the specific date. Fellows reported that the conversation with Freelain occurred on a call for service for a Criminal Damage to Auto around Taylor and Washington. Fellows reported that Freelain asked him where he was when Vardal appeared on the scene. Fellows informed Freelain he was in the station which is where he observed Vardal and her companion.

(continued)

| REPORTING OFFICER Cmdr. K. Williams | STAR NO. 10 | SUPERVISOR | STAR NO. | DATE 16 Nov 12 |
|---|---|---|---|---|

Village-Rule26Discl-00037

OAK PARK POLICE DEPARTMENT

CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE | 13 | REPORT NUMBER |
|---|---|---|---|---|---|
| | offense/incident/arrest | | OF | 26 | 12- 12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

REPORT NUMBER 12-04 83

| BLOCK NUMBER | |
|---|---|
| | **Fellows (continued)** |
| | Fellows commented that Vardal did not appear to be angry. She only said hello to him and he does not |
| | know if she spoke to anyone else. Fellows stated that there is a camera right outside the station covered |
| | by a gray dome, suggesting that perhaps there is a video recording of the alleged incident. Freelain did |
| | not mention anything to Fellows that day about being battered. Fellows stated that his demeanor |
| | appeared typical. He did not appear excited or anxious. They left the scene about five to ten minutes |
| | after Vardal walked by. The officers were not blocking the street as they were standing on the sidewalk. |

UCR

| | |
|---|---|
| | Stacey Mott    F/W  DOB: 05/20/70 |
| | 1308 Chestnut Lane |
| | Yorkville, IL 60560 |
| | (815) 791-5274 |

METHOD CODE

PLACE CODE

| | |
|---|---|
| | Stacey Mott was interviewed by telephone on 07 June 12 at 1945 hours. She related the following |
| | information in summary: |

CASE STATUS

| | |
|---|---|
| | She and Dina (Sgt. Vardal) were walking to a CTA stop to go see a CUB's game. She related that it was |
| | the game where the Cubs played the Chicago White Sox (cross town classic). Ms. Mott stated that as she |
| | and Vardal crossed the street and approached the CTA station, she observed five or six uniformed |
| | officers talking as they stood across and blocked the sidewalk. Dina recognized one or two of them to be |
| | Oak Park Police Officers. She did touch one of them. She just kind of put her left hand on his right |
| | shoulder and said 'Hey copper get out of my way". It was jokingly,... it wasn't mean. It was just funny. |
| | The whole thing went really quick. I believe the male officer said "Hey Sarge" and they kept walking. |
| | They then entered the EL station.              (continued) |

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K. Williams | 10 | | | 16 Nov 12 |

Village-Rule26Discl-00038

OAK PARK POLICE DEPARTMENT

**CONTINUATION SHEET**

| CONTINUATION OF A | Battery | REPORT | PAGE 14 | REPORT NUMBER |
| | offense/incident/arrest | | OF 26 | 12- 12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

**BLOCK NUMBER**

**Mott (continued)**

Mott believes that Vardal may have said that they were going to the CUBS game. They did not even stop so that she may be introduced to the guys she described as all male, white police officers. None of them said anything to her. It wasn't any big thing for her to remember. It was a non-issue because they were in a hurry to get to the game.

Mott stated that she did not observe the male officer's physical position be affected by Vardal's action. It just seemed like just a little thing. The whole incident was odd. She got the impression that Vardal knew the subjects, principally because one of them said "Hey Sarge" to her. They weren't moving for us. It was odd that they didn't stop and chit-chat.

Mott related that she is an officer with the Yorkville Police Department. In her opinion what occurred that day was not a Battery. It was not insulting or provoking. It was just a joke like people do when the greet others that they know. Like people chest bumping. It was like that. Mott stated that there was no apparent intent in this incident to commit a battery. Mott related that she is friends (probably best friends) with Vardal since college. She did not see the male officer fall back on the car. She does not believe that he stumbled. He may have moved back some but it was not by a lot as if Vardal did a power move. She saw Vardal's left hand on the male subject's right shoulder. He was the closest one of the subjects to them. He was standing by a squad car which was behind him.

On 08 June 12 at 1620 hours, Jim Higgins of CTA Security ((312) 681-4567) was contacted to obtain any video evidence which may be available from the camera directly outside of the CTA station at 720 S. Austin. Higgins related although the camera would capture the images outside of the station on the sidewalk, they only retain about seven days worth of footage. He related that they presently can only go back to 28 May and as this incident occurred on 19 May, CTA would have no footage available.

(continued)

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
| Cmdr. K. Williams | 10 | | | 16 Nov 12 |

Village.Rule26Discl.00039

OAK PARK POLICE DEPARTMENT

**CONTINUATION SHEET**

| CONTINUATION OF A | Battery | REPORT | PAGE 15 OF · 26 | REPORT NUMBER 12- 12483 |
| --- | --- | --- | --- | --- |
| | offense/incident/arrest | | | |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

**BLOCK NUMBER**

Officer Rasul Freelain #334 0806

123 Madison

Oak Park, IL

708 386-3800

Officer Rasul Freelain was interviewed on 15 Jun 12 at 1520 hours in the Watch Commander's office of the Oak Park Police Department. Present during the interview was Freelain's representative from the FOP Labor Council, a Mr. Aaron Janik - Attorney 5600 S. Wolf Road, Western Springs, IL 60558, 708 784-1010. Freelain related that he was ready to proceed with the interview.

Freelain related the following information in summary:

At approximately 1630 hours on 19 May, he and Officer P. Fellows were assigned to a suspicious auto call at 720 S. Austin. It was a postal vehicle. There was conversation that the vehicle was cloned. No one could determine where the vehicle was from. They were concerned because it was NATO weekend. Fellows was 1st on scene, he arrived sometime later. They were then joined by Sgt. Curtin and three officers from the Chicago Police Department. During the course of that investigation, there was conversation where Chicago P.D. offered to give us assistance. They called their dispatch to try to figure out where the vehicle was from and whether they could tow the vehicle. The Oak Park officers were making there own telephone calls to try and resolve the matter. There was an Hispanic, an Asian and one that was white. The Hispanic officer was the one talking to Chicago's dispatch. As that was taking place, there was conversation that a tow was on the way. They had to get the vehicle out of there. The three Chicago officers were helpful but they were also crude. Freelain reported that he overheard the Chicago officers making comments to each other regarding women who were passing by such as "She's beautiful", or "That's a nice dress".

(continued)

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
| --- | --- | --- | --- | --- |
| Cmdr. K. Williams | 10 | | | 16 No12 |

Village.Rule26Discl.00040

OAK PARK POLICE DEPARTMENT

CONTINUATION SHEET

| CONTINUATION OF A | Battery | REPORT | PAGE | 16 | REPORT NUMBER |
| | offense/incident/arrest | | OF | 26 | 12- 12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

| BLOCK NUMBER | |
|---|---|
| | Freelain (continued) |
| | Freelain reported that he was positioned at the east-bound exit of the I-290, facing southwest towards the entrance to the Blue Line with his car facing on a south-east diagonal direction at the same location. Freelain stated that he was standing near the Chicago officers when he heard one of them state that there were some women walking towards them, pointing north on Austin. Freelain looked in the direction that the Chicago officer was pointing, where he observed two women: one with a blue jersey; one with light colored hair; approximately one block away, approaching the parking lot of 618 S. Austin, and then turned back around towards the entrance to the Blue Line. |
| | After about two minutes he felt and saw a left palm on his right chest. The left hand was beginning the process of pushing him. It seemed like the world was moving in slow motion. He was shocked because he was standing with five officers. Curtin was about 10 feet away with his body was facing east. Curtin was looking in the direction of Freelain. The three Chicago officers were on bikes and they were kind of staggered, they were together but they were not blocking the sidewalk. They were holding their bikes. Freelain felt the left hand on his chest, he looked and saw Sgt. Vardal in a Cubs jersey. He turned and had tunnel vision. The second hand (her right hand) pushed the right side of his chest. Both of her hands were equally pushing and driving him backward. Freelain reported Vardal's contact as a 'driving push that caused him to take three steps back'. He was totally in disbelief. He felt his heart rate go up. He was caught off guard. He was further alarmed when he learned that it was Vardal. This was someone touching him in an unwanted way. He was driven back until his back touched a part of his squad car, by the mirror. He was two steps off of the sidewalk with no where else to go. |
| | (continued) |

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K. Williams | 10 | | | 16 Nov 12 |

Village-Rule26Discl_00041

**OAK PARK POLICE DEPARTMENT**

**CONTINUATION SHEET**

CONTINUATION OF A ___ BATTERY ___ REPORT
offense/incident/arrest

PAGE 17 OF 26

REPORT NUMBER: 12- 12483

REPORT NUMBER: 12-12483

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

| BLOCK NUMBER | |
|---|---|
| | Freelain (continued) |

She pushed him until he was stopped by the car. It was a push and a stop. The whole thing lasted about five seconds. She held him in the push. He felt really vulnerable. If he did what he would normally do if it were a citizen off of the street, she would have been handcuffed. He felt he would have been in a really vulnerable spot if he defended himself, so he put both of his hands up and out as if he was surrendering. He had to start arching his back. She said "Look out. Look out!" This wasn't look out because I'm concerned for your safety. He felt that there was a taunting element to it. She was grinning at the time. He felt like "why are you touching me?" They were not blocking the sidewalk, so he did not know why it was happening.

Vardal then disengaged and turned. The other woman was standing to Vardal's right, closest to the fence. Vardal then took her hands off of his chest turned and walked back to the middle of the sidewalk. He does not recall if Vardal and her companion said anything to any of the officers. Freelain reported that Vardal proceeded to enter the CTA station at that point. As this was happening, he was humiliated and embarrassed. He was concerned if anyone was watching this. There were five officers on scene and she did not make contact with any of the other officers. This was not horseplay.

After she went into the station, one of the officers, perhaps the Hispanic officer or the white officer who was standing the closest to him, asked him who was that. He asked if that was an officer. Freelain told them that it was a Sergeant. One of them said out loud, "Who was that person who was with her?", and if that person was her lover or girlfriend. They were asking about a romantic thing. Neither women were present when the comment was made as they had both already walked past Curtin into the lobby of the CTA station. Curtin and Freelain made eye contact and Curtin then shook his head in a disapproving manner. Curtin had a disgusted look on his face. Freelain mumbled "Who knows"?, in response to the officer's question. The Chicago officers then went back to what they were talking about.

(continued)

REPORTING OFFICER: Cmdr. K. Williams   STAR NO. 10   SUPERVISOR   STAR NO.   DATE

Village-Rule26Discl-00042

OAK PARK POLICE DEPARTMENT

CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE | 18 | REPORT NUMBER |
|---|---|---|---|---|---|
| | offense/incident/arrest | | OF | 26 | 12-12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

| BLOCK NUMBER | |
|---|---|
| | **Freelain (continued)** |
| | A couple of minutes passed by. Freelain was in shock. Curtin then came to him and said that |
| | Fellows was going to clear. Curtin was getting ready to clear the call. He said that when he |
| | cleared, he wanted Freelain to wait on the scene for the tow truck. He also told him that when he |
| | goes into the station, he wanted him to type a memo to the Command staff to tell them about the |
| | truck. Chicago officers then left, so did Curtin. Freelain went into his squad car to wait on the |
| | tow. He was on this call at 1630. He waited in the squad car until about 1650 hours. He waited |
| | for a couple of minutes and then decided to call Sgt. Curtin. He believed that he must not know |
| | that 10 days prior, he had made a complaint of sexual harassment against Sgt. Vardal. |
| | |
| | He called Curtin on his cell phone and asked for a meet. It was about 10 or 12 minutes after |
| | 1700 hours. Curtin said that he was about to go 42 at 1730 hours, but he could spend a couple of |
| | minutes with him on the telephone. Freelain asked Curtin if he was aware that 10 days ago he |
| | had filed a Sex Harassment case against Sgt. Vardal. Curtin was in shock. He said that he didn't |
| | know about the complaint but he was wondering why she pushed him into the side of a squad |
| | car. Freelain said he did not know if it was retaliation or if Vardal was out of her mind, but that |
| | he could not believe that this thing just happened. Curtin asked him what procedures had he |
| | followed on the Sex harassment case. Freelain said that he followed Dept. procedure and took it |
| | to Human Resources. Curtin told Freelain to document what happened and give it to Spataro. |
| | He told him to put his name in the report and state that he had seen the whole thing. He said |
| | please do this because this is getting out of control. They then ended the telephone call. It was |
| | just a couple of minutes. Before he called Sgt. Curtin, he called his wife to make her aware but |
| | she did not answer. He then called Sgt. Curtin and he was still waiting on the tow. A few |
| | minutes passed and then he went over the air to request relief so that it would not run into |
| | overtime. At approximately 1745 hours he then contacted the Watch Commander to ask for |
| | relief. Sgt. Lepcznski went over the air and said he would send him a relief car. |

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K. Williams | 10 | | | 16 Nov 12 |

Village_Rule26Discl_00043

OAK PARK POLICE DEPARTMENT

**CONTINUATION SHEET**

| CONTINUATION OF A | BATTERY | | | | |
|---|---|---|---|---|---|
| | offense/incident/arrest | REPORT | PAGE 19 OF 26 | REPORT NUMBER 12-12483 | |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

**BLOCK NUMBER**

Freelain continued

Tworek and Cook responded to Lepczynski's call to relieve Freelain who proceeded to the station where he typed an email as directed by Sgt. Curtin regarding the incident with Vardal. He then went home and told his wife what had happened.

