RASUL FREELAIN,

       Plaintiff,

    v.

VILLAGE OF OAK PARK, a municipal
corporation, SERGEANT DINA VARDAL, in
her individual capacity,

       Defendants.

No. 13 CV 3682

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Village of Oak Park Police Officer Rasul Freelain reported to his employer that he was sexually harassed and battered on separate occasions by Sergeant Dina Vardal. During the Village's investigation of both complaints, Freelain became anxious and stressed about his safety at work. He developed debilitating migraine headaches, which caused him to seek treatment and absences from work. Freelain believes the Village interfered with his efforts to take protected leave and that after Freelain took such leave, the Village retaliated and discriminated against him. Freelain brings claims against the Village for retaliation under the Family Medical Leave Act and the Americans with Disabilities Act, interference under the FMLA, and discrimination under the ADA. 29 U.S.C. § 2601–2654; 42 U.S.C. §§ 12101–12213. The Village moves for summary judgment on each of those claims. For the following reasons, the Village's motion is granted.

# I. Legal Standards

"Summary judgment is appropriate when no material fact is disputed and the moving parties are entitled to judgment as a matter of law, meaning that no reasonable jury could find for the other party based on the evidence in the record." *Carman v. Tinkes*, 762 F.3d 565, 566 (7th Cir. 2014). In reviewing a motion for summary judgment, district courts must construe all facts and reasonable inferences in the non-moving party's favor. The non-moving party cannot defeat a motion for summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(c)(1), (e). Instead, the non-moving party must cite to the record to show: "the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

Local Rule 56.1 requires the movant to file a statement of undisputed facts and the non-movant to file a concise response, admitting or denying the facts by citing to admissible evidence in the record. N.D. Ill. L.R. 56.1(a)(3), (b)(3)(B). Facts are deemed admitted for purposes of the motion if the responding party does not controvert the fact by citing to admissible evidence. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citation omitted). Arguments included in the statement of undisputed facts or in the responses will be disregarded. The facts discussed below are undisputed either because they were affirmatively admitted by the responding party or because they were deemed undisputed in accordance with the local rule.[1]

---

[1] Defendant moves to strike certain exhibits submitted by plaintiff on the grounds that the exhibits were not previously disclosed. The motion is denied. Exhibits ZZ, HHH, III, JJJ,

## II.     Background

Freelain worked for the Village for over a decade. [128] ¶ 1.[2] In May 2012, Freelain reported to the Village's Human Resources director that Vardal sexually harassed him. [128] ¶ 4. The HR director notified Vardal of Freelain's accusation, that the Village would investigate the complaint, that she must limit her contact with him to essential police matters, and that any retaliation was prohibited. [142] ¶ 12. A few weeks later, Freelain made another report to the HR director; this time he complained that Vardal shoved him while he was on duty. [128] ¶ 6. Freelain believed that such conduct constituted felony criminal battery and he asked to file a police report about the incident. [128] ¶ 7.

The Village hired an outside agency to investigate Freelain's complaints. [142] ¶ 13. Although the investigation concluded quickly, the Village did not share the results with Freelain until several months later. [142] ¶ 14. Eventually, the HR director informed Freelain that the investigation did not substantiate his sexual harassment complaint and that criminal battery charges would not be filed against Vardal. [128] ¶ 8. Freelain calls the investigation a sham. [128] ¶ 8.

---

KKK, and LLL appear in plaintiff's Supplemental 26(a)(1) Disclosures. Exhibits FF, SS, and YY were discussed in depositions. Plaintiff says Exhibit CCC was disclosed prior to the close of discovery and tendered at that time ("pg. 15 and 16 of 26a1-2"). [147] at 3. Indeed, plaintiff's Supplemental 26(a)(1) Disclosures refers to "Various Emails Hand numbered in lower right corner P 1-74," [147-1] ¶ 19, of which Exhibit CCC could be a part. In any event, the email is not determinative of any issue in this case. Finally, plaintiff cannot be faulted for not producing Exhibit WW during discovery because it did not yet exist; it was authored after the close of discovery and plaintiff has produced it in due course, with no prejudice to defendant as a result.

[2] Bracketed numbers refer to entries on the district court docket. Freelain's response to the Village's LR 56.1 statement is [128], and the Village's response to his LR 56.1 statement of additional facts is [142].

In July 2012, Freelain began experiencing migraine headaches. [128] ¶ 10. Several weeks later, Freelain notified the Village that he could not work his scheduled shift because he was sick, due to stress. [128] ¶ 11. The deputy chief and a sergeant signed off on a Medical Roll form for Freelain that stated: "Stress and severe headaches related to ongoing investigation." [142] ¶ 3; [122-1] at 1. Four days later, Freelain informed the Village that he was suffering from stress and migraine headaches again, due to Vardal's continued presence at work; Freelain explained that he could not work his scheduled shift that night or the following two days. [128] ¶ 12. After Freelain's third consecutive absence from work, and pursuant to the Medical Roll policy regarding police officer absences, the Village sent him paperwork instructing him on how to request FMLA leave, if appropriate. [128] ¶ 13. Freelain told his immediate supervisor that he believed the sexual harassment and continued presence of Vardal caused his headaches and that he wanted his absences classified as arising from a work-related injury. [128] ¶ 15.