Persons who were on the scene of this incident which occurred on 19 May included Freelain, Sgt. Curtin, Officer Fellows, and three Chicago officers. On Monday the 21st in the morning around 0830 hours, Freelain met with Frank Spataro and told him. Freelain met with Spataro and reported to him. He was told that an outside investigator is going to handle the matter that he reported on 09 May. Freelain reported that Spataro told him to put the incident concerning Vardal in writing for the investigator. Freelain then went to afternoon court. Freelain reported that he informed Aaron Janick, counsel for the Illinois FOP Labor Council about the battery. He then came in after the afternoon court and spoke to the afternoon Watch Commander which was Sgt. Sean O'Shea. Freelain reported that he had informed Spataro of his intention to file a criminal complaint against Vardal for her actions.

Spataro told Freelain that he did not know if Vardal knew about his complaint prior to the pushing incident. He was not aware if Vardal was advised. Freelain was in uniform at the time of the incident and on a work related assignment.

Freelain characterized the incident as "duty related". He stated that he was on duty on assignment, he was not on a personal break. He was in the process of completing his assignment when he was battered. This is a duty related battery.

Freelain related that he did not know if he was pushed because he is a uniformed officer. He is not a psychologist or mind reader. It is apparent to the world that he was on duty. He did not have to determine the psychological mind set of Vardal. It was unprovoked while he was executing his duties. No one would mistake him for being a security guard.

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K Williams | 10 | | | 16 Nov 12 |

Village.Rule26Discl.00044

OAK PARK POLICE DEPARTMENT

CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE 20 OF 26 | REPORT NUMBER 12-12483 |
|---|---|---|---|---|
| | offense/incident/arrest | | | |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

**Freelain (continued)**

He knows that Vardal does not like him personally but he knows that this incident was job related.

Freelain related that there were no other comments that he recalled at the time of the incident. He mentioned to Sgt. Curtin that he hopes the mike in his car works. He hopes that he checks the audio and video in the squad car.

Freelain stated that yes something had occurred that he felt was a causal factor in the incident of 19 May. He stated that he was the involved in a four hour interview and that for the past several years he has experienced hostile environment and sexual harassment from Sgt. Vardal in a variety of situations. He was alarmed by the incident then and still alarmed today.

Freelain state that he had previously filed a complaint with the Village of Oak Park and the Oak Park police department involving Sgt. Vardal.

Freelain related that he did not know whether Vardal was advised of the filing of his complaint prior to the 19 May incident. He had reported the incident with Human Resources and with Sgt. Curtin and Sgt. O'Shea and Deputy Chief Ambrose. He was told by Deputy Chief Ambrose on 21 May that to the best of his knowledge that no one has informed her that a complaint had been filed. This is the same thing that Spataro told him, however he does not know, because these are human beings. In the meeting with Ambrose he told Freelain that he was not being ordered to not discuss the matter with anyone. However he then turned and told Sgt. O'Shea that he was being ordered not to discuss the matter.

One week went by and he was trying to determine where Fellows was in this incident. On Memorial Day, he and Fellows were on a call. He asked Fellows not to be insulted because he was being vague.

(continued)

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K Williams | 10 | | | 16 Nov 12 |

Village.Rule26Discl.00045

# OAK PARK POLICE DEPARTMENT

**CONTINUATION SHEET**

| CONTINUATION OF A | BATTERY offense/incident/arrest | REPORT | PAGE 21 OF 26 | REPORT NUMBER 12-12483 |
|---|---|---|---|---|

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

**BLOCK NUMBER**

Freelain (continued)

Freelain reported that he asked Fellows if he remembered anything concerning the incident with Vardal on 19 May. Fellows stated that he remembered the call and that he was in the lobby of the train station when Vardal and a person he thought was from the West Suburban Consolidated Dispatch Center enter the station. Fellows stated that he had a short conversation with Vardal and her friend and then they proceeded to the train platform. Freelain told Fellows that someone may ask him questions about this later and told Fellows that while he (Freelain) did not have anything to hide, he could not say anything more about it.

Freelain related that no incidents have occurred involving Vardal since 19 May. Freelain also related that he had not told Vardal not to touch him either before, during or after the incident. For fear of retaliation, he had never made any comments of this sort to her to do anything to him.

Freelain related that he felt that Vardal was dangerous and unpredictable and that he reported the same to the Chief of Police and to Human Resources. Freelain related that this is a person who has repeated a cycle of approaching him with the intention of having a romantic relationship or interaction. He has been subjected repeatedly to this. This cycle goes on and on. She extended the arm back out after he had previously expressed rejection (meaning continued advances were made).

Freelain asked that Vardal be placed on administrative leave, stating it was his right to do so. He was in fear of being physically hurt. If you look at what he has documented in detail with HR, it has culminated to this point of him being battered on duty. The danger is that this has been on-going conduct for several years. She has never touched him, 10 days after he made the complaint, she shoved him against a squad car. This is dangerous behavior. Every officer knows that she has been disciplined before for sexual harassment. When he finally put his foot down, he ended up getting battered. If no one said anything to her, it should even be more alarming.

(continued)

| REPORTING OFFICER Cmdr. K. Williams | STAR NO. 10 | SUPERVISOR | STAR NO. | DATE 16 Nov 12 |
|---|---|---|---|---|

OAK PARK POLICE DEPARTMENT

CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE 22 | REPORT NUMBER |
|---|---|---|---|---|
| | offense/incident/arrest | | OF 26 | 12-12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS, IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

**BLOCK NUMBER**

Freelain (continued)

Just 4 days prior to his complaint, she was calling him on his cell phone. There are so many reports in this department where she has been doing things to males including rubbing their genitals. He could not be expected to just walk off. They were now in full blown physical contact. They are police officers. They carry firearms. What has to happen to him next. The touching of him in the context of these facts makes it dangerous.

Freelain explained that he felt the incident of 19 May should be considered criminal because it meets the statute elements for Battery 720 ILCS 5/12-3(a)(2), (Freelain reads the definition). He stated that a push or shove is provoking or insulting because there is no relationship between them, as far as anything that he has done. There were five officers out there. Vardal sought him out. It was conspicuous. He was completely embarrassed. This is someone who has come to him before that he has tried previously to discourage before by saying "Let me check with my wife on that.". She still comes to him again. He tried his best to tell her that "I am not buying what you're selling". This whole thing has been uncomfortable. Freelain has said to Vardal on multiple occasions, when she has made comments that he deemed inappropriate, "Let me check with my wife, and I'll get back to you". She is a supervisor and she has a lot of power and influence over him.

Also he feels that this is criminal because in the beginning of 2010, she entered the juvenile office while he was working as a detective. She told him that she believed she was under investigation. She was looking for detective Stewart. Freelain told her that he did not know where Stewart was. She then said that Sgt. Moran is out to get her and that is why she called someone in administration so that matter could be taken care of. This is why he is concerned. She had put him on notice that if she has problems, she goes to administration to get them dealt with. He believed Vardal was telling him that "I don't care that there are five officers around, I can still come up and push you and taunt you and you can do nothing about it". In the previous encounter, she named a member of the administration. (continued)

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K. Williams | 10 | | | 16 Nov 12 |

Village.Rule26Discl.00047

OAK PARK POLICE DEPARTMENT

CONTINUATION SHEET

| CONTINUATION OF A | BATTERY | REPORT | PAGE 23 OF 26 | REPORT NUMBER |
|---|---|---|---|---|
| | offense/incident/arrest | | | 12-12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS, IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

**BLOCK NUMBER**

Freelain (continued)

She said "That's why I called him.", so that she wouldn't have problems with Sgt. Moran. She was intimidating him with the power she had over him. He felt she was saying that "if you are out to get me, I can call administration". He felt like she was telling him that when she is about to get in trouble, "I have a close relationship with this person, so that if I have any problems, this is what I can do". Freelain stated that she had the power to make stuff to go away. This had already been going on for two plus years. He felt vulnerable, like no one was going to do anything. This was done in the context of her having her own problems. He has worked with enough victims to know what she was implying. When someone is giving them a hard time, that is why I had to call so and so, to get it taken care of. He felt that she was talking to him. She in a was very frazzled state. This is what he meant by dangerous. He thought what might happen if this person not stable.

Freelain stated that it was not incidental contact. No one else on scene received the contact. Any other reasonable person on the scene would have likewise felt that it was provoking. It happened while he was on duty and he was in a public way. This is class 3 felony. This is a major deal and not an LO ticket.

He is concerned that he may see her in court. He is genuinely concerned for his safety. He feels that at this point, that if you did all this and she told him before that she can just make it go away. He is concerned for his safety as it relates to physical injury. He is also concerned by any possible attempt by her to make a counter claim that he has touched her inappropriately. Desperate people say things sometimes. He has no history of inappropriate behavior. No one has anything against him. People know his character. But when you tell him that you're connected, he becomes concerned.

Freelain related that he did not suffer any injury during the incident of 19 May. He felt that he was insulted.

(continued)

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K. Williams | 10 | | | 16 Nov 12 |

OAK PARK POLICE DEPARTMENT

CONTINUATION SHEET

| CONTINUATION OF A _____ BATTERY _____ REPORT | PAGE 24 OF 26 | REPORT NUMBER |
|---|---|---|
| offense/incident/arrest | | 12-12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

| BLOCK NUMBER | |
|---|---|
| | Freelain (continued) |

Based on his experience knowledge of the statute, he knows that when a uniformed officer is executing his duties and a battery occurs, this makes it a class 2 felony. And if anyone is battered on the public way, it a class 3 felony. He was not in an apartment. He was not blocking the public way. People were able to pass by. Even if she felt that they were blocking, why would she push him. No one had to move out of the way to allow them to pass.

Freelain stated that he did report that he was battered 15 minutes after the incident when he reported to Sgt. Curtin. He was the supervisor on the scene and he was the acting watch commander.

He did not recall if anyone made a comment regarding whether the incident of 19 May was a battery. They responded like that had to be someone you knew because otherwise you would have tackled her. He was embarrassed because he was pushed by a women and thought they were thinking that they just got punked. This is why is was such a humiliated experienced. His training is that if anyone puts his hands on him, at a minimum, they are going to get a check. So because of fear of knowing that she had people will be open to her version of what she tells, he had better be clear on what happened. He decided to just take it. No one said that you should arrest that person, because of his response. They figured that you got to know that person. Sgt. Curtin just looked disapprovingly. He did not ask for assistance from the Chicago Police because he did not want his business in front of them. He did not want to get embarrassed. He was in shock because he had just reported her and now this occurs. And my on-duty watch commander was standing right there and he did not say anything. so he decided to keep himself together and follow up with the supervisor later, to ask if knew that this was not welcome contact.                                                      (continued)

| REPORTING OFFICER Cmdr. K Williams | STAR NO. 10 | SUPERVISOR | STAR NO. | DATE 16 Nov 12 |
|---|---|---|---|---|

OAK PARK POLICE DEPARTMENT

**CONTINUATION SHEET**

| CONTINUATION OF A | BATTERY | REPORT | PAGE | 25 | REPORT NUMBER |
|---|---|---|---|---|---|
| | offense/incident/arrest | | OF | 26 | 12-12483 |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

Freelain (continued)

He did not tell Curtin that he wanted to arrest her for battery, nor did Curtin ask him. He asked him what did you do the last time and then told Freelain to follow up with documenting the incident in a memo.