The HR director sent Freelain a letter explaining that until Freelain submitted a medical certification form to establish his need for FMLA leave, his absences would be classified as "self sick" for payroll purposes. [128] ¶ 20.[3] This letter also explained that before Freelain could return to work, the Village required him to submit a note from his physician stating he was clear for work and to submit to a fitness for duty exam. [128] ¶ 20. Ten days later, Freelain's doctor submitted a

---

[3] A "self sick" absence denotes a non-work-related illness and is deducted from the officer's bank of sick and/or vacation days. [51] ¶ 35. A "sick accident" absence, on the other hand, denotes a work-related absence and is not deducted from the officer's bank of sick and/or vacation days; the officer is paid for those absences. [51] ¶ 35.

FMLA "Certification of Health Care Provider" stating that Freelain had been suffering from headaches and that he required intermittent leave, approximately twice a week for two to three hours at a time due to his headaches. [128] ¶ 24. The HR director granted Freelain's request for intermittent leave as described by his doctor and he advised Freelain that the headache-related absences would be designated "FMLA self-sick" for payroll purposes. [128] ¶ 26.

The police chief advised Freelain that his fitness for duty exam would occur with another doctor on October 2, 2012, and if necessary, on October 9, 2012, as well. [128] ¶ 31. One day later, Freelain provided a letter from his own doctor, releasing him to return to work. [128] ¶ 28. Freelain's doctor wrote that Freelain was currently "receiving counseling for stress precipitated by workplace problems involving a supervisor" and that "Mr. Freelain missed 14 days of work from August 21, 2012 to September 28, 2012. The causes of Mr. Freelain's absences from work were a combination of the headaches/sleep disorder and the workplace stressors." [99-5] at 35.

Freelain appeared for the fitness for duty exam on October 2 and 9, 2012, per the police chief's orders. [128] ¶ 32. Over one month later, Freelain expressed concern to the HR director that his leave was not being classified as administrative leave while he awaited the fitness for duty results. [128] ¶ 34. On November 13, 2012, the HR director received the results of the fitness for duty exam, which concluded that Freelain was fit to return to duty as a police office. [128] ¶ 32. Freelain returned to work that same week, [128] ¶ 37, but it took several additional

weeks before the Village changed its classification of Freelain's absences to paid administrative leave (for the period of time when he waited for the fitness for duty results). [128] ¶ 38.

In late December 2012, Freelain requested FMLA leave to care for his wife who had been diagnosed with breast cancer. [128] ¶ 39. He later provided the Certification of Health Care Provider form to the Village regarding his wife's illness and his need for leave to care for her. [128] ¶ 40. The Village informed Freelain that he had no remaining FMLA leave to care for his wife. [51] ¶ 41. Since he needed flexibility in his schedule in order to care for his wife, Freelain voluntarily stepped down from his detective position and returned to patrol, which increased the likelihood that Vardal would act as his immediate supervisor. [51] ¶ 10.

Approximately one month later, the Village granted Freelain's request for FMLA leave to care for his wife. [128] ¶ 41. Due to the continuing issues with classifying Freelain's absences, Freelain ran out of FMLA leave again and had to return to work even though he needed to be at home caring for his wife. [51] ¶¶ 41–42. Almost six weeks later, the Village granted Freelain's updated request to continue caring for his wife. [128] ¶ 42. Freelain says the Village did not respond to his request for a FMLA extension on a timely basis. [128] ¶ 45.

Freelain filed a Charge of Discrimination with the EEOC, alleging sexual harassment, discrimination due to disability, and retaliation. [51] ¶ 43. Ultimately, Freelain was paid for all of the time he spent on FMLA leave. [128] ¶ 70. He was never demoted from his rank at the Village, despite his absences. [128] ¶ 57. In fact,

his evaluation scores increased after his FMLA leave, [128] ¶ 79, and—as of the date of the motion for summary judgment—he was still employed with the Village as a police officer. [128] ¶ 1.

## III.   Analysis

### A.      FMLA and ADA Retaliation

Both the FMLA and the ADA prohibit retaliation against employees who exercise rights under those statutes. 29 U.S.C. § 2615(a); 42 U.S.C. § 12203(a); *Hansen v. Fincantieri Marine Group, LLC*, 763 F.3d 832, 836 (7th Cir. 2014); *Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 710 (7th Cir. 2015). A retaliation claim under either statute requires proof of the employer's retaliatory intent. *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 828 (7th Cir. 2012); *Burks v. Wis. DOT*, 464 F.3d 744, 759 (7th Cir. 2006). To establish a prima facie case of retaliation, the employee must prove: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the two. *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012); *Dickerson v. Bd. of Trs. of Comty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). A plaintiff may establish a prima facie case indirectly by demonstrating that he engaged in protected activity, suffered an adverse employment action, met his employer's legitimate expectations, and was treated less favorably than similarly situated employees who did not engage in protected activity. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). Whether proven directly or indirectly, the point is to ask whether a jury could infer retaliation. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 2016 WL 4411434 at *4 (7th Cir. 2016).