Freelain did tell Sgt. O'Shea that he wanted to file complaints. He was told that this is an 'active investigation' by Deputy Chief Ambrose. Freelain told Ambrose that at the end of this he wished to sign complaints. This was in the conversation with Ambrose and O'Shea on 21 May.

Freelain spoke to his wife and Detective Stewart on a limited basis about this case. Stewart had known about the incident since 05 May. He felt comfortable speaking about the matter to her. She was his partner and she had seen some of the prior incidents 'first-hand'. After the battery, he told her about the incident and that he was reporting this to the Department.

Freelain related that he has been pushed and tackled to the ground previously by members of this department. Specifically in the context of self-defense training. But he has never been inappropriately pushed by any member of the Department, male or female. Freelain related that he has as part of training (control tactics) been bumped or pushed another officer. He has also shaken hands with other officers. But he has never touched anyone on this job in an insulting or provoking or criminal manner.

Freelain stated that what he wished to be done is that Vardal should be charged with two felonies and a misdemeanor. She should be held accountable by the Department and the Village. There is nothing that she has done which matches our standards. She continually harasses and sexually pursues fellow members. This is a pattern of behavior that needs to be handled appropriately however the department decides. Freelain stated that if he had of done this, if he had harassed the Sergeant and then battered her and told her to 'look out' then he would certainly be held responsible. It is worse in this situation because Vardal is a supervisor. If she gets away with this then no one is safe.

(continued)

| REPORTING OFFICER | STAR NO. | SUPERVISOR | STAR NO. | DATE |
|---|---|---|---|---|
| Cmdr. K. Williams | 10 | | | 16 Nov 12 |

Village Rule26Discl.00050

# OAK PARK POLICE DEPARTMENT

**CONTINUATION SHEET**

| CONTINUATION OF A | BATTERY REPORT | PAGE 26 OF 26 | REPORT NUMBER 12-12483 |
|---|---|---|---|
| | offense/incident/arrest | | |

USE A NARRATIVE SUMMARY WITH OFFENSE, INCIDENT, ARREST AND INVESTIGATIVE ACTION REPORTS. IF INFORMATION IS AN EXTENSION OF A REPORT, ENTER BLOCK NUMBER AT LEFT

Dina Vardal     F/W, DOB 11/25/68

123 Madison

Oak Park, IL 60302

708 386-3800

Ms. Vardal was interviewed on 26 Jun 2012 at 1410 hours in the Watch Commander's office of the Oak Park Police Department. Present at the time were R/C and Commander P. Howard. Vardal was advised of the allegations against her, informed that she was not in custody and was read an Oak Park Police Department "Advise of Rights" form. Vardal received and signed the form. She then did thereafter state that upon the advice of council she was refusing to give a statement at this time. She was provided a copy of the Advise of Rights form. The interview was concluded at that time at 1415 hours.

In addition to the above reported interviews, on 08 Jun contact was made with Jim Higgins, the manager of CTA Security Services, 1(312) 681-4567 regarding any possible video evidence from the camera located in front of 720 N. Austin. Higgins related that there is no video evidence retained from that location for the date of the incident on 19 May.

Two squad car videos from the vehicles assigned to this incident were obtained for this investigation. The video from squad number 522 (operated by Freelain) does not show the sidewalk where the incident occurs. A few people can be seen walking into the street as if the side walk is blocked. The video from squad number 515 (operated by Fellows) shows Sgt Vardal and her companion emerge from the group of officers who appear to be bunched together on the sidewalk. Vardal's arm can be seen going up briefly but the image is not clear enough to see what she is doing. The angle of the camera in relation to the sidewalk does not give a clear visual image. These videos were inventoried as evidence for this investigation.

This is the end of the report.

| REPORTING OFFICER Cmdr. K. Williams | STAR NO. 10 | SUPERVISOR | STAR NO. | DATE 16 Nov 12 |
|---|---|---|---|---|

Village.Rule26Discl.00051

# Exhibit B

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RASUL FREELAIN,                )
                               )
              Plaintiff,       )
                               )
       vs.                     )    No. 13 C 3682
                               )
VILLAGE OF OAK PARK, a         )
municipal corporation,         )
SERGEANT DINA VARDAL, in       )
her individual capacity,       )
                               )
              Defendants.      )


        The deposition of RASUL FREELAIN,

called by the Defendant for examination,

pursuant to notice and pursuant to the Federal

Rules of Civil Procedure for the United States

District Courts pertaining to the taking of

depositions, taken before Susan M. Reed,

Certified Shorthand Reporter for the State of

Illinois, at 55 West Monroe Street, Suite 800,

Chicago, Illinois, at 11:00 o'clock A.M., on the

2nd day of June, A.D., 2015.

Page 76

1    A.    Yes.

2    Q.    And that had happened in 2005, seven

3 years before your incident, correct?

4    A.    I don't know the exact year.

5    Q.    But you knew for many years prior to

6 May 9, 2012, that the administration

7 investigates sexual harassment complaints; is

8 that a fair statement?

9    A.    That's a fair statement.

10    Q.    Did Dina Vardal ever make an offensive

11 joke to you?

12    A.    Not that I recall.

13    Q.    Did Dina Vardal ever call you a name?

14    A.    No.  She yelled at me, but I don't know

15 if she called me a name.

16    Q.    When did she yell at you?

17    A.    There was an incident when Schonella

18 Stewart and I were partners.  We were working

19 nights.  Time frame would have put it at

20 approximately 2010 or so, where --2009, 2010,

21 where -- I don't remember the total

22 circumstances, but what I recall was we were

23 sort of getting ready to end our tour of duty.

24 It was close to the end of the night, and we

Page 85

1 incidents like when she sent you a birthday

2 email which you would say -- would that fall

3 into the harassing component or the harassing

4 with a sexual overtone component?

5    A.    That one I can't say for sure.  I would

6 think -- how I felt was you're creating, you're

7 trying to create some kind of personal

8 connection with me.

9    Q.    Sure.

10    A.    You're thinking about me.  It's almost

11 my birthday.  You just want me to have a good

12 time, those sort of things.

13    Q.    Sure.

14    A.    So I think that would sort of gravitate

15 more towards something that was unwelcome in the

16 context of some of the other things; but, again,

17 I can't read her mind, so I can't tell you

18 fully.  I just know it was unwelcome and

19 unwanted.  I didn't want it.

20    Q.    Sure.  But that incident where she

21 wished you happy birthday on the Oak Park Police

22 email system is one of the incidents which you

23 believe was part of her attempt to solicit you,

24 right?

Page 86

1    A.    Yes, I think that's fair to say that.

2    Q.    And do you know whether Dina ever sent

3 birthday email wishes to anybody else in the

4 department?

5    A.    I don't know.

6    Q.    Did you ever ask?

7    A.    I wasn't going to ask her, so I never

8 asked.

9    Q.    Did you ever ask anybody else whether

10 Dina Vardal sent birthday wishes to them?

11    A.    No, I didn't ask anybody else.

12    Q.    Would it shock you to know that Dina

13 Vardal sends birthday wishes to many, if not

14 all, staff members because she gets them from

15 the roll, the date of your birth?

16        MR. ROBERTSON:   Objection.   Assumes

17 facts not in evidence.

18 BY MR. MILLER:

19    Q.    Strike the question.   Would it surprise

20 you to know that Dina Vardal sends birthday

21 wishes to many other staff members besides you?

22    A.    No, it wouldn't surprise me.

23    Q.    Why did you believe that just because

24 Dina Vardal sent you a happy-birthday email on

Page 87

1  the Oak Park official email system that that was

2  somehow soliciting you to have a sexual

3  relationship with her?  Explain that to me.

4      A.    Sure.  As I've said, Sergeant Vardal,

5  I've never, other than the CTA or the instances

6  where we talked about where she was a watch

7  commander and I had to seek her out to approve

8  reports, she was never my direct supervisor.

9      Q.    Sure.

10     A.    It's not the email, birthday email

11 itself because I received happy-birthday emails

12 also from Deputy Chief Ambrose; and sometimes

13 would even receive a birthday card from him; but

14 he was my direct supervisor.  I worked directly

15 for him for years.

16     Q.    Sure.

17     A.    He and I had a rapport.  We at that

18 time -- it made sense for him to extend

19 something personal to me, have a good birthday,

20 have a this, have a what have you.  Sergeant

21 Vardal, on the other hand, we never had that

22 rapport.  In fact, from the very -- we had no

23 history.  Nothing that would lend itself to say

24 I'm thinking about you on your birthday or

Page 88

1 before your birthday and I just wanted to stop

2 and give you a moment and say I'm thinking about

3 you.

4          Actually it was in stark contrast

5 to much of the treatment I received from her

6 which was often, as I described, insulting,

7 belittling, demeaning, bombastic, harassing.  So

8 it was very -- it was so different from that,

9 just like the few inquiries of can you come hang

10 out with me, come spend time with me, this and

11 that, or I want to train you one on one in my

12 personal time.  Those were so different from

13 some of the other treatment.

14          It sort of was as if you're

15 dealing with two extremes of the same -- the

16 person expressing two extreme things.  When they

17 seem to be I'm interested in, and I think you

18 look cute and I want to spend some time with you

19 and I want to this, this, this pleasant tone,

20 happy birthday, I'm thinking about you, but then

21 on the other hand there was the, all the

22 belittling treatment.

23          So that's the distinction.  She

24 wasn't the only person I received a

Page 89

1 happy-birthday email or communication from, but

2 she had no relationship with me as far as

3 anything supervising me.  It was clearly

4 inappropriate.  There was no reason for her to

5 be sending me that.

6     Q.   I thought you said there were times

7 when she did supervise you?

8     A.   I tried to explain that to you before

9 that --

10     Q.   Isn't it true that there were times

11 when she did, in fact, supervise you?

12     A.   Only on CTA or a non-normal -- under

13 normal working situations, she was never my

14 direct supervisor, meaning that as a detective

15 she was never my direct supervisor.  As a patrol

16 officer, she was never my direct supervisor.

17           When I worked the CTA detail, she

18 would wind up supervising me.  When I worked the

19 IDOT detail, she had the potential to be a

20 supervisor for me; or as a detective, if she

21 happened to be the supervisor sitting in the

22 watch commander's chair at the time, she may

23 have had to review reports; but on a day-to-day

24 basis she was never my direct supervisor.

Page 98

1 her, that you would be -- you would catch hell.

2 That was the phrase that they used, you would

3 catch hell from her.

4     Q.    Okay, well, when you said romantic

5 overtures -- I mean what was the term you just

6 used?  Did you believe that inviting you to a

7 party was a romantic overture?

8     A.    Yes, to come spend time with her.  Come

9 spend time with me at my home, I'd like that.

10 That to me was inappropriate, and I told her

11 I'll check with my wife on that.  And every time

12 she asked I would tell her I'll check with my

13 wife on that as my attempt to let her know,

14 please, just leave me alone.  I'm a

15 family-oriented person.  I'm not interested.

16 But I didn't want to get subjected to, you know,

17 total backlash from her.

18     Q.    Did you believe that when she invited

19 you to a get-together where other people would

20 be present that that was some sort of sexual

21 invitation?

22     A.    Yes.

23     Q.    Okay.  And you believe that she got

24 upset when you wouldn't come?

Page 102

1    A.    No.  In that instance, no.

2    Q.    Do you admit that there was a problem

3 with the sobriety test?

4    A.    Yes.

5    Q.    And your beef with her on this issue,

6 if I'm not mistaken, is that she offered to

7 train you on her personal time and you thought

8 that was inappropriate; is that correct?

9    A.    No, that's not a complete account of

10 what my concern is.

11    Q.    Is it true that one of the objections

12 you had to her offering to train you on your

13 personal time is that you thought it was an

14 inappropriate overture to you personally?

15    A.    Yes, absolutely.

16    Q.    Okay.  And are you aware that she is an

17 instructor in field sobriety testing?

18    A.    Yes, I am.

19    Q.    Are you aware that she has -- teaches

20 at College of DuPage?

21    A.    I wouldn't know where she taught, no.

22    Q.    Are you aware that she has received a

23 number of awards from, for example, the American

24 Association of Intoxicated --

1          SERGEANT VARDAL:  Motorists.

2 BY MR. MILLER:

3     Q.    -- Motorists?

4     A.    I wouldn't be surprised.  That wouldn't

5 surprise me.