Once the employee sets forth a prima facie case of retaliation, the employer may rebut the inference of retaliation by proffering a non-retaliatory reason for taking an adverse employment action against the employee. *King v. Preferred Tech. Grp.*, 166 F.3d 887, 892 (7th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973)). In turn, the employee may show the proffered reason is merely a pretext for retaliation. *Id.* To do so, the employee must prove not only that the justification was false, but also that the true reason for the adverse action was, in fact, retaliation. *Id.* at 893 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742 (1993)).

Freelain engaged in statutorily protected activity by requesting FMLA leave and by filing charges with the EEOC. *Nicholson*, 690 F.3d at 828; *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 787 (7th Cir. 2007). His prima facie case of retaliation turns on whether the Village's actions were adverse employment decisions and whether they were caused by Freelain's protected activity (or otherwise driven by retaliatory animus).

An employment action must be "materially" adverse. *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008); *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001). This is a fact-specific inquiry because the definition of an "adverse action" includes anything that would discourage a reasonable employee from exercising his rights, *Breneisen*, 512 F.3d at 979, but excludes the range of trivial actions that make an employee unhappy. *Kersting*, 250 F.3d at 1115. Typically, a materially adverse action is one that changes the terms and conditions

of employment; for example, a termination, a demotion through a salary or a wage decrease, or a loss of title or benefits. *Kersting*, 250 F.3d at 1115 (quotation omitted); *see also Crady v. Liberty Nat. Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993). To satisfy this element, Freelain asserts that the Village: misclassified his leave from work; prevented his opportunity of secondary income and promotion; subjected him to investigations; refused his "light duty" request; denied his scheduling request; subjected him to a fitness for duty exam; delayed the grant of his FMLA time; and refused to permit him to sign a criminal or internal complaint.

A "causal connection" exists where the employee can show that the employer would not have taken the adverse employment action but for the employee's protected activity. *King*, 166 F.3d at 892 (citing *Johnson v. City of Fort Wayne*, 91 F.3d 922, 938–39 (7th Cir. 1996)). A causal connection can be established by an admission of retaliation or by evidence from which a jury could infer retaliatory intent. *Scruggs v. Carrier Corp.*, 688 F.3d 821, 827 (7th Cir. 2010) (quoting *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008)).[4] For example, a reasonable jury could infer retaliatory intent from evidence that an employer treated an employee who engaged in a protected activity less favorably than a

---

[4] After the parties briefed this case, the Seventh Circuit rejected the language of "convincing mosaic" as a legal standard and the lower courts' practice of separating direct and indirect evidence in discrimination and retaliation claims. *Ortiz*, 2016 WL 4411434 at *3–4. "Evidence is evidence," courts should consider all evidence in these cases as a whole. *Id.* at *4. The burden-shifting framework of *McDonnell Douglas* was not at issue in *Ortiz*. *Id.* at *5.

similarly situated employee who did not. *Hull v. Stoughton Trailers, LLC.*, 445 F.3d 949, 951 (7th Cir. 2006).[5]

For reasons discussed below, each of Freelain's complained-of actions do not support a retaliation claim under the FMLA or the ADA because they are not adverse employment actions and because there is no causal connection between the Village's decision to take these actions and Freelain's protected activity. Moreover, for many of the complained-of actions, the Village has proffered an explanation for its decision to act, and Freelain has not rebutted the explanation with evidence of pretext. As such, the Village is entitled to summary judgment on Freelain's FMLA and ADA retaliation claims.

### 1.    *Misclassification of Leave*

Freelain argues that the Village repeatedly misclassified his absences as "self sick," causing him to lose his personal sick and/or vacation time. The Village acknowledges that it mistakenly classified some of Freelain's absences as "self sick," but also notes that it corrected these errors and that it paid Freelain for all of the time he spent on FMLA leave. [128] ¶ 70. Had the Village never corrected these errors, perhaps this would have amounted to an adverse action, but the Village's corrective action demonstrates that the terms and conditions of Freelain's employment were not affected. Freelain emphasizes that weeks passed by before the Village corrected the classifications, but he cites no authority that found a delayed remedy to constitute an adverse action, and he does not submit evidence or

---

[5] Analysis of whether employees are similarly situated should not be rigid or mechanical; the court should look for "any evidence that would allow a meaningful comparison between the circumstances […of the] would-be comparators." *Hull*, 445 F.3d at 952.

argument to suggest that he was not made whole for the delays. In this case, the delay was an inconvenience and a source of anxiety for Freelain, but it did not materially change the conditions of his employment; nothing happened during the delay that altered Freelain's relationship with his employer. That the Village did not immediately resolve the classification issue, therefore, does not rise to a "materially" adverse action.[6]