6     Q.    Are you aware that she has offered to

7 conduct sobriety training to numerous other

8 officers, male and female, on her own time?

9     A.    I have no knowledge of that.

10    Q.    Did you believe it was a sexual

11 overture to you that she offered to take time

12 after her shift was he over to give you some

13 instruction on field sobriety testing?

14    A.    Yes, I did, in part.

15    Q.    When she offered to give you field

16 sobriety testing, did she say that she wanted to

17 do it at her home?

18    A.    She said one on one in my free time.

19    Q.    Did she say where she wanted to do the

20 field sobriety testing?

21    A.    No.

22    Q.    You interpreted -- is it fair to say

23 that you interpreted her request -- her

24 suggestion or offer to give you field sobriety

Page 104

1 training one on one as an overture to you

2 personally?

3    A.    Yes.

4    Q.    And correct me if I'm wrong, is it fair

5 to say that this suggestion she had to give you

6 one-on-one field sobriety training occurred

7 after she watched the video which you and I

8 agree had some problems on it?

9         MR. ROBERTSON:  Objection.  Form of that

10 question, argumentative.  Your personal

11 belief --

12 BY MR. MILLER:

13    Q.    Strike the question.  Would you agree

14 with me that she, Dina, offered to give you

15 one-on-one field sobriety testing training after

16 she viewed the field sobriety video which we

17 discussed before that you told me had some

18 problems with it?

19    A.    And in which she said I looked cute

20 doing it, yes.

21    Q.    I won't take that.  We'll talk about

22 the cuteness later.  Please answer the question

23 I ask.  Please read the question back.

24         MR. ROBERTSON:  He answered it.

Page 296

```
 1     Q.    They were heading south a block away
 2 when you last noticed them?
 3     A.    Right, I see them.  I don't know who it
 4 is.  I turn my head, and I look back to what I
 5 was watching, which was --
 6     Q.    So prior to the incident, you didn't
 7 know it was her?
 8     A.    No, did not.
 9     Q.    And so they were heading south, and
10 what direction were you facing when the incident
11 occurred?
12     A.    I was facing southwest.
13     Q.    So your back was to them?
14     A.    My -- not my complete back but sort of
15 like my right side, my right side and shoulder
16 so I wouldn't see someone approaching me.
17     Q.    So you were facing basically kind of
18 like northwest?
19     A.    Facing southwest.
20     Q.    Facing southwest.  Okay.
21     A.    Southwest.  They're walking south, and
22 I'm facing southwest.
23     Q.    Got it.  And what happened?
24     A.    While facing that direction, I feel a
```

Page 297

1 hand make contact.

2    Q.    Make contact on what?

3    A.    On my chest.

4    Q.    I thought they were -- you had your

5 back toward them, kind of toward them?

6    A.    I might have turned my body this way

7 and kept my head that way.  I know how I was

8 positioned, but I'm not -- you know, we can turn

9 our heads and our body.  I know at the moment

10 that this happened, my head is facing southwest.

11    Q.    Yeah.

12    A.    But then there's contact to my right

13 side of my chest initially.

14    Q.    Okay.

15    A.    So I may have gone from this to this,

16 but I'm still facing southwest.

17    Q.    So your head might have been turned but

18 your --

19    A.    Body could have been facing west.

20    Q.    All right.  And what did you feel?

21    A.    I felt a hand on my right chest.

22    Q.    Okay.

23    A.    I mean on my vest cover.

24    Q.    All right.

Page 298

1    A.    Then I slowly turn, and then now

2 there's a right hand --

3    Q.    Yeah.

4    A.    -- the other hand on the left side --

5    Q.    Okay.

6    A.    -- of my chest.  Then I look, and I see

7 it's Sergeant Vardal.

8    Q.    Okay.

9    A.    And she starts to push me back.

10   Q.    Yeah.

11   A.    I'm kind of in shock because I can't

12 believe that I'm getting pushed at this point.

13   Q.    Yes.

14   A.    So the mind's going in slow motion,

15 like what is going on, why is this happening.

16   Q.    Just tell me what she did.

17   A.    So she pushes me.

18   Q.    Yeah.

19   A.    I sort of move.

20   Q.    Did she make a comment?

21   A.    Not yet.

22   Q.    Okay.

23   A.    She pushes me, pushes me against the

24 squad car.  There's a mirror, like the passenger

Page 299

1 side mirror because my car was on an angle but

2 really close to the sidewalk.

3     Q.    Yeah.

4     A.    That's what kind of stops me ultimately

5 is I'm pressed against the squad car.  I put my

6 arms up, and I'm kind of bent back while she's

7 still pushing forward.

8     Q.    You put your arms up?

9     A.    Yeah, in a submissive kind of -- like

10 this kind of position.

11     Q.    Did you put your arms up because you

12 wanted people around you to know that you

13 weren't causing it?

14     A.    I think instinctively probably, that I

15 was trying to make it clear I'm withdrawing from

16 this.  I'm not instigating anything.

17     Q.    How long did she continue to have her

18 arms on you or her hands?

19     A.    Contact?

20     Q.    Yes.

21     A.    Maybe about five seconds or so.

22     Q.    She had contact with you for five

23 seconds?

24     A.    Approximately.

Page 300

1    Q.    Okay.

2    A.    From the point where she makes first

3 contact --

4    Q.    Yeah.

5    A.    -- I go back, go back, I'm against the

6 car, I'm bending back more.  She tells me --

7    Q.    She's still in contact with you?

8    A.    Yeah, she told me to look out, like

9 look out, look out with a sneer; and then she,

10 she then, she then turned and walked away.

11    Q.    All right.  So she pushed you and she

12 continued to push you for five seconds until you

13 were backed up onto the squad car, then she

14 retracted?

15    A.    I would say that's probably the total

16 amount of time, approximately.  Again, I don't

17 have a time, but I would say it's about that.

18    Q.    And what did she tell you?

19    A.    She tells me to look out, to look out.

20    Q.    Could you tell what tone she had?

21    A.    Yeah.

22    Q.    What tone was it?

23    A.    It was a threatening tone, like an

24 intimidating type tone.  Like I better look out,

Page 301

1  I better watch myself, I better watch out.

2  That's how I took it.

3     Q.   Sure.

4     A.   That's how it sounded.

5     Q.   And what did you do then?

6     A.   I then kept my hands up.

7     Q.   Where did she go?

8     A.   She then continued, went back to

9  walking with her friend, companion.  They

10 continued south to the blue line and then

11 entered into the blue line station.

12    Q.   So when she was heading southbound and

13 she first made contact with you are you saying

14 that she went out of her line of walking to push

15 you up against the car for a total of five

16 seconds?

17    A.   She would have had to because I wasn't

18 blocking the sidewalk.

19    Q.   Sure.  Okay.  And this was witnessed by

20 the officers standing there?

21    A.   Yes.

22    Q.   Sanchez, you, Curtin, two Chicago

23 officers and the friend?

24    A.   Well, let me rephrase that.  I know

Page 303

1    A.    At that point one Chicago officer turns

2 and looks at me -- or first Sergeant Curtin

3 shakes his head and sort of like rolls his eyes

4 in a manner that expresses disapproval for her

5 conduct, like in disbelief that she had just

6 done that.

7    Q.    Who made that?

8    A.    Sergeant Curtin.  He makes eye contact

9 with me and sort of makes an expression on his

10 face that's a disapproving look like what, why

11 did she just do that.

12    Q.    Did he say all those things or --

13    A.    No.

14    Q.    -- are you just --

15    A.    That's what I took from his expression

16 that he gave to me.

17    Q.    Okay.

18    A.    After he says that, then --

19    Q.    What did he say to you?

20    A.    No, after he makes that expression

21 rather --

22    Q.    I see.

23    A.    -- a Chicago officer makes a comment,

24 says something along the line asking was she a

Page 304

1  police officer, you know, is she on the job or

2  is she a cop because he seemed very -- like he

3  couldn't believe what just happened and was

4  looking like, okay, are we going to do

5  something, are we going to arrest her, is she a

6  cop.  It must have clicked that would be the

7  only reason I wouldn't have reacted is because

8  she must be a cop that just did this.

9      Q.    What did the Chicago officer say?

10     A.    He said who is she, is she a cop,

11 something like that.

12     Q.    Did he say anything else besides that?

13     A.    He then -- then somebody else -- well,

14 then a Chicago officer, I don't remember if it

15 was the same one or not, kind of went, wow, like

16 man, like sort of an expression of surprise.

17     Q.    Which one was that --

18     A.    I don't remember.

19     Q.    -- that had that look of surprise?

20     A.    I don't remember.

21     Q.    Do you remember what he looked like?

22     A.    There were -- there was a Latino

23 officer, there was a white officer, and I don't

24 remember the third one.

# Exhibit C

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RASUL FREELAIN,               )
                              )
        Plaintiff,            )
                              )
        vs.                   )  No. 13 CV 3682
                              )
VILLAGE OF OAK PARK, a        )
municipal corporation, and    )
SERGEANT DINA VARDAL, in      )
her individual capacity,      )
                              )
        Defendants.           )


        The deposition of DINA VARDAL, called by
the Plaintiff for examination, taken pursuant to
notice and pursuant to the Federal Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before Donna Wadlington Shavers, a
Certified Shorthand Reporter, at 20 North Wacker
Drive, Suite 3710, Chicago, Illinois, on the
25th day of August, 2015, commencing at
approximately the hour of 10:43 a.m.

1          And let's -- you know,
2    chronologically, I should have already asked you
3    this.  But could you tell me your history with
4    the Oak Park Police Department assignment-wise
5    from when you joined to when you left?
6        **A.    I joined in 1997.  I went through the**
7    **field training program again.  I didn't have to**
8    **go through the academy because I'd already went**
9    **through the academy with New Lenox.**
10                **I -- shortly after training I**
11   **went to work with the auto theft unit with the**
12   **Illinois State Police.  After that I was**
13   **assigned as a tactical officer in the detective**
14   **bureau.  After that assignment I went back to**
15   **the street and became -- eventually became a**
16   **field training officer, a firearms instructor, a**
17   **SWAT team member, ATB instructor, honor guard**
18   **member.**
19       Q.    Okay.
20                And how long were you a
21   sergeant?  From 2004 until 2015?
22       **A.    2005 is when I became a sergeant.**
23       Q.    2005 to 2015?
24       **A.    Correct.**

1    Department, as you sit there today?

2        A.    No, I do not.

3        Q.    Okay.

4              I'd like to talk about what

5    happened on the -- at the L stop with you --

6        A.    Okay.

7        Q.    -- and Stacey Mott and the other

8    officers.  Okay?

9        A.    Okay.

10       Q.    All right.

11             You indicated -- or Ms. Mott

12   indicated that you were going to celebrate her

13   birthday at the Cubs game?

14       A.    Yes.  That's correct.

15       Q.    And do you know whose idea that was?

16       A.    I believe it was my idea, I believe.

17   I bought the tickets for us to go to celebrate

18   her birthday.

19       Q.    And what was the plan?

20       A.    That we would drive up to Oak Park and

21   take the L into the city because there's -- it's

22   not very easy to park in the city and I'm not

23   very well versed with the city.

24       Q.    And did you do that?

1          And how was Ms. Mott dressed?

2     **A.    She was wearing a Cubs shirt.**

3     Q.    And where did you park?

4     **A.    We either parked on Harrison Street or**

5     **in the police station lot.  I don't recall which**

6     **one we parked at.**

7     Q.    Okay.

8          And you were walking down

9     which street?

10     **A.    We were walking -- prior to the**

11     **incident we were walking down Austin Boulevard.**

12     Q.    And in which direction?

13     **A.    South.**

14     Q.    And on which side of the street?

15     **A.    West.**

16     Q.    Okay.  I just wanted to clarify from

17     yesterday.

18     **A.    I got that.**

19     Q.    And as you're approaching the

20     intersection of Austin and the Eisenhower, can

21     you tell me what you see?

22     **A.    There were several people up on the**

23     **sidewalk and there was at least two police cars**

24     **there.  And we were walking southbound getting**

1    **ready to cross over the entry/exit ramps of the**

2    **Eisenhower and there were at least four officers**

3    **blocking the sidewalk.**

4        Q.   Okay.

5             MR. MILLER:  Counsel, I'm going to

6    volunteer something to help you.  I have a

7    picture of the scene.  Maybe it will help you.