Moreover, a jury could not conclude that the misclassification was retaliatory. The Village's Human Resources Department and the deputy chief had the final authority over how to pay an officer while on sick leave—whether the time away from work would be taken from the officer's sick bank and/or deducted from the officer's payroll. [142] ¶ 7. Freelain asserts seven additional facts in an attempt to raise an issue as to the intent to punish him for taking protected leave. [133] at 5. Five of these facts have no bearing on the question of intent; instead, they discuss the number of hours Freelain lost due to the classifications, Freelain's efforts to notify the Village that his absences were work-related, Freelain's inability to work full shifts when he experienced headaches, that Freelain's time should have been classified as "sick accident," and other related topics—none of which reflect on the Village's attitude toward Freelain's protected activity. [142] ¶¶ 1–4, 7. The other

---

[6] Freelain argues that the more than six-week delay in returning the results of the fitness for duty exam, during which time he was prevented from working (even though he had been cleared to return to work by his own physician), was also retaliatory. He points to evidence in the record of the delay itself, but nothing else that would support a finding that the Village caused the delay or that would connect it to his protected activity. The undisputed record shows that the Village had no involvement in the timing of the doctor's release of the results of the fitness for duty exam. [99-2] at 334:11–14. Since there is no "act" by the Village, there can be no "adverse action" or "causal connection" between that act and Freelain's protected activity.

two facts state that the Village classified other police officers' time differently than Freelain's time and that the deputy chief ordered Freelain's absence to be changed from "sick accident" to "self sick" (with the unstated implication that this order was motivated by the deputy chief's desire to retaliate against Freelain). [142] ¶¶ 6, 8.

Freelain described two other officers' FMLA leave experiences. First, Freelain "think[s]" Officer Paul Fellows had "a neck injury or something, […] some years ago and was afforded, you know, FMLA leave without an incident or problems." [124-4] at 514:8–12. Fellows told Freelain that he never had to request the forms required by the Medical Roll nor did he have to request that his absences be designated as "sick accident" in order to get the benefit of that classification from the Village. [124-4] at 419:11–420:7. Second, Freelain testified about Officer Johnny Patterson: "a couple years ago I think, [he] had a heart situation at work, or, you know heart condition and he had to miss work. And my understanding, he was able to use Family Medical Leave Act without problem." [124-4] at 515:2–8. Freelain does not have personal knowledge about either of the officers' injuries, their FMLA requests with the Village, who at the Village they interacted with, how the Village processed those requests, and other significant details. Although the court draws inferences in favor of Freelain, it cannot do so for his conclusory statements or for his statements that are based on speculation or conjecture. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 985 (7th Cir. 1999); *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012). This testimony does not support an inference of a nexus between the Village's classification decisions and Freelain's protected activity.

A sergeant told Freelain that the police chief was "tired" of Freelain "using FMLA time," [124-1] at 193:2–9. The police chief was not the relevant actor or decision maker in classifying Freelain's time and therefore, a statement made to Freelain about a sergeant's opinion or belief that the police chief was "tired" of Freelain "using FMLA time" does not support an inference of a causal link between the classification decisions and Freelain's protected activity.

Another sergeant told Freelain that the "self-sick" classification for his absences in 2012 was "wrong," [124-4] at 423:16–19, and that those absences should have been classified as "sick accident." [124-2] at 291:3–22. This sergeant explained that he felt that the way the Village contacted Freelain while Freelain was on FMLA leave was "harassment" because of the limitations on the contact a police department has with an employee who is on FMLA leave. [125] at 139:14–140:6. The sergeant's belief about the Village's contact with Freelain was "only based on [his] own personal opinion of being [sic] felt like [sic] that I was unjustly treated the same way in some cases." [125] at 140:1–10. The fact that the classifications were believed to be "wrong" does not suggest anything more than an error by the Village. Even with the sergeant's opinion testimony that the Village's contact with Freelain while he was on leave was "harassment," a trier of fact could not infer retaliation because the testimony alludes to the sergeant having suffered similar maltreatment by the Village. In other words, this sergeant's belief does not suggest that the Village overstepped those contact limitations *because of* or *in response to* Freelain's protected activity.

Finally, Freelain cites an email the deputy chief wrote to the police chief and other Village personnel when Freelain notified the Village he would be taking eight hours of FMLA leave to care for his wife who had a surgical procedure the day before. [122-1] at 46. The deputy chief wrote: "Since we had issues with Officer Freelain in the past concerning his use of the medical roll, we are seeking direction. We believe his request should be sick family and needs to be more specific, i.e., he needs to attend to his wife [or] he must assist with the children. Also, doesn't FMLA require prior approval from the HR Director? Attached is a copy of the medical roll which was completed by his supervisor." [122-1] at 46. From this email, a trier of fact could not infer animus. At most, it is an admission of confusion and past errors by the Village, as well as an effort to seek guidance in advance of acting so as not to repeat the same errors. It does not support an inference of causation between the Village's classification decisions and Freelain's protected activity.

The Village proffers explanations for the misclassifications that Freelain has failed to rebut with evidence of pretext. First, the Village says it classified Freelain's absences as "self sick," in August and September 2012 because it had yet to receive a Certification of Health Care Provider from Freelain's physician. [128] ¶ 20; [142] ¶ 3; [122-1] at 1. As the HR director outlined in a memorandum to Freelain on September 11, 2012, the Certification of Health Care Provider is a prerequisite for having one's leave be marked as something other than "self sick," pursuant to the Village's Medical Roll. [99-5] at 13; *Townsend-Taylor v. Ameritech Services, Inc.*, 523 F. 3d 815, 818 (7th Cir. 2008) (employers may require compliance

14

with their own internal attendance procedures in addition to FMLA certification requirements).