8    You don't have that.

9             MR. ROBERTSON:  Oh, I appreciate it.

10   I'm not going to use it.  I mean, we'll walk

11   through -- not that -- I appreciate if you want

12   to use it.

13            MR. MILLER:  No problem.

14            MR. ROBERTSON:  It's just --

15            THE WITNESS:  I got it.

16   BY MR. ROBERTSON:

17       Q.   Yeah.

18                 And you said there were two

19   police cars.  Did you see which department they

20   were from?

21       **A.   I believe they were Oak Park squads.**

22       Q.   Okay.

23                 And you said there were four

24   officers?

58

1    A.    Yes.

2    Q.    Did you say four or at least four?

3    A.    **At least four officers standing across**

4  **the sidewalk.**

5    Q.    And uniformed officers?

6    A.    **Yes.  They were uniformed.**

7    Q.    Did you recognize any of those

8  officers?

9    A.    **Just one officer.  It was Officer**

10  **Freelain.**

11   Q.    Did you see Sergeant Curtin on the

12  scene?

13   A.    **Not until after I walked past the**

14  **officers but he was there.  Yes.**

15   Q.    And where was he in relation to the

16  officers?

17   A.    **Well, they were at the start of the**

18  **sidewalk at the crosswalk and Sergeant Curtin**

19  **was in between them and the L station.**

20   Q.    So he'd be a little bit further up the

21  hill?

22   A.    **He was in between the L station and**

23  **the -- the ramps.  So it's not much of a hill**

24  **there.  But yes.**

60

```
 1        Q.   I got you.
 2                      And where were the four
 3   officers in relation to you and Ms. Mott as
 4   you're approaching?
 5        A.   In front of us.
 6        Q.   When you say "in front," directly in
 7   front?
 8        A.   Directly -- directly in front of us
 9   blocking the sidewalk and the crosswalk.
10        Q.   And which way were they facing?
11        A.   At least -- I know Officer Freelain
12   was facing me and at least one or two of the
13   Chicago officers I believe were facing us.
14        Q.   When you realized that Officer
15   Freelain was facing you, how close were you
16   guys?  When you saw and recognized Office
17   Freelain, how close were you guys?
18        A.   Within five feet.
19        Q.   Okay.  Did you guys make eye contact?
20        A.   I believe we did.
21        Q.   Did you say anything to Officer
22   Freelain or did Officer Freelain say anything to
23   you?
24        A.   I jokingly said to him, "Hey, Copper,
```

61

1  **get out of my way." Because they were blocking**

2  **the sidewalk.**

3      Q.   Okay.  And when you said that -- did

4  you say anything before that?

5      **A.   No.**

6      Q.   Okay.

7              When -- where were you when

8  you said, "Hey, Copper, get out of the street,

9  you're blocking the sidewalk."

10     **A.   I didn't say, "Hey, Copper, get out of**

11  **the street."**

12     Q.   I'm sorry.

13     **A.   I said, "Hey, Copper, get out of my**

14  **way."**

15     Q.   Get out of your way.  Okay.

16              When you said that --

17     **A.   Yes.**

18     Q.   -- where were you in terms of --

19              Were you on the entrance,

20  across the entrance ramp?  Were you on the

21  sidewalk?

22     **A.   We were just clearing the exit ramp of**

23  **the 290 coming off eastbound traffic.**

24     Q.   Okay.

1      All right.  So with the left
2  hand.  And I know you said a light tap.  Is
3  there any way you could further quantify the
4  force used?
5      **A.    The amount of force that you would use**
6  **to knock on a door.**
7      Q.    Okay.
8            So would you say it's less
9  than a force used on a high five or about the
10  force --
11     **A.    Yes.**
12     Q.    Less than a high five, about what you
13  use to knock on a door?
14     **A.    Less than the force of a high five.**
15  **Yes.    That's a very good analogy.**
16     Q.    Okay.
17            And what part of your hand
18  touched what part of his body?  I know you said
19  hand and shoulder, but I want to get more
20  specific.
21     **A.    It was such a quick incident.    I**
22  **believe it was the top portion of my fingers**
23  **that touched the top portion of his shoulders.**
24     Q.    Okay.

72

1    Q.    And you believe Officer Freelain was
2  just going off of work?
3    **A.    I believe he was working the CTA**
4  **assignment that day.**
5    Q.    Okay.  Now did you -- you offered at
6  that time to give Officer Freelain additional
7  training, correct?
8    **A.    I felt that he needed additional**
9  **training with DUI, standard DUI testing.  Yeah.**
10 **So I offered to give him additional training,**
11 **yes.**
12   Q.    Okay.  And you offered to do that
13 training one-on-one, correct?
14   **A.    In the roll call room of the police**
15 **department, yes.**
16   Q.    Did you specifically say, hey, I'll
17 give you one-on-one training in the roll call of
18 the --
19   **A.    Well, we can -- what I specifically --**
20 **I didn't mean to cut you off.  Were you finished**
21 **with your question?**
22   Q.    No, I was going to ask what you said
23 rather than what you may have been thinking and
24 said.

1          Did you say -- did you say,
2   "I'll give you one-on-one training in the roll
3   call room of the police department?"  Or did you
4   say, "I can give you some one-on-one training?"
5       A.   I did not specifically say in the roll
6   call room, but I was talking to him about it.
7   He was saying how the entire department could
8   use the training instead of just him.  I said,
9   yes, and I brought that up.
10          But as far as where we would
11  conduct the training, no, it was never
12  specifically mentioned.  But I have done
13  training in the roll call room with officers on
14  my shift.
15      Q.   Okay.
16          And did you offer to do this
17  one-on-one training on your own time?
18      A.   It would have taken five minutes to do
19  this training with Officer Freelain and so that
20  he would be better able to testify in court.
21          And since we do not work the
22  same shift, I had offered it -- that during a
23  shift change I would show him some things that I
24  noticed that he did wrong on his field sobriety

1    testing and be done with it.

2        Q.    Did you offer to do it on your own

3    time?

4        A.    Yes.  Because we don't work the same

5    shift, I offered to do it on my own time because

6    I felt that he needed the training in his

7    experience as being a street officer because he

8    was more of a detective.  He was a detective

9    for -- I don't even know how many years -- but

10   many many years.  And then he comes back out on

11   the street and he jumps right into DUI

12   training -- or DUI's and it's not an easy thing

13   to jump into.  Just as it would be the opposite

14   way if a patrol officer jumped into the

15   detective bureau.

16       Q.    Have you offered one-on-one training

17   on your own time to any other officers?

18       A.    Yes.

19       Q.    And who are they?

20       A.    Well, officers on my shift.

21       Q.    Which ones?

22       A.    Officer Alvarez, Officer Miller.  I'm

23   not sure if I offered it to Officer Love.

24   There's been numerous officers over the years.

1          I was a training assistant at

2  the College of DuPage for standard field

3  sobriety testing.  So I was -- I felt that it

4  was knowledge that I had that I could share with

5  the other officers.

6     Q.   The -- when you made this offer of

7  one-on-one training, how close were you and

8  Officer Freelain standing to each other?

9     A.   Approximately as far apart as we are

10 standing now.  The underground is not a very

11 quiet place.

12    Q.   Maybe three feet?

13    A.   Three, four feet.

14    Q.   Okay.

15    A.   It's very noisy in the underground.

16 So if you stand any further away, I'd have to

17 shout at him.

18    Q.   Sure.

19               Is it kind of a darker place?

20    A.   It is.  There's lights underneath

21 there, but it's darker than daylight.

22    Q.   All right.

23               And Officer -- after Officer

24 Freelain suggested that you do the training for

118

1                (WHEREUPON, the confidential

2                testimony of Dina Vardal ended

3                and the testimony resumed.)

4

5 BY MR. ROBERTSON:

6     Q.    You said that the only allegations of

7 sexual harassment by Officer Freelain was

8 against you involving a party in 2007?

9     **A.    To my understanding reading through**

10 **the material, that's the only allegation of**

11 **sexual harassment that he had.**

12     Q.    Okay.

13                Did you see any allegations

14 regarding the DUI and you referring to him as

15 looking cute?

16     **A.    But I didn't refer to him as looking**

17 **cute.**

18     Q.    I'm talking about the allegations.

19 When you're reviewing your materials.

20     **A.    Yes, I did.**

21     Q.    And there were also allegations

22 involving an email you sent to him, correct?

23     **A.    The allegation of me wishing him a**

24 **happy birthday?**

119

1    Q.   Right.

2    **A.   Yes.  There was an allegation of that,**

3 **but I wish happy birthdays to everybody in that**

4 **department.  You can check my email server**

5 **there.**

6    Q.   And there was an allegation --

7              You have no problem with us

8 checking your email server?

9    **A.   No.  I was -- in reference to the**

10 **happy birthday allegations?  No.**

11    Q.   Oh, no.  I meant just like a Hillary

12 Clinton type of thing.

13        MR. MILLER:  Objection to the form.

14 What is a Hillary Clinton type of thing?  What

15 does that question mean?

16 BY MR. ROBERTSON:

17    Q.   Well, have you ever typed emails you

18 wouldn't want us to see?

19    **A.   At work?  No.**

20        MR. MILLER:  Objection.  Form.

21 Foundation.  Relevance.  Go ahead.

22        THE WITNESS:  Sorry.

23          If you're speaking of work

24 emails, no.  I've never typed an email at work

196

1    car?

2         **A.    I do not.**

3         Q.    Do you know -- did you say anything

4    else other than what you've previously said?  I

5    won't even try to repeat it.

6         **A.    No.**

7         Q.    About the copper statement.

8         **A.    Hey, Copper, get out of my way.**

9         Q.    Right.

10        **A.    Just jokingly with a laugh said, "Hey,**

11   **Copper, get out of my way."**

12        Q.    Was there an audible laugh?

13        **A.    No.  Just when you speak with a --**

14        Q.    Kind of a joking tone?

15        **A.    -- laugh.  Yeah.**

16        Q.    Okay.

17                        And would you agree with

18   Ms. Mott that it's a busy highway there?

19        **A.    Very busy.**

20        Q.    Okay.  And busy and noisy?

21        **A.    Yes.**

22        Q.    Okay.

23                        You had never met any of those

24   CPD officers before, correct?

1      Q.   Okay.

2                And that's a -- and the email

3  reads, "I am off tomorrow but wanted to make

4  sure I wished you happy birthday on Wednesday!

5  Hope it's a good one."  That's the email you

6  sent to Mr. Freelain, correct?

7     **A.**   **That's correct.**

8     Q.   Okay.  And then there was a response

9  five -- five days later, six days later

10  indicating, "Thank you.  My family and I had a

11  great time."

12     **A.**   **Yes.**

13     Q.   Okay.

14                Do you know approximately how

15  many other birthday emails you said you sent out

16  to the department?  Ballpark.