Second, the Village says it made a mistake when it classified Freelain's absences as "self sick" between the time when Freelain's personal treating physician cleared him to return to work and when Freelain actually returned to work after waiting for the fitness for duty exam results. [128] ¶¶ 28, 32, 37. The Village does not explain why it made this error, but it did correct it. [128] ¶ 38.

Third, the deputy chief explained that he instructed a sergeant on at least two occasions to change Freelain's designation from "sick accident" to "self sick" for that shift, [99-3] at 56:9–16, because his understanding at the time was that an employee could not use FMLA leave for one single day at a time. [99-3] at 56:9–16. The deputy chief later learned from HR that Freelain had an exemption allowing him to call in FMLA leave one day at a time. [99-3] at 56:16–19. Although Freelain's absences were misclassified for weeks or months at a time, the Village eventually corrected these errors and paid Freelain for all of the time he spent on FMLA leave. [128] ¶ 70. The Village also granted every one of Freelain's requests for FMLA leave, albeit after delays in some instances. [128] ¶ 43.

Freelain has not come forward with any evidence from which a jury could reasonably conclude that the Village's explanations for classifying his absences were a pretext for retaliation. Freelain provides no evidence, for example, to suggest that the Village's mistakes should be viewed with suspicion. It corrected its errors, and nothing about the correction suggests a consciousness of guilt concerning retaliatory

intent to misclassify in the first place. A mistake is not necessarily evidence of retaliation—pretext is more than a mistake, it is a lie—and Freelain must point to some evidence to suggest that the Village's claim of administrative error concealed animus toward Freelain's protected activity. He has not done so.

## 2. Secondary Income and Promotion

Freelain asserts that he was forced to forgo opportunities to work with the Chicago Transit Authority and the Illinois Department of Transportation, which resulted in lost income, because of mistreatment he received from the police chief and the deputy chief and because he wanted to avoid contact with Vardal. [133] at 6; [142] ¶ 39. Freelain also argues the Village's retaliatory behavior stopped him from taking the "Sergeant's test," which is required for promotion. [133] at 7. Additionally, Freelain claims he lost an opportunity for a side job with a sergeant's security company because the Village would not issue him a required document (a PERC Card verifying his employment with the Village) on a timely basis. [133] at 6–7.

Neither of the accusations about forgoing opportunities to work at CTA or IDOT or to take the "Sergeant's test" involves *action* by the Village. Rather, Freelain made a decision to not do something based on his belief about or feelings towards the Village. There can be no retaliation without both an action by the employer and a connection between that action and the plaintiff's protected activity. Freelain has neither element with respect to these opportunities, so his retaliation claim as to these issues fails.

Regarding the PERC card, the Village eventually granted Freelain's request and gave him the card. [142] ¶ 38. Again, Freelain does not offer any authority to support his argument that the delay in granting his request could qualify as an adverse employment action. Since Freelain ultimately received the PERC card, a reasonable trier of fact could not conclude that the terms and conditions of his employment were affected while he waited for the Village to process his request. Waiting, in this instance, was not a "materially" adverse action.

Freelain contends the processing was unfairly delayed and he cites a sergeant's deposition testimony to support his belief that this was a retaliatory attack by the Village. The sergeant's testimony, however, is to the contrary. The sergeant testified that other officers' PERC card requests also experienced delayed processing and that he does not know why Freelain's card was not signed immediately. [125] at 127:2–128:3. To cast suspicion on the delay he experienced, Freelain needed to point to evidence that officers who were similarly situated to him, but who did not engage in protected activity, received PERC cards faster than he did. Freelain does not identify any comparators who were granted PERC cards promptly, and he has no support for an inference that the Village administered its PERC card review process against Freelain more strictly. A jury could not conclude that the PERC card processing delay was an act taken on account of the Village's hostility towards Freelain's protected activity.

### 3.    Investigations of Freelain's Leave

The Village admits it investigated Freelain's use of FMLA leave to confirm it was consistent with the Certification of Health Care Provider. [142] ¶ 8; [99-5] at

17–21. Investigating an employee's absences in this manner is lawful under the FMLA and does not necessarily constitute an adverse employment action. *See*, *e.g.*, *Breneisen*, 512 F.3d at 982 (concluding that an employer's asking an employee why she was taking leave and telling her the leave was hurting the team were "minor annoyances" and not adverse actions) (citing *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405 (2006)). There is nothing in the record to support an inference that these inquiries into Freelain's absences discouraged him from engaging in protected activity—in fact, the undisputed record shows that Freelain continued to take FMLA leave when necessary. The investigations did not affect the terms of Freelain's employment.