17     **A.**   **I've sent birthday emails out to all**

18  **members, just about all members of the**

19  **department for years.  So 120 members, give or**

20  **take 20.  I would say I've sent out at least 200**

21  **emails.  I have them all in my Microsoft**

22  **Outlook, and they give me reminders that it's**

23  **this person's birthday.**

24     Q.   You said that there was an allegation

```
 1              THE WITNESS:  My actions with Officer
 2    Freelain were in no way sexual and in no way
 3    demeaning and it was a co-worker.
 4                        I've said it before.  I don't
 5    understand why this is happening, why the mind
 6    set is there.  It's been extremely stressful for
 7    me and one of the reasons why, you know, I'm not
 8    going to be working at the Oak Park Police
 9    Department anymore.  Because stuff like this can
10    happen and it's -- it's ridiculous.  It's
11    ridiculous for me.  I mean, not for him.
12    It's -- that's his perception.  Like I've said
13    that plenty of times before but...
14    BY MR. ROBERTSON:
15        Q.   Did officer -- are you indicating that
16    Officer Freelain's complaints against you and
17    the resolution of it contributed to you leaving
18    Oak Park?
19        A.   I would say that it's one contributing
20    factor to me leaving Oak Park.  I am done with
21    it.
22        Q.   Did -- that was resolved in 2012,
23    correct?
24                   MR. MILLER:  That what?
```

1          MR. ROBERTSON:  The sexual harassment
2   complaint and the battery complaint.
3          THE WITNESS:  Allegedly it was
4   resolved in 2012 to the best of my knowledge,
5   yes.  But it's not been resolved because we're
6   here today.
7   BY MR. ROBERTSON:
8      Q.   Okay.
9                  And the Village has provided
10  you with an attorney, correct?
11     **A.   That's correct.**
12     Q.   And you made no plans to leave your
13  job in any -- at any point in time from May of
14  2012 up until July of 2015?
15         MR. MILLER:  I'm sorry.  What was the
16  question?  Can you read the question back
17  please.
18                  (WHEREUPON, the record was
19                  read as requested.)
20         MR. MILLER:  Oh, okay.  You made no
21  plans.  I didn't catch the beginning of that.
22         THE WITNESS:  I always knew I would
23  only work to the age of 50, no more than that.
24                  In May of 2012, no, I had no

# Exhibit D

1

```
              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
                      EASTERN DIVISION

RASUL FREELAIN,              )
                             )
              Plaintiff,     )
                             )
         vs.                 )    No. 13 C 3682
                             )
VILLAGE OF OAK PARK, a       )
municipal corporation,       )
SERGEANT DINA VARDAL, in     )
her individual capacity,     )
                             )
              Defendants.    )
```

      The deposition of STACEY MOTT, called by the Defendant for examination, pursuant to subpoena and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Susan M. Reed, Certified Shorthand Reporter for the State of Illinois, at 55 West Monroe Street, Suite 800, Chicago, Illinois, at 11:00 o'clock A.M., on the 24th day of August, A.D., 2015.

14

```
 1   walking north or south toward the el station?
 2        A.   I would have no idea.
 3        Q.   Okay.  But you were walking down Austin
 4   Boulevard?
 5        A.   Yes.
 6        Q.   And you were approaching the
 7   Eisenhower?
 8        A.   Yes.
 9        Q.   And you were parking -- you were
10   walking from downtown Oak Park?
11        A.   Correct.
12        Q.   I'm going to let out a little secret,
13   and I'm going to tell you you were walking north
14   to south.
15        A.   Thank you.
16        Q.   Because downtown Oak Park is north of
17   the Eisenhower.  Okay.  So assuming you were
18   walking south toward the el station, as you were
19   walking south and you got to the Eisenhower,
20   would the el station be to your right as you're
21   walking south or would the el station be to your
22   left as you're walking south?
23        A.   It was on our right.
24        Q.   So would it be fair to say that as you
```

1    approached the el station, you were walking on
2    the right side of Austin Boulevard as you were
3    walking south?

4        **A.    That's correct.**

5        Q.    As I recall, I think maybe you kind of
6    have to walk uphill a little bit on Austin
7    Boulevard to get to the entrance to the el
8    platform; is that correct?

9        **A.    I believe so because you're going over**
10   **the highway.  So I think there was a little bit**
11   **of an elevation.**

12       Q.    All right.  So as you approached the el
13   platform, just kind of describe for me, you're
14   walking on the right side of the street.  That
15   would be the west side of the street.  You're
16   heading south toward the el station, and just
17   kind of describe for us what you observed when
18   you first noticed something.

19       **A.    Well, we needed to cross a very busy**
20   **intersection; and there was only a small section**
21   **of sidewalk; and in front of that sidewalk were**
22   **approximately five police officers who were**
23   **standing, talking, monitoring traffic,**
24   **something; and we needed to get past them to**

1 **continue on the sidewalk to get to the platform.**

2     Q.   So you were -- were you in the

3 crosswalk as you were crossing this entrance to

4 the Eisenhower?

5     **A.   Yes.**

6     Q.   And you were walking south toward the

7 el platform?

8     **A.   Yes.**

9     Q.   And what did you observe -- where did

10 you observe the officers that you saw as you

11 crossed the entrance to the el -- to the freeway

12 back to the sidewalk?

13     **A.   Well, the officers were kind of**

14 **standing in front of and around the sidewalk.**

15     Q.   Okay.

16     **A.   And they were just congregating,**

17 **talking.  So we needed to, you know, get their**

18 **attention, ask them to move so we could continue**

19 **through them.**

20     Q.   Sure.

21     **A.   Being a police officer, you don't want**

22 **to just surprise anybody.**

23     Q.   Right.

24     **A.   So we had to walk up to them and try to**

1    **get past them.**

2    Q.   And approximately how many officers

3    would you say there were?

4    **A.   Five.**

5    Q.   Do you know what department or

6    departments they were with?

7    **A.   I did not.**

8    Q.   Did you recognize any of them?

9    **A.   Are you asking me if I knew any of**

10   **them?**

11   Q.   Yeah.  Did you know any of them?

12   **A.   No.  No.**

13   Q.   As you were walking with Dina prior to

14   this incident that you're about to tell us

15   about, did Dina saying anything to you?

16   **A.   No.**

17   Q.   Did Dina appear to, prior to the

18   incident, know or recognize any of them?

19       MR. ROBERTSON:  Objection.  Speculation.

20   BY MR. MILLER:

21   Q.   From your observation.

22       MR. ROBERTSON:  Same objection.

23   BY MR. MILLER:

24   Q.   Go ahead.  You can answer it.  Did you

1  understand the question?

2     **A.   No.  Can you ask it?**

3     Q.   I'll have her read it back to you.  If

4  it's not a good question, I'll ask a different

5  one.

6               (Requested question read from page

7               17 lines 17 and 18.)

8     **A.   Yeah, she recognized at least one of**

9  **them to be an Oak Park officer.**

10    Q.   Okay.  So as you were approaching these

11 five officers and getting to the curb where

12 these five officers were located, what happened

13 next, basically?

14    **A.   She was walking slightly in front of me**

15 **because I'm not familiar with the area; and as**

16 **we approached the officers, one, as she's**

17 **walking forward, one of the officers would have**

18 **been on her left side.**

19    Q.   Okay.

20    **A.   She put her left hand out to his**

21 **shoulder.**

22    Q.   Which shoulder?

23    **A.   His -- let's see.  Her left hand.  His**

24 **left shoulder then I guess.**

1    Q.    Okay.  He was facing her?

2    A.    Yes.

3    Q.    Was he pretty much directly facing her?

4    **A.    Yes, they were -- they -- all of them**

5    **were, including him, he was the closest, the**

6    **first one that we came into contact with was**

7    **blocking that sidewalk.**

8    Q.    Okay.

9    **A.    So she just real happy, jokingly when**

10   **she touched him, out of my way, copper; and we**

11   **were able to proceed; and I -- as we passed**

12   **them, one of them said, hey, sarge, to her.   I**

13   **don't know which officer said it, but that is**

14   **how I knew she recognized somebody.**

15   Q.    Okay.

16   **A.    And then I said we can't talk, we're on**

17   **our way to a Cubs game or we're late for a Cubs**

18   **game, something like that.**

19   Q.    Describe the -- you said that she

20   touched -- and I'm going to tell you that was

21   Officer Freelain's shoulder.  Describe the touch

22   or the --

23   **A.    It was just friendly, joking.  She had**

24   **an open hand.  Her fingers touched the top of**

1    his shoulder.  She was joking when she made her
2    statement.  It wasn't --
3        Q.    And what did she say?
4        A.    I remember her saying out of my way,
5    cop, we're on our way to a game.
6        Q.    Okay.  And did you see him, his body
7    thrust back?  What did his body do as you
8    observed?
9        A.    No, he had taken a step back so we
10   could walk through, but that was the extent of
11   his movements.  Now, we kept walking.  We did
12   not stop to talk to anybody; but we didn't, you
13   know, hear or -- we weren't -- nothing that we
14   noticed was going on other than us walking past
15   them to get to the station.
16       Q.    Did he -- did you see him strike a
17   vehicle?
18       A.    No, we didn't hear any commotion of any
19   sort that would lead us to believe that somebody
20   had tripped, fallen.  There was no noise that --
21   you know, thuds, bumps or swear words.  You
22   know, if sometimes people start to fall, they
23   make explanations.
24       Q.    Nobody said anything?

22

1    **A.    Because it was such a fast, quick,**
2    **non-incident for us that it's just interesting**
3    **that we end up here.**
4        Q.    Fair comment.  And I'll ask you about
5    that.  So after you pass by Officer Freelain,
6    did you just go down the ramp and off to your
7    Cubs game?
8        **A.    Yes.**
9        Q.    And that was the last you heard of it?
10       **A.    That was --**
11       Q.    About that?
12       **A.    That was the last I heard of it that**
13   **day, yeah.**
14       Q.    When did you next hear anything about
15   this incident?
16       **A.    I don't remember when I heard about it,**
17   **but I do remember how I heard about it.**
18       Q.    Was it sometime later after the
19   incident?
20       **A.    Yes.**
21       Q.    Days or weeks or whatever?
22       **A.    Yes.**
23       Q.    How did you hear about it again?
24       **A.    Dina had called me and said that**

1   like people do when they greet each other they
2   know?
3       **A.   Yes.**
4       Q.   Okay.  Fair to say that the entire
5   contact took a second, half a second?
6       **A.   Yes.**
7       Q.   And that was your entire -- and after
8   that you were -- you were no longer looking at
9   what was occurring, correct?
10      **A.   Correct.**
11      Q.   Now, when you say that you do not
12  believe that the officer -- you do not believe
13  the officer stumbled at all, I believe
14  Mr. Miller asked you that question.
15      **A.   I did not see him stumble.  I did not**
16  **hear any commotion of somebody stumbling or**
17  **falling, anything like that.**
18      Q.   Okay.  So you weren't looking in that
19  direction, correct?
20      **A.   I was not.**
21      Q.   Which would explain why you didn't see
22  someone stumble, correct?
23          MR. MILLER:  Objection.  Speculation.
24

# Exhibit E

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

* * *


RASUL FREELAIN,

       Plaintiff,


    vs.              CASE NO. 13 C 3682


VILLAGE of OAK PARK,
a municipal corporation,
et al.,

       Defendants.

* * *


       Deposition of FRANK M. SPATARO,
SPHR, CCP, a witness herein, called by the
defendants for examination pursuant to the
Rules of Civil Procedure, taken before me,
Patti Stachler, RMR, CRR, CLR, CME, a Notary
Public within and for the State of Ohio, at
Dinsmore & Shohl, LLP, 255 East Fifth Street,
Cincinnati, Ohio, on July 10, 2015, at
8:53 a.m.

* * *

106

1    that?

2              MR. ROBERTSON:   It's not a knowledge

3    issue.

4              Go ahead.

5         **A.    I have personal knowledge why**

6    **that's in there.**

7    **BY MR. MILLER:**

8         Q.   How do you know that?

9         **A.    Is because -- well, we provide**

10   **training to employees to inform them of the**

11   **policy and the procedures.**

12        Q.   Okay.

13        **A.    And it's in there so that there is**

14   **an independent -- that the individual is able**

15   **to convey their -- or make their complaint to a**

16   **person outside the department so that there**

17   **isn't any department interference with making a**

18   **complaint or investigating a complaint.**

19        Q.   Okay.  Did Mr. Freelain make a

20   complaint of sexual harassment to you?

21        **A.    Yes.**

22        Q.   Okay.  And if you could look at

23   Exhibit 21, please.  Tell us -- identify

24   Exhibit 21, please.

1      A.    Exhibit 21 is Officer Freelain's

2  complaint that he'd been sexually harassed.

3      Q.    Okay.  And that has got a file

4  stamp date like in your office on there?

5      A.    Yes.

6      Q.    And is that a stamp -- where is

7  that stamp?

8      A.    It's stamped on the bottom of --

9  on the bottom right-hand side of the document.

10     Q.    Is that like some kind of a

11 machine?

12     A.    Yes.  It's a time stamp.  I

13 required all documents to be time stamped that

14 came into my department.

15     Q.    When is this time stamped?

16     A.    May 10th of 2012.  Or it looks

17 like it -- May 10th or the 18th.  It's a bad

18 copy.

19     Q.    It's actually the 12th.

20     A.    The 12th.

21          MR. ROBERTSON:  I think that's the

22 year.

23     A.    The year is the '12.

24 BY MR. MILLER:

108

1    Q.    Oh, you're right.

2    **A.    I think it's May 10, 2012.**

3    Q.    Okay.  So he then -- did he then

4 do a supplemental complaint?