A sergeant told Freelain that the deputy chief ordered an investigation into Freelain's use of time and the sergeant believed the investigation was "wrong" because Freelain had done everything possible to document the time. [99-1] at 254:7–16. That Freelain or the sergeant takes issue with the Village's investigation—with no foundation to link their conclusory opinion of its wrongfulness to some animus toward Freelain's protected activity—does not establish the required nexus. A trier of fact could not find that the Village's investigations were retaliatory here.

### 4. *"Light Duty" Request*

Freelain believes he should have been allowed to participate in the alternative work or "light duty" program after he was cleared to return to work by his doctor. [133] at 20. He asked his union representative to communicate this request to the Village on his behalf, but Freelain was never allowed to participate in

the program. [133] at 20. The Village submitted two facts stating that Freelain never asked or submitted a written request to return to work with an accommodation or to a "light duty" position. [128] ¶¶ 73, 77. Freelain attempted to dispute these facts by citing a letter his union representative wrote to the Village. [128] ¶¶ 73, 77; [122-1] at 37. This letter states: "I was wondering if there is a pay status or work function that he could be assigned to during the duration of this 'medical clearance' time in an effort for him to earn his wages." [122-1] at 37. The letter, therefore, alluded to the union representative's desire that Freelain be put to work during this waiting period but it did not put the Village on notice that Freelain was the one asking for an accommodation or a "light duty" position. [122-1] at 37.

The Village's non-action here was not a decision it made or an action it took against Freelain. Its passivity was not within the realm of behavior that qualifies as an adverse employment action. Furthermore, Freelain does not point to evidence from which a jury could infer a nexus between Freelain's protected activity and the Village's failure to interpret the union representative's letter as a request from Freelain for a "light duty" position. The circumstances surrounding the "light duty" request—to the extent it even was one—do not indicate retaliation.

### 5. Shift Change Request

A commander denied Freelain's request to switch short-day shifts for the remainder of 2013 to care for his wife. [128] ¶ 63. Freelain appealed to the police chief, who in turn asked the commander for an explanation. [128] ¶ 65. The commander asked a sergeant, who was also the steward for the sergeants' union

and an accountant, to review Freelain's request. [128] ¶ 66. The sergeant determined that the request did not take into account the administrative repercussions that would flow from this request—at a minimum, it would require adding and subtracting time from the records of three separate police officers. [128] ¶ 67.

Freelain says these switches were voluntary actions handled at the shift or sergeant level, but the cited deposition testimony and documents in the record do not support this statement. Moreover, Freelain has not presented evidence that switching short-day shifts was an entitlement at all, let alone that he was entitled to switch short-day shifts continuously for weeks into the future. Instead, the undisputed record establishes that short-day shift switches were a perk, which the Village granted discretionally. Denial of such work perks does not constitute an adverse action. *Tyler v. Ispat Inland Inc.,* 245 F.3d 969, 972 (7th Cir. 2001). Similarly, the inconvenience or annoyance that Freelain suffered as a result of not having his scheduling preferences adopted by the Village does not qualify as an adverse employment action. *Kersting*, 250 F.3d at 1115.

Freelain contends this denial was in retaliation for his use of protected leave, but there is nothing in the record to support this contention. He does not have personal knowledge of how short-day shift switches were processed and his speculative beliefs about how simple such switches were or his conclusory statements that they would not have affected payroll are insufficient to create an issue of fact to avoid summary judgment. *Mills v. First Fed. Sav. & Loan Ass'n of*

*Belvidere*, 83 F.3d 833, 841–42 (7th Cir. 1996). Meanwhile, the undisputed record shows that the Village had never received a request for short-day shift switches as complicated as Freelain's in over sixteen years. [99-7] at 5:7, 112:15–20. There is no evidence that the Village granted a similarly situated officer's extensive request to switch short-day shifts. Therefore, there is no basis for a reasonable jury to conclude that the Village's refusal here was based on its animus towards Freelain for his protected activity. Nor has Freelain pointed to a fact that would support an inference that any of these decision makers—the commander, the police chief, or the sergeant—acted with a retaliatory motive in deciding that Freelain's request was too onerous to approve.

The Village articulated business reasons for why it could not grant Freelain's request. First, as it explained to Freelain contemporaneously, the sergeant determined that administering Freelain's request was too burdensome to be feasible. [125-1] at 46:23–47:2. Second, the police chief concluded that granting Freelain's request would create a precedent with the police officers' union for assigning short-day shifts, which would deviate from their Memorandum of Understanding and could be used by another group of officers for a future demand. [128] ¶ 68. Since Freelain does not cite evidence that suggests the Village's proffered reasons for denying his request to switch short-day shifts were not the true reasons, he cannot support an inference of pretext here.

6.      *Fitness for Duty Exam*

When the HR director engaged a doctor for Freelain's fitness for duty exam, the doctor explained he could do a general fitness for duty exam or he could do an

in-depth evaluation to determine if Freelain's condition would affect his ability to perform the job or create additional concerns. [99-2] at 67:8–17. In response, the HR director selected the in-depth analysis. [99-2] at 68:5–13. Requiring a medical evaluation to assess an employee's ability to safely return to work is not an adverse employment action. *Stern v. St. Anthony's Health Center*, 788 F.3d 276, 294 (7th Cir. 2015) (citing *Timmons v. Gen. Motors. Corp.*, 469 F.3d 1122, 1129 (7th Cir. 2006)); *see also Coffman v. Indianapolis Fire Dept.*, 578 F.3d 559, 565 (7th Cir. 2009) ("We have acknowledged that inquiries into an employee's psychiatric health may be permissible when they reflect concern for the safety of employees and the 'public at large'").