5    **A.    Yes.**

6    Q.    Is that Exhibit -- I'll show you

7 Exhibit 22.  By the way, did he say anything to

8 you when he made the complaint, Exhibit 21?

9    **A.    We met.**

10    Q.    Where did you meet?

11    **A.    We met in my office.**

12    Q.    Was anybody else there?

13    **A.    No.  And he described verbally**

14 **what had happened.**

15    Q.    Sure.

16    **A.    And I asked him to -- at that**

17 **point to put it in writing.  I might have met**

18 **with him the day before he actually submitted**

19 **the document.**

20    Q.    I see.  Okay.  And what is

21 Exhibit 22?

22    **A.    This is a second document that he**

23 **submitted to me that followed an incident that**

24 **occurred on the 19th of May.**

1    Q.   Okay.  What was the -- in a

2  nutshell, what was the incident that occurred

3  on the 19th of May?

4         A.   On the 19th of May he described to

5  me, and then which he later put in writing

6  here, that he'd been assigned or dispatched to

7  look at or investigate I think it was a US Post

8  Office truck that was parked on the bridge on

9  Austin at the Blue Line and at which there were

10 other officers and some officers from the City

11 of Chicago, and this officer -- or Sergeant

12 Vardal and a friend of -- with a friend of hers

13 approached the area that Officer Freelain was

14 assigned to protect or whatever and that when

15 Vardal approached him, she pushed him.  And he

16 was on the sidewalk and he ended up -- pushed

17 him like off the curb.  And he was -- he felt

18 that that was retaliatory and that it was -- he

19 told me that it constituted a criminal offense

20 and that he wanted that to be investigated.

21       Q.   Okay.  And what is Exhibit 82?

22       A.   Exhibit 82 is a memo that I sent

23 to Vardal on May 22nd informing her that

24 Freelain had made a charge against her of

1   sexual harassment and that we were going to be

2   investigating it and to tell her that she was

3   prohibited from having any direct contact with

4   him and that she was not permitted to talk

5   about the complaint with anyone other than

6   Chief Tanksley, Deputy Chief Ambrose, or me --

7   I'm sorry -- and/or a union representative.

8            Q.   Was this the first notice that you

9   had given to Dina Vardal of Officer Freelain's

10  complaint of sexual harassment?

11           A.   Yes.

12           Q.   Okay.  Did you ever verbally

13  notify Dina Vardal between September 10th when

14  Officer Freelain --

15                MS. BOUTET:  May.

16                MR. MILLER:  I'm sorry.  Strike that.

17  BY MR. MILLER:

18           Q.   Between May 9th -- between

19  May 10th, 2010 or May 9th, 2010 when he came to

20  you verbally and May 19th, 20 -- did I say '10?

21  I should have --

22           A.   2012.

23           Q.   May 9, 2012 -- did you ever tell

24  Dina Vardal that Officer Freelain had

```
1   complained of sexual harassment against her?
2           A.    No.
3           Q.    To your knowledge, did anyone tell
4   Dina Vardal between the time she first came --
5   Freelain first came to your office and the time
6   of the push on May 19th, 2012?
7                 MR. ROBERTSON:  Objection.  Beyond
8   this witness's scope of knowledge.
9   BY MR. MILLER:
10          Q.    That you know?
11                MR. ROBERTSON:  Speculation.
12  BY MR. MILLER:
13          Q.    Just your personal knowledge.
14                MR. ROBERTSON:  Hearsay.
15          A.    My personal knowledge, no, she was
16  not informed.
17  BY MR. MILLER:
18          Q.    Okay.  Did you meet with Dina
19  Vardal on May 22nd?
20          A.    Yes.
21          Q.    Where did you meet?
22          A.    In my office.
23          Q.    Was she standing up or sitting
24  down, if you remember?
```

112

1        **A.    I don't recall.**

2        Q.    Okay.   What was her reaction when

3   you gave her this memo, Exhibit 82?

4        **A.    She was incredulous.   She couldn't**

5   **believe -- she was -- she couldn't believe that**

6   **that -- that the complaint had been made.**

7        Q.    Based on her reaction, did it

8   appear that this was news to her?

9              MR. ROBERTSON:   Objection.   Calls for

10  speculation.   That's testifying to the state of

11  another's mind.

12       **A.    She was very surprised that this**

13  **complaint -- that I was informing her that a**

14  **complaint had been made.   She -- as I said, she**

15  **couldn't believe it.**

16  **BY MR. MILLER:**

17       Q.    Okay.   Thank you.

18             Okay.   Did you begin an

19  investigation into the Freelain sexual

20  harassment complaint?

21       **A.    There was some discussion among --**

22  **between myself and Chief Tanksley and I believe**

23  **maybe -- I can't -- I don't -- I can't remember**

24  **who else, but the decision was made that**

1        MR. ROBERTSON:  Objection.  Hearsay,

2  and testifying to someone else's state of mind.

3        MR. MILLER:  Just for the record, you

4  are wasting an enormous amount of paper making

5  hearsay objections because every one of these is

6  admissible on the issue of intent.  It's all

7  admissible for purposes other than the truth of

8  the matter asserted and it's a complete waste of

9  time, but keep making your objections.

10        MR. ROBERTSON:  I will.

11  BY MR. MILLER:

12      Q.  Did the village take Officer

13  Freelain's complaint of sexual harassment

14  seriously?

15        **A.    Yes.**

16      Q.  Did the investigator investigate?

17        **A.    Yes.**

18      Q.  And did he come back and advise

19  you as to the results of his investigation?

20        **A.    Yes.  He -- yes.**

21      Q.  What did he --

22        **A.    He came back and he informed us --**

23  **informed the village and that was --**

24        MR. ROBERTSON:  Objection.  I want to

```
 1   object to hearsay on this.
 2   BY MR. MILLER:
 3        Q.   Okay.  When did he come back to
 4   report to you?
 5        A.   I don't --
 6             MR. ROBERTSON:  Foundation.
 7   BY MR. MILLER:
 8        Q.   Approximately?
 9        A.   It was sometime in early June,
10   maybe.  It didn't take him long to do the
11   investigation.  He came back and he --
12        Q.   All right.  Well, I'm going to lay
13   the foundation for it.
14        A.   Okay.
15        Q.   Approximately -- early June?
16        A.   Yes.
17        Q.   Who did he report to; just you, or
18   were there others?
19        A.   No.
20        Q.   Who else?
21        A.   He reported to me and chief and
22   perhaps -- I don't know if Village Attorney
23   Simone Boutet might have been in that meeting.
24        Q.   Okay.  And what did he report?
```

118

```
 1        A.   He reported that --
 2             MR. ROBERTSON:  Hearsay.
 3        A.   -- he had investigated the
 4   allegations and he found that there were no --
 5   there was no basis to the allegation and
 6   charges that Officer Freelain had made.
 7   BY MR. MILLER:
 8        Q.   And who was this person that
 9   conducted the investigation?
10        A.   Bill Keefe, or William Keefe, or
11   Walsh & Associates.
12        Q.   And tell us about Bill Keefe.
13        A.   Mr. Keefe was a former FBI
14   supervisor for Chicago region, so -- and he was
15   retired and he was with Walsh & Associates, and
16   they conduct investigations and all types of
17   investigations, but he had performed some
18   prior -- he had performed work for us before,
19   and so we knew of him and we felt confident
20   with -- in his abilities.
21        Q.   Okay.  I want you to take a look
22   at Exhibit 18, please.  What is that?
23        A.   This is a memo from me to Officer
24   Freelain describing or informing him of the
```

1     **results of the sexual harassment complaint and**

2     **the battery complaint that he had made against**

3     **Sergeant Vardal.**

4     Q.   Okay.  And what was your

5     conclusion?  You don't have to read it, but

6     just tell me the --

7     **A.   Yeah.  The gist of this is that**

8     **both complaints were found to not have any**

9     **merit, they were not sustained, and that the**

10     **complaint of battery was reviewed by the Cook**

11     **County State's Attorney's Office, who decided**

12     **not to authorize filing criminal charges.**

13     Q.   Okay.  Was the police

14     investigation of the pushing incident submitted

15     to the state's attorney for an independent

16     review?

17     **A.   Yes.**

18     Q.   Why?

19     **A.   Because of Officer Freelain's**

20     **request or insistence that it be reviewed, that**

21     **it constituted a criminal act.**

22     Q.   And what was the conclusion of the

23     State's Attorney's Office?

24     MR. ROBERTSON:  Objection.  This

123

1    comments and the information that he was

2    providing to substantiate his allegation that

3    he was being sexually harassed by her, from my

4    reading of his complaint, I did not see those

5    activities rising to a level that it would be

6    considered sexual harassment.

7         Q.   Okay.  If you didn't think they

8    rose to the level of sexual harassment, why did

9    you decide to send it to an outside

10   investigator?

11        A.   Because we investigate every

12   allegation of harassment.  Whether or not --

13   I'm not -- I'm only going to -- I'm not going

14   to prejudge his complaints, but I did not -- I

15   didn't see the actions that he listed as rising

16   to that level.  Nonetheless, we still had an

17   obligation and duty to investigate his

18   allegations.

19        Q.   Have you sustained other

20   allegations of sexual harassment against other

21   employees?

22             MR. ROBERTSON:  Objection.

23   Relevance.

24             Go ahead.

153

1  the idea of farming it out or who first

2  suggested it?

3       **A.    It was a joint.  I don't know who**

4  **mentioned it first, but it was -- it was a**

5  **joint discussion based on the nature of the**

6  **complaint and that it was -- it was -- there**

7  **was subsequent action that occurred that was**

8  **tied to the complaint.  For that reason, it**

9  **was -- I basically felt that it was a**

10 **complicated investigation that would be best**

11 **handled by an outside more skilled**

12 **investigator.**

13      Q.    Okay.  Now, when you first got

14 this, the talked -- I believe you talked to

15 Officer Freelain on May 9th, correct?

16      **A.    His memo -- I'm not sure.  It was**

17 **on or about May 9th.**

18      Q.    You think it was -- we saw from

19 the exhibit his initial -- the one you asked

20 him to write up came into your office on

21 May 10th, correct?

22      **A.    Yeah.  So I could have talked with**

23 **him on the 9th.  Typically the written document**

24 **would -- I'd get that the next day.**

154

1        Q.   And you reviewed that, correct?

2        **A.   Yes.**

3        Q.   And after reviewing that, you went

4 directly to Chief Tanksley and Deputy Chief

5 Ambrose?

6        **A.   Well, I informed them that a**

7 **complaint had been made.  Going direct, I don't**

8 **know what -- I didn't run downstairs, but at**

9 **some point in time I informed them that I**

10 **received a complaint.**

11       Q.   Well, you did that as soon as

12 possible; is that fair to say?

13       **A.   I did it in a timely manner, but I**

14 **don't recall exactly the circumstances or**

15 **conditions under which I informed them.**

16       Q.   No, I understand that.  But when I

17 say a timely manner, you talked about how

18 seriously the department takes the allegation

19 of sexual harassment?

20       **A.   Yes.  Yes.**

21       Q.   And this involved a supervisor,

22 sergeant, correct?

23       **A.   Yes.  Yes.**

24       Q.   And someone who was in the command

# Exhibit F



**Oak Park**          INTEROFFICE MEMORANDUM

**Date:**       May 22, 2012

**To:**         Dina Vardal, Police Sergeant

**From:**       Frank Spataro, Human Resources Director

**Copy:**       Cara Pavlicek, Interim Village Manager; Rick Tanksley, Police Chief; and
                Anthony Ambrose, Deputy Police Chief

**Subject:**    Notice of Sexual Harassment Complaint

The purpose of this memo is to inform you that Police Officer Rasul Freelain has made a complaint to the Human Resources Department alleging that you have engaged in acts of sexual harassment against him.   Officer Freelain submitted a written statement to me describing incidents of sexual harassment by you against him beginning in 2007 and continuing to the present time.  Officer Freelain's complaint will be investigated thoroughly, and any discussion of his complaint with you will be conducted in strict conformance with applicable requirements stated in your collective bargaining agreement.



In light of this formal notification of Officer Freelain's complaint and allegation of sexual harassment, you are to restrict your contact with him to only essential police matters directly related to your Police Sergeant position, and you are specifically directed to refrain from any retaliatory action towards him.

Finally, as this is a confidential matter, you are not permitted to discuss Officer Freelain's complaint with anyone at this time other than Chief Tanksley, Deputy Chief Ambrose and/or your Union representative.