With respect to this complained-of action, the HR director was the decision maker for the Village.[7] Since Freelain has not brought forward any evidence that his protected activity had any bearing on the HR director's decision to have an in-depth fitness for duty evaluation, there is no support for an inference that a nexus exists between the two.

The HR director testified that although he had not yet received the release to work from Freelain's doctor when the police chief ordered Freelain to undergo a fitness for duty examination, he still would have required Freelain to undergo the in-depth evaluation even if he had received it in advance. [99-2] at 78:21–79:9. In

---

[7] The police chief and the deputy chief did not participate in this conversation with the doctor, nor did they influence the HR director's decision to have the more in-depth evaluation done. [99-2] at 80:10–81:3. The HR director never informed the police chief and the deputy chief that the doctor offered two levels of examinations and that the HR director selected the more in-depth one. [99-2] at 81:1–15. At the time of the deputy chief's deposition, he testified he did not know if different levels of fitness for duty were possible. [99-3] at 125:18–21.

other words, the timing of the release to work from Freelain's doctor had no bearing on the Village's decision to order Freelain to submit to a fitness for duty exam. This is corroborated by the undisputed fact that the HR director informed Freelain at the outset that the Village would require a fitness for duty exam, *in addition to* a notice from his physician releasing him to return to work. [128] ¶ 20.

The HR director explained that he wanted to mitigate any risk to the Village that could arise from Freelain's return to work. [99-2] at 68:5–13. Specifically, the HR director worried about the effect Freelain's headaches and inability to sleep would have on his performance as a police officer, [99-2] at 37:11–15, and he was concerned by Freelain's absences for eight-hour periods at a time when his doctor's notations on the FMLA form stated that Freelain would be absent from work twice a week for two to three hours a day. [99-2] at 56:9–22.[8]

In response, Freelain argues that if the Village were truly concerned about him carrying a gun and wielding his arrest powers, the Village could have taken those powers away from him. Identifying another course of action the Village could have taken, though, does not undermine the credibility of the explanation the HR

---

[8] Freelain's headaches caused him to take entire days off of work on August 21, 24, 25, 26, 29, and 30, 2012, and September 3, 4, 7, 8, 9, 12, 13, 17, 18, 21, 22, 23, 26, and 27, 2012. [128] ¶ 72. His doctor's calculation of absences two times per week for two to three hours per episode was an estimate. *See* [51-3] at 3 (asking the doctor to estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next six months). Elsewhere on the same form, the doctor said, "[Patient] with episodic headaches that are debilitating. He is unable to work on days of severe headaches." [51-3] at 3. It is not necessary to resolve which estimate was correct because the basis for an employer's decision need not be "correct" so long as it was not impermissibly biased or pretextual. That the HR director was struck by the discrepancy between one estimate on the form and the frequency and duration of Freelain's absences in practice is an acceptable proffered justification.

director proffers here. Freelain has not presented anything from the record to suggest that the proffered justifications were not the Village's true motivating reasons for ordering the in-depth evaluation.

### 7.     *FMLA Extension Request*

Freelain says the Village's unexplained delay in granting his request for an FMLA extension to continue caring for his wife resulted in him running out of FMLA leave again and him returning to work even though he needed to be at home caring for his wife. He believes this delay was an act of retaliation by the Village. As support, Freelain only points to evidence of the delay itself. The undisputed record shows that the Village responded to Freelain within ten days of his updated request and reconfirmed its approval. [128] ¶ 42.[9] Freelain provides no authority for his proposition that a delay in the Village's granting of his updated FMLA request could be an adverse employment action. Nor does Freelain point to any evidence in the record that could support an inference of a causal connection between the delay and Freelain's protected activity.

### 8.     *Pressing Charges Against Vardal*

Freelain argues that the opportunity to file criminal charges or an internal complaint is a right routinely given to his fellow officers and that it was only in retaliation that the Village refused to allow him to file such charges against Vardal. He offers no citations to the record to support this supposedly routine right, though.

---

[9] The Village also notes that the FMLA's implementing regulations only require an initial eligibility notice and one notice of designation in response (per 12-month period), 29 C.F.R. § 825.300(b), (d); thus, it was not legally required to respond to Freelain's updated request.

Being denied the opportunity to file a complaint about a single occurrence did not affect the terms and conditions of Freelain's employment. Thus, it was not a materially adverse employment action.

Although Freelain refers to other officers having the right to file such complaints, he does not identify any specific officers, nor does he show how those officers were similarly situated to him. Without such evidence, there is no support for an inference that the Village treated Freelain less favorably than it would treat an officer who had not taken protected leave (or not complained about harassment) and subsequently asked to file these complaints. In sum, Freelain has not pointed to any evidence of a causal connection between his protected activity and the Village's decision here.