# Exhibit G



**Oak Park**          INTEROFFICE MEMORANDUM

| | |
|---|---|
| **Date:** | September 28, 2012 |
| **To:** | Police Officer Rasul Freelain |
| **From:** | Frank Spataro, Human Resources Director |
| **Copy:** | Cara Pavlicek, Interim Village Manager; Rick Tanksley, Police Chief; and Simone Boutet, Acting Village Attorney |
| **Subject:** | Report on Sexual Harassment Complaint and Battery Complaint against Sergeant Dina Vardal |

On May 10, 2012 you provided me with a written complaint made against Sergeant Dina Vardal of the Oak Park Police Department alleging that she had sexually harassed you beginning in 2007 and continuing to the date of your complaint. Later, on May 21, 2012 you amended your complaint to include an incident occurring on May 19, 2012 where you alleged that Sergeant Vardal, while off-duty, engaged in physical contact with you at the Austin Boulevard entrance to the CTA Blue Line that you stated was battery to a police officer. Upon receipt of your complaint, the Village engaged the services of an outside investigator, Mr. William Keefe, to investigate your allegations and report his findings. This memo contains the findings for both allegations: 1) that Sergeant Vardal sexually harassed you; and 2) that Sergeant Vardal's physical contact with you at the CTA station was an act of battery against a police officer.

I. Sexual Harassment Complaint

The Personnel Manual states the following with regard to sexual harassment: ."Sexual harassment" means any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment."

Federal Law defines sexual harassment as: " Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

With regard to specific incidents stated in your complaint, those where Sergeant Vardal was communicating with you regarding your duties while on the CTA detail, and the manner in which you conducted field sobriety tests are examples of communicating clearly identified operational concerns for the purpose of improving, not interfering with your work performance, and are not examples of harassment or a hostile work environment  With regard to the other reported incidents there is no evidence that any of these incidents were sexual in nature. Also, there is no evidence of Sergeant Vardal affecting or making employment decisions that adversely affected your employment with the Village.

**Oak Park 0219**

In light of the information above, I have found Sergeant Vardal to be exonerated of the allegation that she engaged in sexual harassment meaning that while the incidents occurred as described in your complaint, none of them were improper or unlawful to substantiate the allegation.

II. Battery against a Police Officer

Your complaint that Sergeant Vardal's physical contact with you at the Austin Boulevard CTA station constituted battery against a police officer was reviewed by the Cook County States Attorney Office Who decided not to authorize the filing of criminal charges with regard to this incident.

# Exhibit H

In summary, on 09MAY12, I reported to Village of Oak Park Human Resources Director Frank Spataro that for the past several years I have experienced assorted harassment, including Sexual Harassment from Sgt. Dina Vardal of the Oak Park Police Department. Unfortunately, after making this report, the harassment has not stopped. Rather, it has only gotten worse.

Specifically, on 19MAY12, approximately 1624 hours, Officer Paul Fellows and I were dispatched to a suspicious auto call at 720 S. Austin (CTA Blue Line station). During the course of this investigation, three uniformed Chicago Police Department Officers, as well as OPPD Sgt. John Curtain arrived on scene to assist with the investigation (involving an abandoned United States Postal Service mail truck).

During the course of the suspicious auto investigation, at approximately 1652 hours, I was standing on the sidewalk a few feet from my squad car on the west side of Austin, north of the entrance to the Blue Line; at this time my vehicle was parked facing a S/E direction and positioned in a manner designed to divert oncoming S/B traffic away from the mail truck. As the CPD officers were speaking with one another, my attention was focused on the entrance to the CTA Blue Line station entrance. While facing south on Austin, I was startled when someone suddenly placed their left palm on my chest and started to push me. As I turned to face the person pushing me, I was alarmed to see that it was Dina Vardal touching me; Vardal was off duty, wearing a blue Cubs jersey over a low cut white shirt and blue jeans. Vardal then placed her right palm on my chest (so that now both of her palms were on my chest) and pushed me against the passenger side of the squad car, near the passenger side mirror. As I was pinned against the passenger side door of my squad car, Vardal grinned at me and said "look out! look out!" Vardal then removed her hands from my chest, at which time she (and a second unknown F/W accompanying her) walked S/B Austin and entered the Blue Line station.

As this incident unfolded, I was in complete disbelief. Feeling both angry and alarmed, I wondered whether I would lose my balance and fall backwards onto Austin Blvd if I tried to evade her. I worried that I would be scrutinized if I put my hands up to defend myself against the battery, or even be blamed for her unprovoked actions. Because of such fears, I simply held my palms open and raised my hands up as she touched my chest and pushed me against the squad car in order to clearly demonstrate to everyone that Vardal alone was the aggressor.

I felt completely embarrassed and humiliated. In front of Sgt. Curtain and three CPD Officers, I had just been shoved against a squad car by the supervisor who had been harassing me for years; "Did this just happen?," I wondered in total disbelief. Immediately following the battery, I turned in the direction of Sgt. Curtain, who was standing several feet from me. Sgt. Curtain looked at me and shook his head from side to side, expressing his disapproval of Vardal's conduct. Once she walked away from the scene, the CPD Officers, also apparently surprised by Vardal's actions, asked me whether the woman was a "PO" (a Police Officer). I replied that she was a Sergeant, at which time the CPD Officers crudely wondered aloud whether the woman

Oak Park 0084

accompanying Vardal was her girlfriend. I related that I did not know, at which time the CPD Officers continued speaking amongst themselves.

Several minutes later Sgt. Curtain, the three CPD Officers and Officer Fellows left the scene. In total disbelief, I sat in my squad car as I awaited the tow truck that would remove the abandoned mail truck. Only 10 days after filing a Sexual Harassment complaint, I found myself confronted and battered by the very person who has been harassing me for years.

Following the incident, on 19MAY12 approximately 1712 hours, I called Sgt. Curtain on his cell phone and spoke with him regarding the incident. I asked him whether he was aware that I had recently filed a Sexual Harassment complaint against Vardal. Sgt. Curtain related that he was unaware, and added that he had wondered why she pushed me into the side of the squad car. Sgt. Curtain then asked what procedure I followed in reporting the Sexual Harassment. When I related I made a formal complaint with Human Resources, Sgt. Curtain related that I should submit a supplemental report to HR, informing them of the battery. Sgt. Curtain also advised to include in my documentation that he was on scene and that he witnessed the battery. He added that I should be sure to "report this [incident], because this is getting out of hand."

On the morning of Monday 21MAY12, I reported the battery to Frank Spataro-Director of Human Resources. Mr. Spataro advised that an independent investigator would be conducting the Sexual Harassment investigation. On the afternoon of 21MAY12, I then met with OPPD Sgt. Sean O'Shea and Deputy Chief Anthony Ambrose, at which time DC Ambrose related he and an unspecified Commander would be conducting the criminal investigation; I was provided with RD #12-12483. During this meeting, DC Ambrose, in the presence of Sgt. O'Shea, related that Sgt. Curtain would be asked to submit a To-From document, detailing his observations from the 19MAY12 battery. DC Ambrose then related that Sgt. O'Shea and Sgt. Curtain would be ordered to refrain from discussing this battery investigation with anyone. DC added that I am not being ordered to refrain from discussing this matter.

One week later, on 28MAY12, I spoke briefly with Officer Fellows. While I did not discuss any of the details of the 19MAY12 battery, I asked Fellows whether he recalled witnessing anything unusual during the suspicious auto investigation. Fellows related he only remembered that while speaking with a security officer inside the Blue Line station, he saw Dina Vardal and an unnamed female dispatcher from WSCDC enter the station and related that they were headed to the Cubs game. Curious that I was asking about the circumstances of 19MAY12, but recognizing my deliberate attempt at discretion, Fellows did not ask me any questions regarding 19MAY12. He did however offer an unsolicited comment that Vardal may still be romantically involved with Officer Ian Miller, and warned it is common knowledge that Vardal is suspected seeking out members of the administration, violating chain of command, when she faces trouble or when she wants someone investigated or punished.

2

As this detailed account has made clear, Sgt. Dina Vardal's actions are reprehensible, and they are having a very real, tangible and negative physical and mental impact on me and my family. I am completely stressed. Difficulty sleeping, chronic headaches and upset stomach are regular occurrences. My wife and family are also being negative impacted by Vardal's continued actions, due to the stress these actions are creating.

Worse yet, her actions on 19MAY12 were criminal.

According to 720 ILCS 5/12-3 (from Ch. 38, par. 12-3), Vardal committed one Misdemeanor and two Felonies when she battered me (as described above). Specifically, consider the following language taken directly from 720 ILCS:

"Sec. 12-3. Battery. (a) A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual.

(b) Sentence.

Battery is a Class A misdemeanor.

Aggravated Battery:

(c) Offense based on location of conduct. A person commits aggravated battery when, in committing a battery, other than by the discharge of a firearm, he or she is or the person battered is on or about a public way, public property, a public place of accommodation or amusement, a sports venue, or a domestic violence shelter.

-This battery occurred on the public way.

(d) Offense based on status of victim. A person commits aggravated battery when, in committing a battery, other than by discharge of a firearm, he or she knows the individual battered to be any of the following:

   (1) A person 60 years of age or older
   (2) A person who is pregnant or physically handicapped
   (3) A teacher or school employee upon school grounds
      or grounds adjacent to a school or in any part of a building used for school
      purposes.

   (4) A peace officer, community policing volunteer,
      fireman, private security officer, correctional institution employee, or Department
      of Human Services employee supervising or controlling sexually dangerous persons
      or sexually violent persons:
         (i) performing his or her official duties;
         (ii) battered to prevent performance of his or

5

her official duties; or
(iii) battered in retaliation for performing his
or her official duties.

(h)  Sentence. Unless otherwise provided, aggravated battery is a **Class 3 felony.**

Aggravated battery as defined in subdivision (a)(4) [i.e. Battery to a Police Officer] (d)(4), or
(g)(3) is a **Class 2 felony**"

I am asking that Dina Vardal's ongoing pattern of harassment, intimidation, retaliation and
misconduct finally be taken seriously by both the Oak Park Police Department and the Village of
Oak Park. Her behavior reflects poorly on the entire Village of Oak Park. Her ongoing actions
are condemnable, deplorable, vicious and unethical. It is unthinkable that Vardal be able to
victimize coworkers and force me and others to work in a harassing, negative and hostile
environment, violating our right to exist in a workplace free of harassment.

R Frank 359/0806  29MAY12

Officer Rasul Freelain #359/0806

4

Oak Park 0087

# Exhibit I



OFFICE OF THE STATE'S ATTORNEY
COOK COUNTY, ILLINOIS

ANITA ALVAREZ
STATE'S ATTORNEY

SPECIAL PROSECUTIONS DIVISION
2650 SOUTH CALIFORNIA AVE.
CHICAGO, ILLINOIS 60608

August 22, 2012

Deputy Chief Ambrose
Oak Park Police Department
123 Madison
Oak Park, Illinois 60302

Re:     Oak Park Sgt. Dina Vardal

Dear Deputy Chief Ambrose,

     We have completed our review of the matter of the above-captioned officer. We will not be filing criminal charges in this matter. If you have any questions, please contact me at 773-674-4063.

Very truly yours,

ANITA ALVAREZ
Cook County States Attorney

BY:     _____

LuAnn Snow
Assistant State's Attorney

05/30/2013 14:02 FAX 7088856083



STATE S ATTORNEY
COOK COUNTY, ILLINOIS

☒001/001

## OFFICE OF THE STATE'S ATTORNEY
### COOK COUNTY, ILLINOIS

ANITA ALVAREZ
STATE'S ATTORNEY

CRIMINAL PROSECUTIONS BUREAU
2650 SOUTH CALIFORNIA AVENUE
CHICAGO, ILLINOIS 60608

December 11, 2012

Rasul Freelain
10000 S. Claremont Avenue
Chicago, Illinois 60643

Officer Freelain,

The State's Attorney has declined to file felony charges against Dina Vardal; a decision you noted in your letter of November 28, 2012. At this time, there is no further review taking place. I regret that you do not agree with the decision but the State's Attorney's Office has an obligation to file charges where we have a good faith basis that the defendant will be found guilty. That is not the case here.

Sincerely,

LuAnn Snow, Supervisor
Assistant State's Attorney
Professional Standard Unit

Oak Park 0156