Moreover, the Village explains that Freelain's position and actions with respect to supposed battery by Vardal "looked unusually extreme," [141] at 18, because an outside agency investigated the allegations and concluded that Freelain's complaints were not substantiated. [142] ¶ 13. Furthermore, the deputy chief testified that the Cook County State's Attorney Office of Public Integrity reviewed Freelain's case against Vardal and affirmed the finding that there was no aggravated battery. [99-3] at 80:13–22. From the Village's perspective, there was no reason to file criminal charges or an internal complaint on Freelain's uncorroborated claims. In response, Freelain only claims that the investigation was a sham. Since Freelain presents no evidence as to how the Village's reasons for not

allowing him to file criminal charges or an internal complaint were a pretext, there is no evidence that the Village engaged in retaliation.

### 9. *The Retaliation Claim as a Whole*

The analysis does not end by concluding that each of the complained-of actions are insufficient, on their own, to support a retaliation claim under the FLMA or the ADA. Pieces of evidence should not be evaluated in isolation, but as a whole. *Ortiz*, 2016 WL 4411434 at *3–4. The sum of the parts here is an unfortunate series of administrative errors and delays in accounting for Freelain's absences that caused a temporary loss of pay and forced Freelain to choose between losing more pay and abandoning his sick wife to return to work, but did not, in the end, affect Freelain's job. Freelain was frustrated and disappointed, but even if in combination the Village's actions were materially adverse, there is no evidence to tie these acts to Freelain's protected activity.

This is not a case where there is a suspicious pattern of retaliatory behavior; rather, the record shows a series of employer mistakes within a period of time that the employer corrected. It then successfully avoided committing the same or similar errors going forward. The evidence that Freelain was never demoted from his rank at the Village, despite his absences, [128] ¶ 57, that his evaluation scores increased after his FMLA leave, [128] ¶ 79, and that he is still employed with the Village as a police officer, [128] ¶ 1, is probative of a functioning and non-retaliatory working relationship. Further, when considering the evidence that the Village corrected all of its errors and restored Freelain's bank of sick and vacation time, there is no

inference of retaliatory intent. The Village is entitled to summary judgment on Freelain's FMLA and ADA retaliation claims.

## B.    FMLA Interference

Under the FMLA, it is unlawful for an employer to interfere with an employee's exercise or attempt to exercise any FMLA rights. 29 U.S.C. § 2615(a)(1). An FMLA interference claim requires proof that: (1) the employer was eligible for FMLA protections; (2) the employer was covered by the FMLA; (3) the employee was entitled to take leave under the FMLA; (4) the employee provided sufficient notice of intent to take leave; and (5) the employer denied FMLA benefits to which the employee was entitled. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015). Only the fifth element is at issue here. Freelain did not come forth with any admissible evidence to rebut the undisputed fact that the Village granted each and every one of Freelain's FMLA requests. Therefore, the Village is entitled to judgment as a matter of law that Freelain was not denied any FMLA entitlements. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 223 (7th Cir. 2015). The Village's summary judgment motion as to Freelain's FMLA interference claim is granted.

## C.    ADA Discrimination

The ADA prohibits employers from discriminating against their employees "on the basis of disability." 42 U.S.C. § 12112(a); *Wheatley v. Factory Card and Party Outlet*, 826 F.3d 412, 417 (7th Cir. 2016). A disability discrimination claim under the ADA requires the employee to show: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job; and (3) the employer took an

adverse employment action against him because of his disability. *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 286–87 (7th Cir. 2015). Only the third element is at issue here. As discussed above, the complained-of actions by the Village do not qualify as adverse employment actions. Moreover, as with his retaliation claim, Freelain has not identified any evidence of causation—evidence to suggest that the Village made its decisions because of Freelain's disability. The evidence is that the Village obtained information about Freelain's ability to perform his job and acted accordingly. Therefore, summary judgment on Freelain's ADA discrimination claim is proper.

## IV.    State-Law Claims

In Count V, Freelain alleged a cause of action against Vardal and the Village (as Vardal's employer) under the Illinois Gender Violence Act. 740 ILCS 82/5, 10. In Count VI, he alleged a cause of action against Vardal under Illinois assault and battery laws. In a separate motion, [148], the Village moved for summary judgment on Count V. The Village filed that motion after the deadline for dispositive motions and without the court's permission. That motion is denied as untimely.

Jurisdiction over both state-law claims is supplemental to the federal claims. 28 U.S.C. § 1367(a). Since the Village prevailed at summary judgment on the federal claims, the state-law claims should be dismissed without prejudice. 28 U.S.C. § 1367(c)(3); *Ridings*, 537 F.3d at 772 (7th Cir. 2008) ("Generally, when a court resolves all federal claims before trial, it should dismiss supplemental claims without prejudice") (citing *Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007)). Accordingly, the state-law claims are dismissed without prejudice.

## V.     Conclusion

The Village's motion for summary judgment, [97], is granted. Its motions to strike, [144], and for summary judgment on the Illinois Gender Violence Act claim, [148], are denied. The state-law claims are dismissed without prejudice. Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: 11/3/2016